**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Monette Farms Ltd., *et al.*,[1]<br><br>Debtors in a Foreign Proceeding. | Chapter 15<br><br>Case No. 26-10547-LSS<br><br>(Joint Administration Requested) |

**DECLARATION OF JEFFREY OLIVER AS CANADIAN COUNSEL TO THE
DEBTORS IN SUPPORT OF THE DEBTORS' CHAPTER 15 PETITIONS AND
REQUESTS FOR CERTAIN RELATED RELIEF
PURSUANT TO CHAPTER 15 OF THE BANKRUPTCY CODE**

I, Jeffrey Oliver, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the law of the United States, as follows:[2]

1.      I am a partner of the Canadian law firm of Cassels Brock & Blackwell LLP, Suite 3700, Bankers Hall West, 888 3rd Street SW, Calgary, AB T2P 5C5 Canada.  I am counsel to the above-captioned Debtors (the "Debtors"), who are the subject of proceedings (the "Canadian Proceedings") under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as amended, the "CCAA") that are currently pending before the Court of King's Bench of Alberta (the "Canadian Court").

---

[1] The Debtors in these Chapter 15 cases, along with the last four digits of each Debtor's U.S. Federal Employer Identification Number ("FEIN") or Canada Revenue Agency Business Number ("BN"), are: Monette Farms Ltd. (BN 0221); Monette Land Corp. (BN 9609); DMO Holdings Ltd. (BN 3689); Goat's Peak Winery Ltd (BN 0281); Monette Farms BC Ltd. (BN 3314); Monette Farms Ontario Corp. (BN 3538); NexGen Seeds Ltd. (BN 3684); Monette Produce Ltd. (BN 0959); Monette Seeds Ltd. (BN 5307); Monette Farms Land GP Ltd. (BN 9220); Monette Farms Land II GP Ltd. (BN 2423); Monette Farms BC GP Ltd. (BN 0958), DMO Holdings USA, Inc. (FEIN 7641); 1012595 DE Inc. (FEIN 4459); Monette Seeds USA LLC (FEIN 7430); Monette Farms Arizona, LLC  (FEIN 4502); Monette Farms USA, Inc. (FEIN 2442); Monette Produce, LLC (FEIN 9419).  The Debtors' executive headquarters are located at: 280023 Range Road 14, Rocky View County, AB T4B 4L9, Canada.  The Foreign Representative's service address for purposes of these Chapter 15 Cases is 520 5th Ave SW, Suite 1610, Calgary, AB T2P 3R7, Canada.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Verified Petition filed contemporaneously herein.

2.      I submit this declaration (the "Declaration") in support of the *Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief under Chapter 15 of the Bankruptcy Code* (together with the Official Form 401 Petition for each Debtor, collectively, the "Chapter 15 Petitions") and in connection with the relief requested by FTI Consulting Canada Inc. ("FTI"), in its capacity as the court-appointed monitor (in such capacity, the "Monitor") and authorized foreign representative (in such capacity, the "Foreign Representative") for the Debtors set forth in the *Foreign Representative's Motion for Provisional Relief* (the "Provisional Relief Motion"), each filed concurrently herewith in these chapter 15 cases (the "Chapter 15 Cases"), and to aid the United States Bankruptcy Court for the District of Delaware (the "Court") in understanding Canadian law pursuant to the CCAA.

3.      If I were called upon to testify, I could and would testify competently to the statements set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

4.      In this Declaration, after describing my background and qualifications, I provide a description of Canadian law and the practice relevant to this Court's consideration of the Chapter 15 Petitions.

5.      In preparing this Declaration, I have reviewed (i) the Chapter 15 Petitions, (ii) the documents submitted in the Chapter 15 Cases and (iii) the applicable provisions of the CCAA and other provisions of Canadian law that I consider relevant to the Chapter 15 Cases.

**PROFESSIONAL BACKGROUND AND QUALIFICATIONS**

6.      I attended Queens University where I graduated with a Bachelor of Law.  I was admitted to the British Columbia Bar in 2002, and to the Alberta Bar in 2011.

