**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Monette Farms Ltd., *et al.*,[1]<br><br>Debtors in a Foreign Proceeding. | Chapter 15<br><br>Case No. 26-10547-LSS<br><br>(Joint Administration Requested) |

**DECLARATION OF DERYCK HELKAA IN SUPPORT OF (I) DEBTORS' VERIFIED PETITION FOR (A) RECOGNITION OF FOREIGN MAIN PROCEEDINGS, (B) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (C) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE AND (II) FOREIGN REPRESENTATIVE'S MOTION FOR PROVISIONAL RELIEF**

I, Deryck Helkaa, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the law of the United States, as follows:[2]

1.     I am a Senior Managing Director, Corporate Finance and Restructuring, at FTI Consulting Canada, Inc. ("FTI"). I hold a B.A. in economics from the University of Western Ontario. I am a Licensed Trustee in Bankruptcy, a Chartered Insolvency and Restructuring Professional, and a Chartered Professional Accountant. I am a member of the Canadian Association of Insolvency and Restructuring Professionals, Insolvency Institute of Canada, and Turnaround Management Association. I have more than 25 years of experience providing transaction and restructuring advisory services to companies and their stakeholders, including

---

[1] The Debtors in these chapter 15 cases, along with the last four digits of each Debtor's U.S. Federal Employer Identification Number ("FEIN") or Canada Revenue Agency Business Number ("BN"), are: Monette Farms Ltd. (BN 0221); Monette Land Corp. (BN 9609); DMO Holdings Ltd. (BN 3689); Goat's Peak Winery Ltd (BN 0281); Monette Farms BC Ltd. (BN 3314); Monette Farms Ontario Corp. (BN 3538); NexGen Seeds Ltd. (BN 3684); Monette Produce Ltd. (BN 0959); Monette Seeds Ltd. (BN 5307); Monette Farms Land GP Ltd. (BN 9220); Monette Farms Land II GP Ltd. (BN 2423); Monette Farms BC GP Ltd. (BN 0958), DMO Holdings USA, Inc. (FEIN 7641); 1012595 DE Inc. (FEIN 4459); Monette Seeds USA LLC (FEIN 7430); Monette Farms Arizona, LLC  (FEIN 4502); Monette Farms USA, Inc. (FEIN 2442); Monette Produce, LLC (FEIN 9419). The Debtors' executive headquarters are located at: 280023 Range Road 14, Rocky View County, AB T4B 4L9, Canada. The Foreign Representative's service address for purposes of these chapter 15 cases is 520 5th Ave SW, Suite 1610, Calgary, AB T2P 3R7, Canada.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Verified Petition filed contemporaneously herein.

representing creditors, lenders, shareholders, management, and boards of directors in both formal and out-of-court restructurings and cross-border cases.  I have industry experience in agriculture and farming, and FTI has been engaged as financial advisor to the Company since April 2025 to assist with their restructuring efforts.  My office is at 520 5th Ave SW Suite 1610 Calgary, AB, T2P 3R7 Canada.

2.      FTI acts as the court-appointed monitor (in such capacity, the "Monitor") and authorized foreign representative (in such capacity, the "Foreign Representative") for the above caption debtors (collectively, the "Company" or the "Debtors") in the Canadian proceedings (the "Canadian Proceedings") commenced under the *Companies' Creditors Arrangement Act,* R.S.C. 1985, c. C-36 (as amended, the "CCAA"), pending before the Court of King's Bench of Alberta (the "Canadian Court").  I am authorized to provide this declaration (the "Declaration") on behalf of the Foreign Representative and each of the Debtors.

3.      I submit this Declaration in support of (a) the *Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Verified Petition"), and (b) the *Foreign Representative's Motion for Provisional Relief* (the "Provisional Relief Motion").

4.      As Monitor, I have investigated the business and affairs of the Debtors to the best of my ability since my engagement on this case, and make this Declaration based on that investigation.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management and professionals, learned from my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' industry, operations, and my experience as a Licensed Trustee in Bankruptcy, a Chartered Insolvency and Restructuring Professional, and

a Chartered Professional Accountant.  If upon called to testify, I could and would testify to the facts set for in this Declaration.