7.      I have extensive experience in the field of Canadian corporate reorganization and insolvency law, advising debtor corporations and large corporate groups, lenders, creditors, court-

2

appointed officers (e.g., CCAA monitors), investors, and acquirers in CCAA proceedings, receiverships, bankruptcy, as well as under federal and provincial corporate and/or insolvency legislation in both Canada and international contexts.

8.      My expertise in Canadian restructuring law has been recognized by different publications, including *Canadian Legal Lexpert Directory*, *Chambers Canada*, *Best Lawyers in Canada*, and *Benchmark Litigation*.  I am also a Fellow of INSOL International, a worldwide federation of national associations for accountants and lawyers who specialize in turnaround and insolvency, and a member of the Insolvency Institute of Canada.

### STATEMENT OF CANADIAN LAW AND PRACTICE

9.      The CCAA provides for a court-supervised reorganization procedure designed to enable financially distressed companies to avoid foreclosure or seizure of assets while maximizing the company's value as a going concern for the benefit of creditors and other parties in interest.

10.      A CCAA proceeding is a voluntary insolvency proceeding in which a debtor reorganizes or liquidates its business and distributes proceeds to creditors under court supervision. The debtor's assets and affairs are subject to the supervision of the court during the pendency of a CCAA proceeding.

11.      In a CCAA proceeding, absent exceptional circumstances, a debtor's management and board of directors remain in place, and the board maintains its power under Canadian law to approve significant actions, including disposing of important assets, borrowing significant amounts, or changing corporate structures, subject to oversight by a court-appointed monitor (discussed below) and approval of the court.

12.      Upon the commencement of a CCAA proceeding, the court will appoint a qualified monitor (*see Companies' Creditors Arrangement Act*, RSC 1985, c C-36, s 11.7) who functions

as an independent court officer and observer of the CCAA proceeding and the debtor's business and (i) monitors the company's ongoing operations, (ii) reports to the court on any major events affecting the company, (iii) notifies the company's creditors and, if applicable, shareholders of any meetings and tabulates votes at these meetings, if held, (iv) assists with preparing, filing, and holding meetings for voting on the plan of arrangement, (v) approves the disclaimer of contracts and leases, (vi) may prepare reports in conjunction with any interlocutory motions by the company or other stakeholders, and (vii) prepares a report on the plan of arrangement, which is usually included in the mailing of the plan, if one is filed. *See Companies' Creditors Arrangement Act*, RSC 1985, c C-36, s 23. The court-appointed monitor acts as the "eyes and ears of the court." Consent of the monitor is generally not required for the debtor to manage its business, including the sale of assets in the ordinary course, but the monitor may request that the court enjoin any actions that may prove harmful to the debtor and/or its creditors. Though the monitor need not formally approve significant transactions such as asset sales outside of the ordinary course[3], court approval is generally required for such transactions, and the court gives weight to the monitor's recommendations concerning such transactions. *See Companies' Creditors Arrangement Act*, RSC 1985, c C-36, s 36(1) and (3).

13.    Where a CCAA proceeding involves foreign assets, the court may appoint a foreign representative to apply to a court in a jurisdiction outside Canada to seek recognition of the Canadian proceedings on behalf of the debtor company.

14.    Upon the commencement of a CCAA proceeding, all actions against the debtor and its assets are stayed, wherever located (similar to the Bankruptcy Code's automatic stay). *See Companies' Creditors Arrangement Act*, RSC 1985, c C-36, s 11.02. This stay goes into effect

---

[3] *Companies' Creditors Arrangement Act*, RSC 1985, c C-36, s 23(1)(i).

upon the entry of an interim order and is first granted for a maximum period of 10 days. *See Companies' Creditors Arrangement Act*, RSC 1985, c C-36, s 11.02(1). The relief granted by the court within such 10-day timeframe is limited to relief that is reasonably necessary for the continued operations of the debtor in the ordinary course of business. *See Companies' Creditors Arrangement Act*, RSC 1985, c C-36, s 11.001

15.     The initial stay period is typically extended beyond the 10-day period by an order that amends and restates the initial order, called an amended and restated initial order. This order will be granted where the debtor can show it continues to act with good faith and due diligence. Extensions beyond the initial order day-10 stay are typically several weeks to several months in length and often align with further relief or milestones applicable in the case. There is no limit on the number or duration of these extensions to the stay. *See Companies' Creditors Arrangement Act*, RSC 1985, c C-36, s 11.02(2).