## BACKGROUND

### A. The Debtors' Business Operations

5. The Debtors' business was founded in 1912 as a family farm focused on grain operations in Swift Current, Saskatchewan.  The Debtors experienced significant growth through a series of strategic land acquisitions beginning in approximately 2004.  The Company now operates one of the largest private farming operations in North America with farmland spanning the provinces of Alberta, British Columbia, Manitoba, and Saskatchewan, and the States of Arizona, Colorado, and Montana.

6. The Debtors credit their expansion to upholding strong values, preserving a family farm atmosphere, and leveraging advanced technology to modernize farming practices.  The business is focused on grain production which represented 60% of revenue in 2024 and 55% of revenue in 2025.  The Company is also engaged in the farming of produce, particularly seasonal items such as carrots, squash, broccoli, cabbage, pumpkin, and watermelon, as well as in the cattle ranching, and seed processing sectors.  Additionally, the Company has significant cattle operations including both feeder and breeding cattle and over 43,000 acres of ranchland in British Columbia.  The cattle operations accounted for approximately 17% of revenue in 2025.

7. Starting in 2019, the Debtors expanded their business outside of Canada and into the United States, acquiring operations and or land in Arizona, Montana, and Colorado.  However, the Debtors' chief place of business is Alberta where its management operates, its main bank accounts are located, and debt agreements are legally governed.  The major farming operations are in Saskatchewan (grain) and British Columbia (cattle) with further land in Manitoba and Alberta.

8.    Farming is a capital-intensive business, especially for extensive private operations like that of the Debtors.  To maintain profitability, the Company must oversee distinct seeding and cattle processes (the "Seeding Operations" and the "Cattle Operations").

9.    Seeding Operations begin in April with the chemical treatment of soil and seed processing.  Managing the appropriate timing of this work is essential and complex, requiring the coordination of multiple suppliers and farms to maximize yield.  As a result of the numerous inputs Debtors must expend to effectively seed their farmland, Seeding Operations cost in excess of $40 million.[3]  The Debtors' long-term and current year's performance depends on the productivity of its farmland.  The Debtors believe that if they are able to access liquidity to seed their farmland, they will generate revenue and Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") broadly aligned with previous years.

10.    The Debtors' Cattle Operations are similarly seasonal and input intensive.  The Company manages feeder cattle and breeding cattle.  Each of these segments involves substantial acreage and feedstock.  The profitability of the Cattle Operations depends on continued ranch use and on providing sufficient time for cattle to breed herds.  Any interruption to these processes causes significant value loss.

11.    The Debtors generate revenue through their various farming operations.  89% of the Company's revenue comes from Canadian farmland.  The Debtors' grain is generally sold to multinational corporations like Cargill, Parrish & Heimbecker, and Bunger, and its produce is bought by Loblaws, the Little Potato Company, and others.

12.    The Company also owns or leases substantial property (the "Real Property" and the "Leased Property").  The Debtors own approximately 274,000 acres of Real Property across

---

[3] Unless otherwise stated, all monetary denominations shall be in lawful currency of Canada.

4

Western Canada and the United States, lease approximately 175,000 acres of land in Canada, and an additional 43,000 acres in the United States.  The Debtors' Real Property tax payments are current, and their annual lease payments total approximately $29.4 million.  This amount covers over 196 farmland leases across Canada and the United States.  Provided that the Debtors are permitted to continue raising cattle on their ranches, the Company also holds title to grazing licenses covering 1.2 million acres of land.

13.     The Debtors' growth strategy historically relied on leverage, securing debt through Real Property and a capital facility described in more detail below.  This strategy was enabled by low interest rates and increasing property values.  Beginning in 2024, the Debtors' EBITDA declined as a result of expansion into lower-margin produce and cattle sectors as well as poor farming conditions.  Furthermore, property values remained flat while interest rates increased materially.  As a result, and despite the underlying value of its operations, the Company became overleveraged.

14.     The Debtors pursued various strategies to reduce indebtedness while preserving enterprise value, including equity financing processes and a sale of certain of its farming operations.  Given ongoing pressure, however, these efforts were ultimately insufficient to solve the Debtors' liquidity problems.  As a result, the Debtors, supported by a syndicate of lenders (together, the "Syndicate"), require urgent liquidity to maximize the profitability of their upcoming growing season.