16.     A CCAA proceeding is flexible in its structure and allows the debtor the ability to arrange the proceedings in a manner which best addresses its operational and financial issues. For example, CCAA proceedings can address financial distress through court-approved asset sales, share sales or investments, or plans of arrangement. Throughout a CCAA proceeding, the court retains broad discretion to "make any order that it considers appropriate in the circumstances." *See Companies' Creditors Arrangement Act*, RSC 1985, c C-36, s 11.

17.     The CCAA also provides tools to address operational inefficiencies. As is the case in the United States chapter 11 process, the debtor will usually continue to operate during the CCAA proceedings, and it may also avail itself of restructuring measures (such as the disclaimer of onerous executory contracts) to enhance the prospects of bringing forward a successful plan of

arrangement or other restructuring transaction. *See Companies' Creditors Arrangement Act*, RSC 1985, c C-36, s 32(1)–(3).

18.     In a CCAA proceeding, subject to limited exceptions, clauses triggering termination rights upon the debtor's commencement of an insolvency proceeding are not enforceable, so contract counterparties may not terminate contracts solely by virtue of the commencement of the CCAA proceeding. *See Companies' Creditors Arrangement Act*, RSC 1985, c C-36, s 34(1).

19.     The assets of a business may also be sold outside of a CCAA plan, and outside of the ordinary course of business, without the formal approval of its creditors provided the company obtains prior authorization from the court. *See Companies' Creditors Arrangement Act*, RSC 1985, c C-36, s 36(1). One way to facilitate a sale of assets this way is to conduct a sales and investment solicitation process ("SISP"), with the successful bids identified remaining subject to CCAA court approval.

20.     The CCAA requires the court to consider certain factors when granting authorization of the sale or disposition of assets including: (i) whether the process leading to the proposed sale or disposition was reasonable in the circumstances; (ii) whether the monitor approved the process leading to the proposed sale or disposition; (iii) whether the monitor filed with the court a report stating that in their opinion the sale or disposition would be more beneficial to the creditors than a sale or disposition under a bankruptcy; (iv) the extent to which the creditors were consulted; (v) the effects of the proposed sale or disposition on the creditors and other interested parties; and (vi) whether the consideration to be received for the assets is reasonable and fair, taking into account their market value. *See Companies' Creditors Arrangement Act*, RSC 1985, c C-36, s 36(3)(a)–(f).

21.     When granting approval of a successful bidder under the SISP, the court may authorize the sale or disposal of assets free and clear off any security, charge or other restriction. *See Companies' Creditors Arrangement Act*, RSC 1985, c C-36, s 36(6).  If it does, it also orders that the proceeds of the sale or disposition be subject to a security or charge in favor of creditors whose security or charge is affected by the order.  *See Companies' Creditors Arrangement Act*, RSC 1985, c C-36, s 36(6).

22.     A plan of arrangement is one of the possible outcomes of a process under the CCAA.  For a plan of arrangement to be binding on each class of creditors, a majority of the proven creditors in that class, by number, together with two-thirds (2/3) of the proven creditors in that class, by dollar value, must approve the plan presented to them.  If a class of creditors approves the plan, it is binding on all creditors within the class, subject to the court's approval of the plan. If all the classes of creditors approve the plan, the court must then approve the plan as a final step. *See Companies' Creditors Arrangement Act*, RSC 1985, c C-36, s 6(1).  Upon court approval, the debtor will proceed in accordance with the plan until all requirements thereunder are satisfied.