**B.**     **Corporate Structure and Business Operations**

15.     As shown in the organizational chart below, the Debtors' corporate structure consists of five (5) parent corporations (collectively, the "TopCos"): Monette Farms Ltd. ("Monette Farms"), Monette Land Corporation ("Monette Land"), DMO Holdings Ltd. ("DMO

Holdings"), Goat's Peak Winery Ltd. ("Goat's Peak Winery"), and Monette Farms BC Ltd. ("Monette Farms BC"). Darrel Monette is the sole and direct shareholder of each of the TopCos except for Monette Farms whose ownership is shared among Darrel Monette, who holds 100% of the preferred shares, and the Monette Farms Family Trust, which holds 100% of the common shares.



16.     Substantially all of the Debtors' corporate governance functions and directors are domiciled in Alberta. The Debtors' corporate headquarters is located at 280023 Range Road 14, Rocky View County, AB T4B 4L9, Canada.

17.     Monette Farms is a Canadian company formed via amalgamation under Saskatchewan's *Business and Corporations Act*, SS 2021, c. 6 ("SBCA"). Monette Farms is the 100% owner of six (6) Canadian subsidiaries: Monette Farms Ontario Corp., NexGen Seeds Ltd., Monette Produce Ltd., Monette Seeds Ltd., Monette Farms Land GP Ltd., and Monette Farms Land GP II Ltd. Monette Farms has approximately 47 salaried employees and 158 hourly

employees based in Canada.

18.     Monette Land is a Canadian company formed under the SCBA in March 2022 and has no subsidiaries.

19.     DMO Holdings oversees the Debtors' U.S. operations.  DMO Holdings is a Canadian company incorporated under the SCBA.  DMO Holdings is the majority and sole voting shareholder of 1012595 DE Inc., a Delaware corporation.  DMO Holdings is the 100% owner of its sole direct subsidiary, DMO Holdings USA, Inc. ("DMO USA").

20.     DMO USA is the 100% owner of four (4) subsidiaries: Monette Seeds USA, LLC, Monette Farms Arizona, LLC, Monette Farms USA Inc., and Monette Produce, LLC (together with DMO USA and 1012595 DE Inc., the "USA Entities").  The Debtors employ an average of 31 employees across the USA Entities.  A substantial portion of Monette Seeds USA LLC's seed processing capacity is dedicated to processing seed destined for planting on the Group's Canadian farmlands.

21.     Goat's Peak Winery is a Canadian company incorporated in British Columbia under the *British Columbia Business Corporations Act* ("BCBCA").  Goat's Peak Winery historically operated a winery in Cache Creek, British Columbia.  Today, there remains $3 million of property, wine barrels, and other equipment in Goat's Peak Winery's possession.

22.     Monette Farms BC is a Canadian company formed via amalgamation under the BCBCA.  Monette Farms BC owns a series of cattle ranches in British Columbia.  It is also the 100% owner of Monette Farms BC GP Ltd.

23.     The working capital of all subsidiaries, including the USA Entities, is funded by Monette Farms.  Some of the USA Entities hold accounts denominated in Canadian funds which supports the Debtors' cross-border operations.  The USA Entities depend on transfers from

Monette Farms to operate.

**C.     The Debtors' Capital Structure**

**(i)     The Senior Facilities Agreement**

24.     On December 5, 2018, Monette Farms, Monette Farms USA, and Darrel Monette as borrowers, each of the Debtors as guarantors, and the Bank of Nova Scotia ("Scotiabank") as agent, entered into the senior facilities agreement (the "Senior Facilities Agreement") with the Syndicate.  Under the Senior Facilities Agreement, the Debtors have access to (i) a $180 million revolving credit facility for general corporate expenses, (ii) a $750 million revolving credit facility for certain capital expenditures, and (iii) a swingline facility with a maximum draw amount of $10 million (collectively, the "Senior Facilities").

25.     The Senior Facilities Agreement was most recently amended on April 15, 2024.

26.     The Senior Facilities Agreement is secured by security interests in the personal and Real Property of the Debtors pursuant to certain collateral agreements made on June 21, 2024.

27.     The Syndicate has supported the Debtors' operations and restructuring despite the occurrence of multiple events of default under the Senior Facilities Agreement.  Accordingly, the Syndicate has entered into two waiver and covenant agreements, eight amending agreements, and a forbearance agreement which provided opportunity for the Debtors to pursue restructuring efforts.