23.     In a CCAA Proceeding, a debtor can obtain postpetition financing (i.e., DIP financing), subject to a hearing and court approval.  *See Companies' Creditors Arrangement Act*, RSC 1985, c C-36, s 11.2.  Where DIP financing has been granted under an initial order, the amounts drawn must be appropriate in the circumstances and be limited strictly to the amount required during the stay.  Debtors have been able to obtain court approval of postpetition financing on the basis of a term sheet. *See, e.g., U.S. Steel Canada Inc., Re,* 2014 ONSC 6145 (¶¶ 4 and 18); *In the Matter of a Plan of Arrangement of the UrtheCast Corp.*, 2020 BCSC 2012 (¶ 25).  The court may approve priority charges against the debtor's assets in respect of the DIP financing, which may take priority over existing secured creditors, where notice of the charge approval

hearing is given to the potentially affected creditors and the court is of the opinion that such charges are appropriate in the circumstances. *See Companies' Creditors Arrangement Act*, RSC 1985, c C-36, s 11.2(1).

## THE DEBTORS' CANADIAN PROCEEDINGS

24.     On April 17, 2026, the Debtors commenced the Canadian Proceedings pursuant to the CCAA, and the Canadian Court entered an initial order (the "Initial Order")[4] on April 21, 2026, granting certain initial relief in connection with the Canadian Proceedings. A true and correct copy of the Initial Order is attached to the *Declaration of Deryck Helkaa in Support of (I) Debtors' Verified Petition for (A) Recognition of Foreign Main Proceedings, (B) Recognition of Foreign Representative, and (C) Related Relief Under Chapter 15 of the Bankruptcy Code and (II) Foreign Representative's Motion for Provisional Relief*, filed concurrently herewith. The Canadian Proceedings are designed for the benefit of all creditors, and no creditor of the Debtors is prohibited from participating in the Debtors' restructuring efforts in the Canadian Proceedings. In addition, affected creditors are entitled to appear and be heard before the Canadian Court in the course of the Debtors' court-supervised sale and investment solicitation process. The objective of the Canadian Proceedings is to evaluate, implement, and pursue, as appropriate, an orderly sale and investment solicitation process under the supervision of the Canadian Court for the benefit of creditors. Any potential plan of compromise or arrangement would allow the Debtors to improve their balance sheet and, among other things, would permit the Debtors to renegotiate or disclaim unfavorable contracts pursuant to section 32 of the CCAA.

---

[4] Capitalized terms used in this section but not otherwise defined herein shall have the meaning ascribed to them in the Initial Order. To the extent of any inconsistency between the descriptions of the Initial Order set forth herein and the provisions of the Initial Order, the Initial Order shall govern.

25.     Below is a summary of certain provisions of the Initial Order that are relevant to the relief sought by the Foreign Representative in this chapter 15 case.

26.     **Appointment of Monitor and Foreign Representative.**   The Initial Order appoints FTI as the Monitor and authorizes and empowers FTI to act as the Foreign Representative for the Debtors for the purpose of having the Canadian Proceedings recognized under chapter 15 of the Bankruptcy Code.  *See* Initial Order ¶¶ 26, 46.

27.     **Stay of Proceedings.**  The Initial Order provides that, until and including May 1, 2026, or such later date ordered by the Court (the "Stay Period") enforcement actions and proceedings are stayed as to the Debtors, certain non-Debtor affiliates[5] (together with the Debtors, the "Group"), the Monitor, and the Debtors' directors and officers with a number of protections. Specifically:

- **No Proceedings Against the Group or the Property.**  The Initial Order provides that, during the Stay Period, no Proceeding in any court shall be commenced against or in respect of the Group or the Monitor or affecting the Business or the Property, except with leave of the Court, and staying any and all Proceedings currently under way against or in respect of the Group or affecting the Business or the Property.  *Id*. ¶ 16.

- **Non-Debtor Stay Parties.**  Pursuant to paragraph 3 of the Initial Order, the Canadian Court found that the Non-Debtor Stay Parties (Monette Farms Land I LP, Monette Farms Land II LP, and Monette Farms BC LP) are integrally related to the Debtors' business and granted the Non-Debtor Stay Parties the same benefits, protections, duties, obligations, and authorizations provided to the Debtors in the Initial Order, and deemed all property and business of the Non-Debtor Stay Parties to be included within the property and business of the Debtors, notwithstanding that none of these entities are a "company" pursuant to the CCAA.  *Id.* ¶ 3.  Under Canadian law, a court supervising CCAA proceedings has broad jurisdiction pursuant to section 11 of the CCAA to extend stay protection to non-debtor entities that are integrally related to the debtor's business where such protection is necessary to preserve the value of the debtor's enterprise and facilitate an orderly restructuring.  The Canadian Court's extension of stay protection to the Non-Debtor Stay Parties reflects its determination that those entities are so operationally and financially integrated with the Debtors that enforcement actions against them

---

[5] These non-Debtors include Monette Farms Land I LP, Monette Farms Land II LP, and Monette Farms BC LP.

would directly undermine the Canadian Proceedings and the value of the Debtors' assets.