28.     On April 15, 2026, each of the Senior Facilities matured.  As a result, there is no further funding available to the Debtors under the Senior Facilities Agreement.  The Debtors have received several notices of default.

**(ii)     FCC Facility for Cattle Operations**

29.     As of the Petition Date, Monette Farms is indebted to Farm Credit Canada ("FCC") in the amount of approximately $11,809,862.49 plus interest, fees, and other amounts.

30.     Under the credit agreement dated December 4, 2024 (the "FCC Loan Agreement"), Monette Farms received a $30 million credit facility (the "FCC Facility").  The FCC Loan Agreement is secured by certain property, including all cattle purchased using proceeds from the FCC Facility, and any proceeds resulting from the same.  Each of the Debtors has also guaranteed the obligations of Monette Farms under the FCC Facility.

31.      On December 2, 2024, the Syndicate and FCC entered into an agreement providing FCC a priority security interest up to the amount of the FCC Facility.

32.     The FCC Loan Agreement matured on April 15, 2026.  The FCC issued demands and a notice to enforce security on April 16, 2026.  Given the necessity of liquidity, the Debtors are currently unable to satisfy the FCC demands.

**(iii)     Soderglen VTB**

33.     As of the Petition Date, Monette Farms is indebted to Soderglen Ranches Ltd. ("Soderglen") and Jane E. Grad in the amount of $16,666,500.00.

34.     On April 12, 2024, Monette Farms entered into a purchase and sale agreement with Soderglen and Jane E. Grad for Real Property located in Airdrie, Alberta (the "Airdrie Real Property").  The purchase was partially funded by a vendor take back debt obligation in an amount of $18 million (the "Soderglen VTB").  Currently $16,666,500 remains outstanding.  The Soderglen VTB is secured by a first ranking mortgage in the Airdrie property.  Failure to repay the Soderglen VTB entitles Soderglen and Ms. Grad to enforce and foreclose on the Airdrie Real Property.  Interest is incurred under the Soderglen VTB at a rate of Canadian Prime plus 2.0%.

9

35.     To facilitate the Soderglen VTB, the Debtors and the Syndicate initially amended the Senior Facilities Agreement to deem the Soderglen VTB as "Permitted Debt" under the Senior Facilities Agreement, provided that the Soderglen VTB had a maturity of less than 4 years from its incurrence.  However, pursuant to the forbearance agreement to the fifth amended Senior Facilities Agreement, dated November 7, 2025, the Syndicate removed the Soderglen VTB as a "Permitted Debt" because its maturity exceeded 4 years from its incurrence.  This removal resulted in an event of default under the Senior Facilities Agreement.

### (iv)    Other Secured Obligations

#### (a)     Real Property Leases

36.     The Debtors have a variety of additional secured obligations.  As noted above, Debtors lease farmland across Canada and the United States with annual rent costs totaling $29.4 million.  The Debtors' rent payments are due semi-annually.  As of the Petition Date, the Debtors have paid the majority of rent due in the spring.  I understand that the Company intends to pay its remaining rent due in October, approximately $13.2 million.

#### (b)     Scotiabank Bilateral Leased Equipment Loan

37.     Certain of the Debtors entered into a $10 million leasing facility on or around September 1, 2022 with Scotiabank (the "Bilat Equipment Agreement").

38.     The Bilat Equipment Agreement covers two loan facilities: (i) a facility secured against equipment for milling pea protein located in Lethbridge, Alberta and (ii) a facility secured against the Debtors' 2003 Raytheon Aircraft Company.  As of the Petition Date, the amounts outstanding under the two facilities are approximately $5,611,406.11 and $1,171,619.77, respectively.

**(c)** **Scotia New Life Policy Debt**

39.    As of the Petition Date, Darrel Monette and Monette Farms are indebted in the amount of approximately $7.7 million for individual sickness and accident insurance policies purchased from Sun Life Assurance Company of Canada and the Manufacturers Life Insurance Company, in respect of Darrel Monette, with Monette Farms as policy holder and beneficiary.  The maximum benefit under the policy net of the loan amount is approximately $130 million.  On initial issuance, Debtor Monette Farms Ontario Corp. incurred $12 million of debt to Scotiabank in connection with the issuance of the policy and payment of the initial premium thereunder (the "Scotia New Life Policy Debt").  Currently, there remains $7.7 million outstanding.  The life insurance policy has premiums of $2.1 million due on May 4, 2026.  The Scotia New Life Policy Debt is secured by way of assignment over the policy and is guaranteed by Darrel Monette.  The Scotia New Life Policy Debt incurs interest at Canadian Prime or CORRA plus a margin per annum and is repayable on demand.  The Scotia New Life Policy Debt is a "Permitted Debt" under the Senior Facilities Agreement.