- **No Exercise of Rights or Remedies.**  During the Stay Period, the Initial Order stays all rights and remedies of any Person against or in respect of the Group or the Monitor, or affecting the Business or the Property, except with leave of this Court, subject to certain exceptions.  *Id*. ¶ 17.

- **Proceedings Against Officers and Directors.**  During the Stay Period, the Initial Order provides that, except as permitted by subsection 11.03(2) of the CCAA and paragraph 18 of the Initial Order, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the Debtors with respect to any claim against the directors or officers that arose before the date of the Initial Order and that relates to any obligations of the Debtors whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Debtors, if one is filed, is sanctioned by this Court or is refused by the creditors of the Debtors or the Canadian Court.  *Id*. ¶ 22.

28.    **Interim DIP Financing.**  The Initial Order authorizes and empowers the Group to obtain and borrow under a credit facility from the DIP Lenders in accordance with the terms and conditions of the DIP Term Sheet[6] in order to finance the Group's working capital requirements and other general corporate purposes and capital expenditures, provided that the initial advance under such facility shall not exceed $40,000,000[7] unless permitted by further order of the Canadian Court.  *Id*. ¶ 34.

29.    **Charges.**  The Initial Order grants the following charges:

- **Administration Charge.**  The Initial Order granted the Monitor, counsel to the Monitor, the Group's counsel, and the Syndicate's Financial Advisor, as security for the professional fees and disbursements incurred both before and after the granting of the Initial Order, a charge (the "Administration Charge") on the Property, which charge shall not exceed an aggregate amount of $1,500,000, as security for their professional fees and disbursements incurred at the normal rates and charges of the Monitor, counsel to the Monitor, the

---

[6] "DIP Term Sheet" means the Senior Secured Debtor-In-Possession Interim Financing Term Sheet Agreement, between Monette Farms Ltd., and Monette Farms USA, Inc., as Borrowers, the Group, as Guarantors, The Bank of Nova Scotia, as DIP Agent, and the DIP Lenders, as lenders, each as defined therein, dated as of April 17, 2026.

[7] Unless otherwise stated, all monetary denominations shall be in lawful currency of Canada.

Group's counsel, and the Syndicate's Financial Advisor, both before and after the making of the Initial Order in respect of these proceedings. *Id*. ¶ 40.

- **DIP Lenders' Charge.** To secure all obligations under the DIP Term Sheet and the Definitive Documents, the Initial Order granted the DIP Lenders a charge in the amount of $95,000,000 (the full amount potentially available under the DIP Term Sheet) (the "DIP Lenders' Charge") on the Property. *Id*. ¶ 37.

- **Directors' Charge.** The Initial Order grants the Debtors' directors and officers a charge (the "Directors' Charge") on the Property, which charge shall not exceed an aggregate amount of $1,500,000, as security for the indemnity provided in paragraph 23 of the Initial Order.

30. **No Interference with Rights.** The Initial Order provides that during the Stay Period, no Person shall accelerate, suspend, discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Group, except with the written consent of the Group and the Monitor, or leave of this Court. *Id*. ¶ 19.

31. The Debtors have requested a "Comeback Hearing" for May 1, 2026, where they will seek an Amended and Restated Initial Order that superseded the Initial Order. It is contemplated that the Amended and Restated Initial Order will, among other things, extend the Stay Period, increase the Administration Charge and Directors Charge, and increase the amount available under the DIP Credit Facility to $90,000,000 of principal.

11

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 22nd day of April 2026.

Calgary, Canada

/s/ Jeffrey Oliver
Jeffrey Oliver
Suite 3700, Bankers Hall West
888 3rd Street SW
Calgary, AB T2P 5C5 Canada