**(d)** **Security Granted for Equipment Leasing and Security Registrations**

40.    As of the Petition Date, there are approximately 600 unique personal property registrations related to equipment as against the Debtors.  The majority of this secured equipment is financed through John Deere Financial ("John Deere").  Indeed, the Company has over 1,600 farming units leased from John Deere, subject to 481 registrations described as purchase-money-security interests ("PMSIs").

41.    I understand that most of the John Deere leases are paid up front for a period of 12 months.  The John Deere leases require annual payment of approximately $17.43 million.  Of this total, the Debtors have paid approximately $5 million and intend to pay the remainder when due.

11

42.     The Debtors have also financed certain farming equipment through third party financing arrangements.  As of the Petition Date, the Company is indebted in the amount of approximately $26 million under these arrangements.

43.     These arrangements are secured by collateral-specific security interests, including: (i) several registrations covering crops or crop inputs in respect of Monette Farms and NexGen Seeds Ltd., (ii) 12 registrations, inclusive of those securing the Bilat Equipment Agreement, in respect of approximately 51 units of equipment granted to Scotiabank as lender under the Bilat Equipment Agreement and as agent under the Senior Facilities Agreement, (iii) 21 serial-numbered or other registrations for the benefit of, among others, Meridian Onecap Credit Corp., Brandt Finance Ltd., Brandt Tractor Ltd., PNC Vendor Finance Corporation Canada, CNH Industrial Capital Canada Ltd., and Cangas Propane Inc. in respect of various farming and rural equipment.

**D.     The Debtors' Current Financial Performance**

44.     Despite their position as one of the largest private farming operations in North America, the Debtors have encountered financial and operational difficulties in recent years, largely owing to their expansion into lower margin agricultural sectors, including produce, underperforming farming operations caused by weather conditions andhigher input costs and overall commodity prices.

45.     Between 2017 and 2022, the Debtors' revenue increased from $45 million to $198 million through debt-driven expansion.  Over the same period, EBITDA increased from $20 million to $83 million.  However, in 2025 EBITDA fell to $37 million even as cultivated acreage increased.

46.     Defaults under the Senior Facilities Agreement began in October 2024, however issues began to accelerate in 2025.  The Debtors' projected EBITDA for 2025 was $72 million.

However, as a result of poor crop prices, increased input costs, and poor yields, EBITDA fell to approximately $37 million.

47.    Defaults under the Senior Facilities Agreement required amendments, including the appointment of FTI as financial advisor to the Debtor.  In cooperation with the Syndicate, the Debtors undertook to address liquidity issues and their obligations to creditors.  In particular, the Debtors prepared a deleveraging plan.  Under the plan, the Company successfully liquidated certain farmland in Regina, Saskatchewan for $41.18 million and in Montana for $47.5 million.  The Syndicate consented to the Debtors using the proceeds from these sales for working capital purposes as well as for partial repayment of the Senior Facilities.

48.    The Debtors continued to default under the Senior Facilities Agreement, requiring its amendment in November 2025 (the "Forbearance Agreement").  Shortly after entry into the Forbearance Agreement, the Debtors defaulted on deleveraging milestones included as requirements thereto.  Despite these multiple events of default, the Syndicate continued to provide access to its swingline credit facility on a discretionary basis.

49.    As part of the Forbearance Agreement, the Debtors were required to enter into certain sales to raise working capital and to partially repay the Senior Facilities Agreement (the "Sale Program").  The Sale Program was executed between approximately January 16, 2026, and March 1, 2026.  The Sale Program resulted in three sales across Saskatchewan totaling $84.78 million but was otherwise unsuccessful or deemed uneconomical.

50.    Despite the Debtors' efforts, they remain in default under the Senior Facilities Agreement.  As of the Petition Date, the Debtors owe approximately $1.08 billion in total liabilities.  $830 million of the current liabilities consist of obligations under the Senior Facilities Agreement.

13

51.     The value of the Debtors' assets is currently greater than its liabilities based on most recent appraised values and audited financial statements.

## EVENTS LEADING TO THE COMMENCMENT OF
## THE CANADIAN PROCEEDINGS

52.     Beginning in 2024, the Debtors faced significant obstacles which dampened their profitability despite the underlying value of the Company.  FTI assisted Debtors in preparing a cash flow projection to measure the Company's liquidity for the 13-week period beginning April 15, 2026.   These projections show an imminent liquidity need relating to the spring growing season.  Timely investment in the growing season is essential for the Debtors to profit from their agricultural production and farmland.

53.     The Debtors' current financial situation is the result of rising interest rates, higher crop input costs, high start-up costs associated with their expansion into the produce and cattle sectors, and poor crop results due to unfavorable weather conditions and commodity prices.  As a result, the Debtors are overleveraged and are in default under certain credit facilities and other financing arrangements.

## THE DEBTORS' DIP CREDIT FACILITY

54.     Prior to commencing the Canadian Proceedings, the Debtors entered into a term sheet, a copy of which is attached hereto as **Exhibit A** (the "DIP Term Sheet")[4], with Bank of Nova Scotia, as agent (in such capacity, the "DIP Agent"), and certain members of the Debtors' existing lender syndicate (the "DIP Lenders") for a senior secured super-priority debtor-in-possession revolving credit facility of up to $90,000,000 (the "DIP Credit Facility").  The DIP Credit Facility reflected the most viable option available to the Debtors on an executable timeline

---

[4] In the event of any inconsistency between the terms of the DIP Term Sheet and the summary provided herein, the DIP Term Sheet shall govern.

14

and on terms capable of supporting both (i) continuation of operations through the seeding season, and (ii) completion of a court-supervised sale and investment solicitation process in the Canadian Proceedings—to be filed at a subsequent court application—that will be designed to achieve the debt reduction milestones set out in the DIP Credit Facility.

55.     Critically, the DIP Term Sheet conditions the Debtors' ability to obtain advances under the DIP Credit Facility on, among other things, this Court's provisional recognition of (i) the Canadian Court's initial order granting relief to the Debtors, a copy of which is attached hereto as **Exhibit B** (the "Initial Order"), and (ii) upon its entry by the Canadian Court, an Amended and Restated Initial Order, including, in each case, giving full force and effect to the borrowings and charges authorized thereunder in the United States.  I understand that the DIP Lenders are unwilling to provide advances to the Debtors absent this Court provisionally giving full force and effect to those orders in the United States pending recognition of the Canadian Proceeding.

56.     Based upon my review of the Debtors' books and records, the Debtors do not have sufficient liquidity to finance the Canadian Proceedings without the additional financing provided by the DIP Credit Facility.  I believe that the terms of the DIP Credit Facility are fair and reasonable and were negotiated in good faith by the Debtors and the DIP Lenders and that the DIP Lenders would not have extended financing without the protections provided by section 364 of the Bankruptcy Code, made applicable by section 1519(a)(3) of the Bankruptcy Code.

### SUPPORT FOR VERIFIED PETITION

57.     Based on the following facts, I believe that each of the Canadian Debtors has its center of main interests in Canada as such term is used in section 1402(4) of the Bankruptcy Code:

a. The Canadian Debtors each has its registered office in Canada.  Darrel Monette, who is resident in the City of Airdrie, in the Province of Alberta, is the sole director and officer of virtually all Canadian Debtors, and is the directing mind, CEO, and ultimate beneficial shareholder (directly or through the Monette Farms Family

15

Trust) of the Debtors. As the directing mind, Darrel Monette makes all strategic, financial, and operational decisions for the Canadian Debtors from Alberta.

b. The principal debt agreements governing the Canadian Debtors are centered in Canada. The Senior Facilities Agreement is expressly governed by the laws of the Province of Alberta. All defaults, waivers, and forbearance negotiations in respect of the Senior Facilities Agreement, from the initial events of default in October 2024 through the commencement of the Canadian Proceedings on April 17, 2026, were conducted under Alberta law and managed by Darrel Monette in Alberta together with the SFA Agent, The Bank of Nova Scotia, and its special loans team.

c. The treasury and cash management function for the Debtors is centered in Canada. Monette Farms Ltd. maintains the Debtors' primary Canadian-dollar and U.S.-dollar operating accounts and high-interest savings accounts at Scotiabank in Canada. These accounts serve as the centralized treasury from which liquidity is distributed to all subsidiaries, including the USA Entities, as required. All foreign exchange conversion between Canadian and U.S. dollars is conducted through the Monette Farms Ltd. accounts.

d. The Debtors' key professional advisors (FTI as Monitor (with its engagement team located in Calgary, Alberta), Cassels Brock & Blackwell LLP as Canadian lead restructuring counsel, and PricewaterhouseCoopers Consulting Canada Inc. as the Syndicate's Financial Advisor) are all located in Canada.

e. The Canadian Debtors' agricultural operations are managed from Canada. Of the Debtors' approximately 425 full-time employees (increasing to approximately 600 during peak seeding and growing season), approximately 394 are employed in Canada.

f. The Senior Management team (consisting of the Chief Operating Officer, the Chief Financial Officer, the Chief Human Resources Officer, and the General Counsel) is based in Saskatchewan and British Columbia and regularly convenes in Alberta to make key decisions, with Darrel Monette as the ultimate decision-maker.

58. In addition, based on the following facts, I believe that each of the USA Entities has its center of main interests in Canada as such term is used in section 1402(4) of the Bankruptcy Code:

a. Every USA Entity shares the same director and officer: Darrel Monette, resident in Alberta, Canada. No independent U.S.-based management personnel holds any authority over the operations, finances, or strategic direction of any USA Entity. The managers of Monette Seeds USA LLC, Monette Farms Arizona, LLC, and Monette Produce, LLC, and the director and officer of Monette Farms USA, Inc. and DMO Holdings USA, Inc., are each Darrel Monette, domiciled in Alberta.

16

b.  The corporate ownership structure places all USA Entities under direct or indirect Canadian control.  DMO Holdings Ltd., a Saskatchewan corporation wholly owned by Darrel Monette, is the sole parent of DMO Holdings USA, Inc.  DMO Holdings USA, Inc. in turn holds 100% of Monette Seeds USA LLC, Monette Farms Arizona, LLC, Monette Farms USA, Inc., and Monette Produce, LLC.  DMO Holdings Ltd. also holds the sole Class A common voting share of 1012595 DE Inc., a Delaware corporation.  All capital allocation and equity-level decisions for the USA Entities, including decisions relating to capital allocation, guarantees, and strategic direction, flow through DMO Holdings Ltd. in Saskatchewan and ultimately through Darrel Monette in Alberta.

c.  The USA Entities are entirely dependent on intercompany financing from Canada.  Funding for 1012595 DE Inc., which contributes operating costs and pays a management service fee to Monette Farms USA, Inc. under a joint venture agreement, is provided exclusively through intercompany transfers from DMO Holdings Ltd. in Saskatchewan.  The USA Entities' BMO USA accounts (held by DMO USA, MF Arizona, Monette USA, Seeds USA, Produce USA, and 1012595 DE Inc.) are operationally subordinate to the Monette Farms Ltd.  Scotiabank accounts in Canada, which serve as the centralized treasury and foreign exchange conversion point for the entire Group.

d.  The USA Entities are bound by the Senior Facilities Agreement governed by Alberta law.  Each of the six USA Entities is a guarantor under the Senior Facilities Agreement, under which approximately $830 million was outstanding as of April 2026.  All material decisions relating to the Senior Facilities Agreement, including decisions concerning compliance, default management, forbearance negotiations, and the ultimate decision to commence these proceedings, were made by Darrel Monette in Alberta.  These facts have been and remain readily apparent to third parties, and in particular to creditors, at all times.

e.  The USA Entities' primary assets (approximately 54,482 acres of agricultural real property across Big Horn County and other locations in Montana (held by Monette Farms USA, Inc.), approximately 3,134 acres of produce farmland in Aguila, Arizona and a non-operating seed processing facility (held by MF Arizona and Seeds USA), and approximately 4,079 acres of farmland in Genoa, Colorado (held by Monette Farms USA, Inc.)) were acquired, financed, and are managed as an integrated component of the Debtors' operations directed from Alberta.

f.  The USA Entities cannot operate independently without the financial support and management direction of the Canadian Debtors.  If the USA Entities were not part of the Canadian Proceedings or the Cash Management System did not permit intercompany transfers from the Monette Farms Ltd. Scotiabank accounts in Canada, the USA Entities would be unable to continue in business as a going concern and would be forced to cease operations.  The USA Entities' operational viability is accordingly not an independent function of their U.S. place of incorporation but is wholly contingent on the continued operation of an integrated enterprise whose direction, financing, and decision-making are centered in Canada.

17

59.    Based on the foregoing, the Debtors have substantially more ties to Canada than to any other country.

**SUPPORT FOR PROVISIONAL RELIEF**

60.    I believe that provisional recognition and relief in these cases is important to prevent irreparable damage to the interests of the Debtors' estates, creditors, and the efficacy of the Canadian Proceeding.  As set forth above, provisional recognition of the Initial Order and the Amended and Restated Initial Order, once entered, is a condition precedent for the Debtors to obtain advances under the DIP Credit Facility.  Absent provisional recognition of those orders in the United States, including the advances and DIP Charges authorized thereunder, the DIP Lenders are unwilling to provide funding to the Debtors.  Without access to the DIP Credit Facility, the Debtors will suffer immediate and irreparable harm.

61.    Indeed, I understand that the Debtors are just days away from their critical growing season and urgently need liquidity to purchase critical inputs and continue operations.  The Company has been delayed in commencing operations in certain regions due to its limited available liquidity.  In particular, the Debtors' seeding operations require significant upfront expenditures for pre-soil treatment, fertilizer, chemicals, seed, and related inputs, typically exceeding $40 million annually, which the Debtors cannot currently fund.  Absent an immediate liquidity injection, the Debtors would be unable to seed substantial portions of their farmland, resulting in an irreversible loss of value for the 2026 crop year and materially impairing realizations from any sale of operating farmland.  Seeding operations cannot be suspended temporarily given the seasonality of the Debtors' operations and further delay would have significant economic consequences: if land is not seeded within the applicable spring window, the opportunity to generate revenue from that land for the entire year is lost.  Missing the 2026 season would also risk widespread layoffs because farming employment is inseparable from seasonal

18

production activity, loss of licenses that would adversely impact operations, cause environmental risks, and have disparate impacts on rural communities.

62. I believe that the Debtors will suffer immediate and irreparable harm without the protections of sections 362 and 365(e). If such protections were unavailable, the Debtors could face immediate and irreparable harm resulting from the potential termination of critical leases and contracts and the piecemeal loss of assets from individual creditor collection and enforcement efforts. The Debtors thus require the protections of 362 and 365(e) to ensure operational stability as they implement a sale process in the Canadian Proceeding in order to deleverage their business. Absent immediate protection, I believe creditor enforcement would risk a disorderly liquidation and material value destruction to the Debtors assets that could hinder the sale and investment solicitation process being undertaken in Canada. Provisional relief will preserve value and protect stakeholders, including the Debtors' employees, by providing the Debtors with sufficient time to implement an orderly and value-maximizing sales process and the liquidity to remain operational for the 2026 seeding season. Continued operation will ensure continued revenue through the 2026 financial year, maintain asset values, and protect the jobs of the Debtors' employees.

63. I also believe that extending the automatic stay to the Non-Debtor Stay Parties (Monette Farms Land I LP, Monette Farms Land II LP, and Monette Farms BC LP) is critical to preserving the value of the Debtors' business and assets. The Non-Debtor Stay Parties hold beneficial title to substantially all of the Group's Canadian real property, which constitutes the primary collateral under the Senior Facilities Agreement and the primary source of value available to creditors. I believe that absent equivalent protection in the United States, creditors could seek to enforce against the Non-Debtor Stay Parties' U.S.-connected interests and thereby circumvent the Canadian Proceedings, undermining the orderly administration of the estate and materially

19

impairing the value of the real property assets that underpin the Debtors' restructuring. The Non-Debtor Stay Parties are guarantors under the Senior Facilities Agreement, and enforcement against them in the United States would have the same practical effect as enforcement against the Debtors directly. Extending provisional relief to cover the Non-Debtor Stay Parties is therefore necessary to give full effect to the Canadian Proceedings and protect all stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: April 22, 2026
      Alberta, Canada

Respectfully Submitted,

*/s/ Deryck Helkaa*
Deryck Helkaa for FTI, Monitor and Foreign Representative