## EXHIBIT C

**F‌R'Vgt‌o 'Uj ggv**

HIGHLY CONFIDENTIAL

EXECUTION COPY

*This draft Senior Secured Debtor-In-Possession Interim Financing Term Sheet Agreement (this "**DIP Term Sheet**") is for discussion purposes only and does not represent a commitment by The Bank of Nova Scotia to arrange for the extension of credit to any person. This is not a committed offer to lend and no credit review has been performed by The Bank of Nova Scotia or any proposed lender. Furthermore, this DIP Term Sheet is not exhaustive as to the terms and conditions that would be included in a committed offer to lend or the definitive credit documentation that would ultimately be required to consummate the transaction contemplated hereby. This DIP Term Sheet is delivered to you on the basis that you retain as confidential the matters outlined herein and that none of the information be used in a manner inconsistent with its confidential nature or be disclosed to anyone other than the DIP Loan Parties and their advisors directly involved in the proposed transaction.*

## SENIOR SECURED DEBTOR-IN-POSSESSION
## INTERIM FINANCING TERM SHEET AGREEMENT

### Dated as of April 17, 2026

WHEREAS the Borrowers (as defined herein) have requested and the DIP Lenders have agreed to provide interim financing to the Borrowers during the pendency of the DIP Loan Parties' (as defined herein) proceedings (the "**CCAA Proceedings**") under the *Companies' Creditors Arrangement Act* (Canada) (the "**CCAA**") commenced before the Court of King's Bench of Alberta (the "**Court**") on or about the date hereof, all in accordance with the terms and conditions set out in this DIP Term Sheet (this "**DIP Term Sheet**").

WHEREAS the DIP Lenders have agreed to provide interim financing to fund certain obligations of the DIP Loan Parties (as defined herein) in order for such DIP Loan Parties to finalize arrangements for the restructuring or recapitalization of their business, subject to the terms and conditions set out in this DIP Term Sheet and DIP Commitment Letter and on the basis of the DIP Loan Parties' representation, and the DIP Lenders' good faith understanding, that the core element of the DIP Loan Parties' successful restructuring and recapitalization plan is repaying or refinancing the Existing Senior Secured Obligations (as defined herein) in full in cash prior to the DIP Outside Date (as defined herein).

NOW THEREFORE, the parties, in consideration of the foregoing and the mutual agreements contained herein (the receipt and sufficiency of which are hereby acknowledged), agree as follows:

(Unless otherwise defined in the body of this DIP Term Sheet, defined terms have meanings given to them in Schedule A – Definitions.)

| | | |
|---|---|---|
| 1. | **Borrowers:** | Monette Farms Ltd. (the "**Canadian Borrower**") and Monette Farms USA, Inc. (the "**US Borrower**" and, collectively with the Canadian Borrower, the "**Borrowers**"). |
| 2. | **Guarantors:** | The entities set forth on Schedule B hereto (collectively, the "**DIP Guarantors**", and together with the Borrowers, the "**DIP Loan Parties**" and individually, a "**DIP Loan Party**"). |
| 3. | **Monitor:** | The Monitor in the CCAA Proceedings shall be FTI Consulting Canada Inc. (the "**Monitor**"). |
| 4. | **DIP Agent:** | The Bank of Nova Scotia, in its capacity as DIP Agent for the DIP Lenders (the "**DIP Agent**"), appointed in accordance with and subject to the terms and conditions of the DIP |

HIGHLY CONFIDENTIAL

Commitment Letter (as defined below).

| 5. | **Counsel to DIP Agent and the DIP Lenders:** | **Lead Counsel:** McMillan LLP<br>**US Counsel:** Womble Bond Dickinson (US) LLP |
|---|---|---|

6. **DIP Lenders:** Certain financial institutions currently party to the Existing Senior Secured Credit Agreement (collectively, the "**DIP Lenders**" and each a "**DIP Lender**") have agreed to provide commitments in respect of the DIP Credit Facility (the "**DIP Commitments**") in accordance with and subject to the terms and conditions of the Commitment Letter dated April 17, 2026, between the Borrowers, the DIP Agent and the DIP Lenders (the "**DIP Commitment Letter**"). The initial pro rata share of each DIP Lender in the DIP Commitments is set forth in Schedule A of the DIP Commitment Letter.

7. **Existing Senior Secured Credit Agreement:** Effective as of the date of filing of the CCAA Proceedings, no additional loans or other extensions of credit will be made available to the Borrowers under the Existing Senior Secured Credit Agreement. The loans and all other obligations under the Existing Senior Secured Credit Agreement will be repaid as set forth in Section 34 below.

8. **DIP Credit Facility:** Up to CDN$90,000,000 (or Equivalent Amount thereof) (the "**Maximum Amount**") available to the Borrowers provided by way of a senior secured super-priority debtor-in-possession revolving credit facility (the "**DIP Credit Facility**").

Subject to Availability, advances under the DIP Credit Facility shall be made available to the Borrowers on a revolving basis as provided herein, from the Effective Date until the Maturity Date.

All advances under the DIP Credit Facility will be made by way of loans denominated in Canadian dollars or United States Dollars, as requested by the Borrowers, and on which interest is payable based on CAD Prime Rate or US Base Rate, as the case may be, in accordance with the terms hereof (collectively, the "**DIP Loans**").

The amount of the DIP Loans outstanding under the DIP Credit Facility at any time shall be the aggregate principal amount of the DIP Loans denominated in Canadian Dollars plus the Canadian Dollar Equivalent Amount of the aggregate principal amount of the DIP Loans denominated in US Dollars as determined at such time (the "**Outstanding DIP Loans**").

LEGAL*71656698.2

HIGHLY CONFIDENTIAL                    EXECUTION COPY

| 9. | **Availability:** | "**Availability**" means, at any time, an amount equal to (i) the Maximum Amount, <u>minus</u> (ii) the Outstanding DIP Loans at such time. |

Availability shall be determined as of the date the Borrowers submit a Draw Request to the DIP Agent in accordance with the terms hereof.

Provided that no Default or Event of Default has occurred under the DIP Credit Facility and is then continuing, the Borrowers may submit a Draw Request to the DIP Agent on or following the Effective Date subject to the following:

(a) if the Draw Request is submitted on or after the date on which the Initial Availability Conditions have been satisfied but prior to the date on which the Further Availability Conditions have been satisfied, the Borrowers may request advances up to CDN$40,000,000 (the "**Initial Availability Amount**"); or

(b) if the Draw Request is submitted on or after the date on which the Further Availability Conditions have been satisfied, the Borrowers may request advances under the DIP Credit Facility up to the Maximum Amount at all times subject to Availability (the "**Further Availability Amount**").

| 10. | **Effectiveness of the DIP Credit Facility:** | The effectiveness of this DIP Term Sheet shall be subject to the following conditions precedent, which shall be satisfied, or waived in writing by the DIP Agent, on behalf of the DIP Lenders, acting reasonably (the "**Effective Date**"): |

(a) The DIP Loan Parties shall have executed and delivered this DIP Term Sheet, the DIP Commitment Letter and the other applicable DIP Loan Documents to the DIP Agent and the DIP Lenders.

(b) The Court shall have granted the CCAA Initial Order in respect of the DIP Loan Parties substantially in the form attached hereto as <u>Schedule H</u>, or in such other form and substance satisfactory to the DIP Agent, in its sole discretion, and approving the DIP Term

DIP TERM SHEET

LEGAL*71656698.2

001686

Sheet and granting the DIP Charge on the Collateral with the priority provided for herein, securing all DIP Obligations including, without limitation, all principal, interest, fees and costs and the DIP Expenses and providing, among other things, that the DIP Charge, in an initial amount of CDN$42,000,000, shall have priority on such Collateral over the Directors' Charge and all Liens, other than the Permitted Priority Liens, and such CCAA Initial Order shall not have been stayed, vacated or otherwise caused to be ineffective or amended, restated or modified in any manner that adversely affects the DIP Agent or the DIP Lenders, without the written consent of the DIP Agent.

(c)     All applications, motions or petitions brought by any DIP Loan Party in the CCAA Proceedings and in the US Chapter 15 Proceedings and all Court Orders granted or entered in response to such applications, motions and petitions, in each case, as of the date that all other conditions to effectiveness in this Section 10 have been satisfied, shall be satisfactory to the DIP Agent.

(d)     Each of the representations and warranties specified in Section 35 of this DIP Term Sheet shall be true and correct in all material respects as of the date made or deemed made (unless any representation and warranty is qualified by materiality, in which case it shall be true and correct in all respects as of the date made or deemed made).

(e)     No Default or Event of Default shall have occurred and be continuing under the DIP Credit Facility.

The commitment (if any) of the DIP Lenders to provide the DIP Credit Facility shall expire and terminate if the Effective Date has not occurred on or before April 24, 2026, or such later date as the Unanimous DIP Lenders may approve.

| | | |
|---|---|---|
| 11. | **Initial Availability Conditions:** | The DIP Lenders agree to make advances up to the Initial Availability Amount available to the Borrowers subject to |

LEGAL*71656698.2

001687

HIGHLY CONFIDENTIAL                                                    EXECUTION COPY

satisfaction of the following conditions precedent for each advance in respect thereof (the "**Initial Availability Conditions**"):

(a)     All of the conditions to the Effective Date under Section 10 hereof shall have been satisfied or waived and continue to be satisfied.

(b)     The United States Bankruptcy Court of competent jurisdiction that is acceptable to the DIP Agent (the "**US Bankruptcy Court**") shall have granted the US Provisional Recognition Order pursuant to chapter 15 of the US Bankruptcy Code, or any other order that provisionally recognizes the CCAA Initial Order, including the advances under the DIP Credit Facility and the DIP Charge authorized therein, in each case which shall be satisfactory to the DIP Agent, and such order remains in full force and effect and has not been stayed, vacated or otherwise caused to be ineffective or amended, restated or modified in any manner that adversely affects the DIP Agent or the DIP Lenders.

(c)     The DIP Loan Parties shall have complied in all material respects with all of the terms of the CCAA Initial Order and the US Provisional Recognition Order.

(d)     There shall be no Liens ranking senior in priority to the DIP Charge other than Permitted Priority Liens.

(e)     The DIP Agent shall have received confirmation that service of the CCAA Initial Order and the application record seeking the ARIO have been effected on each holder of a Lien listed on the service list agreed between the Borrowers and the DIP Agent (or its counsel).

(f)     No Court Order shall have been made in the CCAA Proceedings, in the US Chapter 15 Proceedings or in any other court of competent jurisdiction relating to the DIP Credit Facility or

DIP TERM SHEET

LEGAL*71656698.2

001688

HIGHLY CONFIDENTIAL   EXECUTION COPY

the DIP Loan Documents which could reasonably be expected to have a Material Adverse Effect.

(g)   The current DIP Budget shall be in form and substance satisfactory to the DIP Agent, acting reasonably.

(h)   All documented expenses (including all documented legal and professional fees and expenses on a full indemnity basis) of the DIP Agent and the DIP Lenders incurred in connection with their pre-filing claims and/or the DIP Credit Facility shall have been paid in full (which documented expenses shall be deducted from the first advance of the DIP Credit Facility).

(i)   The making of any DIP Loans shall not result in the aggregate amounts outstanding under the DIP Credit Facility exceeding the amount authorized at such time by the CCAA Initial Order.

(j)   The making of any DIP Loan shall not violate any requirement of Applicable Law, after giving effect to the CCAA Initial Order and any other Court Order, and shall not be enjoined, temporarily, preliminarily or permanently.

(k)   A duly completed and executed Draw Request shall have been delivered by the Borrowers to the DIP Agent in accordance with Section 13.

For greater certainty, the DIP Lenders shall not be obligated to advance or otherwise make available any loans or advances until all of the foregoing conditions have been satisfied and all of the foregoing documentation and confirmations have been obtained, each in form and substance satisfactory to the DIP Agent, acting reasonably, provided further that the DIP Agent, with the written consent of the Majority DIP Lenders, acting reasonably, may waive satisfaction of any one or more of such conditions precedent.

| 12. | **Further Availability Conditions:** | The DIP Lenders agree to make advances up to the Further Availability Amount available to the Borrowers subject to satisfaction of the following conditions precedent for each |

LEGAL*71656698.2

001689

HIGHLY CONFIDENTIAL

advance in respect thereof (the "**Further Availability Conditions**"):

(a)     The Initial Availability Conditions have been satisfied and the Initial Availability Conditions in paragraphs (b), (c), (d), (e), (f), (g) and (i) thereof continue to be satisfied.

(b)     The Borrowers shall have paid to the DIP Agent, out of the first advance drawn under the Initial Availability Amount, the Arranger Fee, the DIP Agent Fee and the Commitment Fee as contemplated in Sections 26, 27, 28 and 29 hereof.

(c)     No notice of appeal, or application or motion to vary, amend, stay, reverse or otherwise affect the CCAA Initial Order as it relates to the DIP Credit Facility, the ARIO, the Court Orders of the US Bankruptcy Court relating to or affecting the DIP Credit Facility, the DIP Charge, the SISP, the SISP Order, the SISP Procedures or any SISP Transaction Approval Order shall have been filed or is pending.

(d)     The Court shall have granted the ARIO in form and substance satisfactory to the DIP Agent, acting reasonably, by not later than May 6, 2026, which ARIO shall include a Court Order increasing the amount of the DIP Charge to CDN$95,000,000 or such other amount acceptable to the DIP Agent, in its sole discretion.

DIP TERM SHEET

001690

(e)     The CCAA Proceedings shall have been recognized in the United States pursuant to chapter 15 of the US Bankruptcy Code in a proceeding before the US Bankruptcy Court and the US Bankruptcy Court shall have entered the US Recognition Order, in the form accepted by the DIP Agent, giving full force and effect to the CCAA Initial Order and the ARIO, or, for a period of no longer than 25 days from the date of the CCAA Initial Order, if the US Bankruptcy Court has entered an order, including the US Provisional Recognition Order, that provisionally recognizes the ARIO, including the advances under the DIP Credit Facility and the DIP Charge authorized therein, and such order remains in full force and effect and has not been stayed, vacated or otherwise caused to be ineffective or amended, restated or modified in any manner that adversely affects the DIP Agent or the DIP Lenders.

(f)     The DIP Loan Parties are in compliance, in all material respects, with the ARIO and all Court Orders that are effective at the time of the Draw Request.

(g)     The making of any DIP Loan shall not violate any requirement of Applicable Law, after giving effect to the ARIO and any other Court Order, and shall not be enjoined, temporarily, preliminarily or permanently.

(h)     None of the Court Orders shall have been stayed, vacated or otherwise caused to be ineffective or amended, restated or modified in any manner that adversely affects the DIP Agent or the DIP Lenders, without the written consent of the DIP Agent.

(i)     Unless otherwise agreed to by the DIP Agent, acting reasonably, the DIP Milestones shall have been met or satisfied by the deadlines agreed to herein.

(j)     The DIP Loan Parties shall have paid all statutory liens, trust and other government

HIGHLY CONFIDENTIAL                                                  EXECUTION COPY

claims arising after the CCAA Filing Date (but for greater certainty, not including any such claims in existence on the CCAA Filing Date) including, without limitation, source deductions in accordance with the DIP Budget, except, in each case, for any such amounts that are not yet due and payable or which are in dispute, in which case appropriate reserves have been made.

(k)   A duly completed and executed Draw Request shall have been delivered by the Borrowers to the DIP Agent in accordance with Section 13.

For greater certainty, the DIP Lenders shall not be obligated to advance or otherwise make available any funds until all of the foregoing conditions have been satisfied and all of the foregoing documentation and confirmations have been obtained, each in form and substance satisfactory to the DIP Agent, acting reasonably, provided further that the DIP Agent, with the written consent of the Majority DIP Lenders, acting reasonably, may waive satisfaction of any one or more of such conditions precedent.

| 13. | **Drawdowns:** | Provided that no Default or Event of Default has occurred and is then continuing under the DIP Credit Facility, the Borrowers may, concurrent with notification to the Monitor, make a drawdown request for an advance in the form attached as Schedule G hereto (a "**Draw Request**"). |
|---|---|---|

Subject to the satisfaction of the Initial Availability Conditions in Section 11, the Borrowers may make a Draw Request for a single advance up to the Initial Availability Amount on any Business Day following the date of the US Provisional Recognition Order.

Subject to the satisfaction of the Further Availability Conditions in Section 12, the Borrowers may make Draw Requests for advances (after the initial advance) from time to time in the aggregate up to the Further Availability Amount, on not less than one (1) Business Day's notice of the requested draw down date, provided that such request is delivered before 10:00 am Calgary time and, in each case, for an amount not to exceed the projected disbursements for the immediately following two week period as set out in the DIP Budget, at all times subject to Availability.

DIP TERM SHEET

LEGAL*71656698.2

001692

HIGHLY CONFIDENTIAL   EXECUTION COPY

| 14. | **Cash Management:** | All bank accounts, credit cards, and securities accounts or investment accounts (including any accounts in respect of cash equivalents) of the DIP Loan Parties shall be maintained with the Cash Management Banks and their affiliates. The Cash Management Banks shall ensure that the Bank Products remain accessible to the Borrowers until the Maturity Date subject to the payment of the fees owing to the DIP Agent and the DIP Lenders, provided that, in each case the Cash Management Banks will require the Borrowers to either post cash collateral or seek the approval of a court ordered charge to secure the exposure up to the credit limits. The DIP Agent, in its capacity as Existing Senior Secured Agent, agrees neither it nor any of the Cash Management Banks shall sweep cash in any Bank Products other than as permitted by Court Order and in accordance with this DIP Term Sheet. The DIP Loan Parties shall deposit and maintain all cash, including, without limitation, the advances under the DIP Credit Facility and all proceeds of DIP Intercompany Loans, in account(s) with the Cash Management Banks. |

15. **Maturity Date:** The maturity of the DIP Credit Facility (the "**Maturity Date**") shall be the earliest of:

(a) the date on which the stay of proceedings in the CCAA Initial Order or the ARIO (as same may be amended from time to time) expires without being extended or on which the CCAA Proceedings are dismissed or converted into a proceeding under the BIA;

(b) the date on which (i) the US Provisional Recognition Order expires without the US Bankruptcy Court granting a US Recognition Order, (ii) the stay specified in the US Recognition Order expires or (iii) the US Chapter 15 Proceedings are dismissed or converted into a proceeding under Chapter 7 of the US Bankruptcy Code;

(c) the DIP Outside Date;

(d) the effective date of any plan of reorganization or arrangement confirmed by the Court; and

(e) the date of the acceleration of the DIP Loans and the termination of the DIP Commitments

DIP TERM SHEET

LEGAL*71656698.2

001693

HIGHLY CONFIDENTIAL                                                                EXECUTION COPY

with respect to the DIP Credit Facility due to an Event of Default.

All of the DIP Obligations shall be payable in full on the Maturity Date without any requirement for notice or demand.

The Maturity Date may be extended from time to time at the request of the Borrowers, with notification to the DIP Agent and the Monitor and with the prior written consent of the Unanimous DIP Lenders, for such period and on such terms and conditions as the Unanimous DIP Lenders may agree to, acting reasonably.

| 16. | **Permitted Uses of Proceeds:** | The DIP Credit Facility may only be used for the following purposes, after any cash balances available to the Borrowers in excess of $5,000,000 are fully utilized: |
| --- | --- | --- |

(a)     for working capital, capital expenditures, and other Ordinary Course expenditures of the DIP Loan Parties in accordance with the DIP Budget, including any Permitted Pre-Filing Payments and DIP Intercompany Loans to DIP Guarantors, on and subject to the terms and conditions set forth in Section 19;

(b)     to pay the Permitted Fees and Expenses;

(c)     to post cash collateral required by the Cash Management Banks pursuant to Section 14;

(d)     to pay amounts owing to Farm Credit Canada pursuant to the Loan and Security Agreement (Livestock), dated December 4, 2024; or

(e)     to pay interest when due in respect of the Existing Senior Secured Obligations, including without limitation interest owing in respect of interest due but unpaid in respect of the Existing Senior Secured Obligations prior to the CCAA Filing Date.

For greater certainty, without the prior written consent of the DIP Agent, and subject to the CCAA Initial Order or the ARIO, the proceeds of the DIP Credit Facility and available cash shall not be used to:

(a)   make any loans, distributions or payments of any

LEGAL*71656698.2

001694

HIGHLY CONFIDENTIAL

kind to the Individual Borrower except as authorized by the CCAA Initial Order or the ARIO and contemplated by the DIP Budget;

(b)  pay any pre-filing obligations, other than Permitted Pre-Filing Payments or payments otherwise authorized by the CCAA Initial Order or the ARIO and contemplated by the DIP Budget;

| 17. | **Permitted Fees and Expenses:** | "**Permitted Fees and Expenses**" means, collectively: |
|---|---|---|

(a)  the DIP Expenses (as hereinafter defined);

(b)  all reasonable and documented costs and expenses incurred by the Existing Senior Secured Agent after the CCAA Filing Date in connection with the Existing Senior Secured Credit Agreement;

(c)  the fees owing to the DIP Agent and the DIP Lenders in connection with the DIP Credit Facility;

(d)  the reasonable and documented costs and expenses of the DIP Loan Parties associated with the DIP Credit Facility;

(e)  the reasonable and documented costs and expenses of the CCAA Applicants or the CCAA Non-Applicant Stay Parties in connection with the CCAA Proceedings and the US Chapter 15 Proceedings, including the reasonable and documented fees and expenses of the CCAA Applicants' or the CCAA Non-Applicant Stay Parties' financial advisor and legal counsel; and

(f)  the reasonable and documented costs and expenses of the Monitor and the Monitor's legal counsel.

| 18. | **Reimbursement of DIP Expenses:** | The Borrowers will reimburse the DIP Agent and the DIP Lenders, without duplication, for the following (collectively, the "**DIP Expenses**"): |
|---|---|---|

(a)  all reasonable and documented costs and expenses (including reasonable and documented

DIP TERM SHEET

LEGAL*71656698.2

001695

legal and professional fees and expenses on a full indemnity basis) including expenses incurred in connection with the negotiation and development of this DIP Term Sheet, the DIP Commitment Letter and the other DIP Loan Documents, whether or not any of the transactions contemplated hereby are consummated and whether incurred prior to or after the CCAA Filing Date;

(b)     all reasonable and documented costs and expenses (including reasonable and documented legal and professional fees and expenses on a full indemnity basis) in connection with the CCAA Proceedings and the US Chapter 15 Proceedings, including due diligence, review and negotiation of any Court Order, other filing materials and all related documentation;

(c)     all reasonable and documented costs and expenses (including reasonable and documented legal and professional fees and expenses on a full indemnity basis) in connection with the SISP, the SISP Order, the review and evaluation of offers submitted through the SISP or in connection with any SISP Transaction and the review and negotiation of any SISP Transaction Approval Orders; and

(d)     the on-going monitoring, administration and enforcement of the DIP Charge and any other security for the DIP Obligations and in relation to the CCAA Proceedings and US Chapter 15 Proceedings generally.

All DIP Expenses incurred prior to the Effective Date shall be paid in full from an advance under the DIP Credit Facility after the Initial Availability Conditions have been satisfied or waived in accordance with Section 11 hereof and the Borrowers shall pay all DIP Expenses incurred after the Effective Date within 15 days of presentment of the applicable invoice.

| 19. | **DIP Intercompany Loans:** | Subject to the terms of this DIP Term Sheet (including, without limitation, the DIP Budget) and the ARIO, the Borrowers shall be permitted to use proceeds of DIP Loans |

HIGHLY CONFIDENTIAL

advanced under the DIP Credit Facility to advance intercompany loans to DIP Guarantors (the "**DIP Intercompany Loans**"), provided that the following conditions precedent shall be satisfied, or waived in writing by the DIP Agent, in its sole discretion, prior to the Borrowers making any such DIP Intercompany Loan:

(a)    the Initial Availability Conditions and, as applicable, the Further Availability Conditions shall have been satisfied or waived in accordance with this DIP Term Sheet;

(b)    there shall be no Default or Event of Default outstanding under the DIP Credit Facility that has not been cured or waived in writing by the DIP Agent, in its sole discretion;

(c)    such DIP Intercompany Loans shall be properly recorded on the books and records of the DIP Loan Parties and appropriately documented; and

(d)    the indebtedness and obligations of the DIP Guarantors to the Borrowers under and in respect of the DIP Intercompany Loans shall be deemed to be assigned as security to the DIP Agent for the benefit of the DIP Lenders pursuant to the DIP Charge.

**Interest Rates:**

| | | |
|---|---|---|
| 20. | *For CAD DIP Loans Advanced under DIP Credit Facility*: | CAD Prime Rate (subject to a floor of 0%) <u>plus</u> 4% per annum. |
| 21. | *For USD DIP Loans Advanced under DIP Credit Facility*: | US Base Rate (subject to a floor of 0%) <u>plus</u> 4% per annum. |
| 22. | *Rates upon an Event of Default:* | Interest Rate shall be automatically increased by 2% per annum upon the occurrence and during the continuance of an Event of Default under the DIP Credit Facility. |
| 23. | *Payment of Interest:* | Interest shall be payable on the Outstanding DIP Loans under the DIP Credit Facility from the date of the funding thereof at the Interest Rate applicable to such Outstanding DIP Loans, compounded monthly and payable monthly in arrears in cash on the last Business Day of each month. |

HIGHLY CONFIDENTIAL

| 24. | *Criminal Interest Rates:* | If any provision of this DIP Term Sheet or any of the other DIP Loan Documents would obligate the DIP Loan Parties to make any payment of interest, fees or other amount payable to the DIP Agent or the DIP Lenders in an amount or calculated at a rate which would be prohibited by law or would result in a receipt by the DIP Agent or the DIP Lenders of interest at a criminal or usurious rate (as construed under the *Criminal Code* (Canada) or applicable US law, as applicable), then notwithstanding that provision, that amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by law or result in a receipt by the DIP Agent or the DIP Lenders, as the case may be, of interest at a criminal or usurious rate, the adjustment to be effected, to the extent necessary, as follows: |

    (a)    first, by reducing the amount or rate of interest required to be paid to the DIP Agent or the DIP Lenders under this DIP Term Sheet; and

    (b)    thereafter, by reducing any other amounts (other than costs and expenses) (if any) required to be paid to the DIP Lender which would constitute interest for purposes of Section 347 of the *Criminal Code* (Canada) or applicable US Law.

| 25. | *Interest Act:* | For the purposes of the *Interest Act* (Canada), the parties acknowledge and agree that all calculations of interest under this DIP Term Sheet are to be made on the basis of the nominal interest rate described herein and not on the basis of effective yearly rates or on any other basis which gives effect to the principle of deemed reinvestment of interest. |

**Other Fees:**

| 26. | *Arranger Fee:* | An arranger fee as set forth in the Fee Letter, fully earned upon the granting of the CCAA Initial Order and payable in accordance with the DIP Fee Letter (the "**Arranger Fee**"). |

| 27. | *DIP Agent Fee:* | An agent fee as set forth in the Fee Letter, payable to the DIP Agent monthly in arrears on the last Business Day of each month, with the first such period commencing on the Business Day immediately following the date of issuance of the DIP Commitment Letter by the DIP Lenders (the "**DIP Agent Fee**"). |

DIP TERM SHEET

LEGAL*71656698.2

001698

HIGHLY CONFIDENTIAL   EXECUTION COPY

| 28. | *Commitment Fee:* | A commitment fee equal to 100 bps on the Maximum Amount, which fee shall be fully earned upon execution of this DIP Term Sheet and payable to the DIP Agent (the "**Commitment Fee**") in accordance with this Section 28. |
| | | The Borrowers shall pay the Commitment Fee from the first advance under the DIP Credit Facility. |
| 29. | *Allocation of Commitment Fee:* | The Commitment Fee shall be paid to the DIP Agent for allocation amongst the DIP Lenders on a pro rata basis based on their respective DIP Commitments.  For greater certainty, the Arranger Fee and the DIP Agent Fee are intended to compensate the DIP Agent for its services in arranging the DIP Credit Facility and its duties under this DIP Term Sheet and the other DIP Loan Documents and shall each be retained by the DIP Agent for its own account and shall not be allocated among the DIP Lenders. |
| 30. | **Security and Priority:** | A first-ranking (except as otherwise contemplated herein) court-ordered super-priority charge (the "**DIP Charge**") on all of the existing and after-acquired real and personal, tangible and intangible, assets and property of the DIP Loan Parties, including without limitation, all shares, partnership interests, limited partnership interests, securities or other investment property, whether certificated or uncertificated, owned by the DIP Loan Parties, all insurance proceeds, all rights of the Borrowers under or in connection with any DIP Intercompany Loans, and all proceeds of the foregoing (the "**Collateral**"). |
| 31. | **Permitted Liens and Priority:** | All Collateral will be free and clear of other liens, encumbrances and claims, except for the Permitted Liens. Unless otherwise agreed to in writing by the DIP Agent, in its sole discretion, the DIP Charge shall be subordinate only to the Permitted Priority Liens. |
| 32. | **Mandatory Prepayment Due to Currency Fluctuations:** | If at any time the Equivalent Amount of the Outstanding DIP Loans under the DIP Credit Facility exceeds the Initial Availability Amount or the Further Availability Amount, as may be then applicable (the "**Deficiency**"), as a result of currency exchange fluctuations, the Borrowers shall within one (1) Business Day of the receipt of a written notice by the DIP Agent in respect of such Deficiency, prepay the Outstanding DIP Loans in an amount equal to such Deficiency, together with accrued interest on the principal amount so prepaid to the date of such prepayment. |

DIP TERM SHEET

LEGAL*71656698.2

001699

HIGHLY CONFIDENTIAL   EXECUTION COPY

| 33. | **Mandatory Payment of Excess Cash:** | If the DIP Loan Parties hold or otherwise control Excess Cash, then the DIP Loan Parties shall, within three (3) Business Days, unless otherwise approved in writing by the DIP Agent: (i) apply the Excess Cash to reduce any amounts then owing in respect of the Outstanding DIP Loans, or (ii) in the event no amounts are then owing in respect of the Outstanding DIP Loans, either (a) provided that the Monitor is satisfied that the Existing Senior Secured Lenders' security is valid and enforceable, distribute such Excess Cash to the Existing Senior Secured Agent to be applied to any outstanding Existing Senior Secured Obligations, or (b) the Monitor shall hold such Excess Cash segregated and in trust for the Existing Senior Secured Lenders until the Monitor is satisfied that such security is valid and enforceable. |
| --- | --- | --- |
| | | For greater certainty, Excess Cash applied to reduce the amounts then owing in respect of the Outstanding DIP Loans may be re-borrowed prior to the Maturity Date, subject to the satisfaction of the Initial Availability Conditions or the Further Availability Conditions, as the case may be, in respect of such requested advances. |
| 34. | **Mandatory Prepayment upon Disposition of Collateral:** | For the purposes of determining the application of proceeds of dispositions solely as between the DIP Obligations and the Existing Senior Secured Obligations, all proceeds of dispositions of Collateral save and except for (i) dispositions of inventory in the Ordinary Course of the DIP Loan Parties' business (including without limitation any proceeds from the completion of any SISP Transaction and any proceeds of insurance relating to Collateral) or (ii) any proceeds generated by sales of cattle and contemplated in the then-current DIP Budget, shall, after first being applied to the extent not funded, to fund an administrative reserve maintained by the Monitor for the purposes of securing the Administration Charge and the Directors' Charge in accordance with the priority set out in the CCAA Initial Order or the ARIO, as applicable, such reserve not to exceed the maximum aggregate amount of such charges (with any balance of such administrative reserve remaining upon the completion of the SISP being distributed as soon as possible by the Monitor in accordance with the waterfall set out below or in accordance with any Court Order), be applied as follows: |
| | | First, applied to any Permitted Fees and Expenses of the DIP Agent and the DIP Lenders then due and payable in respect of |

DIP TERM SHEET

LEGAL*71656698.2

001700

amounts owing under the DIP Credit Facility;

Second, applied to any interest then due and payable in respect of the Outstanding DIP Loans;

Third, after the acceleration of the DIP Obligations, applied to any principal amounts of the Outstanding DIP Loans;

Fourth, prior to the acceleration of the DIP Obligations, applied to any outstanding principal amounts of the Existing Senior Secured Obligations in accordance with the Existing Senior Secured Credit Agreement;

Fifth, prior to the acceleration of the DIP Obligations, applied to any fees and expenses of the Existing Senior Secured Agent and the Existing Senior Secured Lenders then due and payable with respect to the Existing Senior Secured Credit Agreement;

Sixth, prior to the acceleration of the DIP Obligations, applied to any interest then due and payable on the Existing Senior Secured Obligations;

Seventh, prior to the acceleration of the DIP Obligations, applied to any principal amounts of the Outstanding DIP Loans; and

Eight, to the Borrowers or as the Court may otherwise direct.

For greater certainty, no proceeds of Collateral (including without limitation any proceeds from the completion of a SISP Transaction and any proceeds of insurance relating to the Collateral) shall be retained by the Borrowers or the other DIP Loan Parties to be used for working capital purposes or to reduce debt or any obligation ranking junior to the security securing the Existing Senior Secured Obligations until the DIP Obligations and all remaining Existing Senior Secured Obligations have been repaid in full in cash.

Within five (5) Business Days of any distributions made under this Section 34 to the DIP Agent and/or the DIP Lenders, the DIP Agent shall provide the Monitor and the DIP Loan Parties an accounting summary of how all disposed proceeds have been applied and an update on the amounts owing under each of the above thereafter.

HIGHLY CONFIDENTIAL

| 35. | **Representations and Warranties:** | The representations and warranties of the DIP Loan Parties to the DIP Agent and each DIP Lender are set forth in <u>Schedule C</u> attached hereto.  The DIP Agent and the DIP Lenders are relying upon the representations and warranties of the DIP Loan Parties in agreeing to enter into this DIP Term Sheet and providing the DIP Credit Facility. Unless expressly stated to be made as of a specific date, the representations and warranties made in this DIP Term Sheet shall survive the execution of this DIP Term Sheet and the other DIP Loan Documents and shall be deemed to be repeated as of the date of each advance under the DIP Credit Facility. |
| 36. | **Covenants:** | The affirmative, negative and reporting covenants given by the DIP Loan Parties to the DIP Agent and each DIP Lender are set forth in <u>Schedule D</u> attached hereto. |
| 37. | **DIP Budget and Variance Reporting:** | Attached hereto as <u>Schedule I</u> is a copy of the initial DIP Budget (excluding the supporting documentation provided directly to the DIP Agent in connection therewith), that has been reviewed and approved by the Monitor.  The DIP Budget shall be the DIP Budget referenced in this DIP Term Sheet until such time as a revised DIP Budget has been approved by the DIP Agent in accordance with this Section 37. |

The Borrowers shall provide an updated rolling 13-week cash flow forecast (the "**Rolling Cash Flow**") to the DIP Agent every two weeks (unless otherwise consented to by the DIP Agent), in each case to be delivered to the DIP Agent, its counsel and the Monitor, no earlier than the last Business Day of the second week following the date of the delivery of the DIP Budget or the prior Rolling Cash Flow, as applicable. Such Rolling Cash Flow shall be reviewed and approved by the Monitor and the DIP Agent, acting reasonably. If the DIP Agent, acting reasonably, approves in writing such Rolling Cash Flow, such Rolling Cash Flow shall become the then-current DIP Budget for purposes of this DIP Term Sheet.

On the last Business Day of every second week, the Borrowers shall deliver to the DIP Agent and its counsel, a variance calculation (the "**Variance Report**") setting forth (i) actual aggregate receipts and disbursements and net cash flow of the DIP Loan Parties for the two-week period ended on the previous Friday and (ii) actual aggregate receipts and disbursements and net cash flow of the DIP Loan Parties on a cumulative basis since the beginning of the period covered by the 13-week static cash flow forecast provided by the

DIP TERM SHEET

LEGAL*71656698.2

001702

HIGHLY CONFIDENTIAL EXECUTION COPY

|  | | Borrowers to the DIP Agent on April 16, 2026, in each case as against the then-current DIP Budget, and setting forth all the variances, on a line-item and aggregate basis in comparison to the amounts set forth in respect thereof in the DIP Budget. Each such Variance Report shall include reasonably detailed written explanations for any material variances during the relevant period and such additional information as the DIP Agent may from time to time reasonably request respecting the DIP Budget. The Borrowers shall promptly discuss the Variance Report with the DIP Agent, and its counsel and financial advisors, as requested by the DIP Agent. |
|---|---|---|
| 38. | **Events of Default and Remedies:** | Upon the occurrence and during the continuance of an Event of Default under the DIP Credit Facility, the DIP Agent may, upon the instruction of the Majority DIP Lenders, terminate the DIP Commitments under the DIP Credit Facility immediately upon written notice to the DIP Loan Parties and the Monitor and, subject to any Court Orders, with two (2) days prior written notice, and declare the DIP Obligations to be immediately due and payable by providing such a notice and demand to the Borrowers, with a copy to the Monitor. Subject to obtaining prior approval of the Court, with not less than three (3) Business Days' notice to the Borrowers after the occurrence and during the continuance of an Event of Default, the DIP Agent shall have the rights and powers of a secured party under Applicable Law to enforce the DIP Charge and to exercise all other rights and remedies in respect of the DIP Obligations and the DIP Charge. |

Without limiting the foregoing remedies, upon the occurrence and during the continuance of an Event of Default, and upon obtaining prior approval of the Court, the DIP Agent may, upon the instruction of the Majority DIP Lenders:

(a) apply to a court for the appointment of a receiver, an interim receiver or a receiver and manager over the Collateral or any of it, or for the appointment of a trustee in bankruptcy of the Borrowers or any of the other DIP Loan Parties;

(b) set-off or combine any amounts then owing by the DIP Agent or any of the DIP Lenders to the DIP Loan Parties against the DIP Obligations of the DIP Loan Parties hereunder;

LEGAL*71656698.2

001703

HIGHLY CONFIDENTIAL

(c)     subject to obtaining prior approval from the Court, exercise any and all rights under any deposit account control agreements with the Cash Management Banks, including delivery of notices of exclusive control, or any similar notices, to the Cash Management Banks.

(d)     subject to obtaining prior approval from the Court, exercise the powers and rights of a secured party under the *Personal Property Security Act* (Alberta), or any legislation of similar effect; and/or

(e)     subject to obtaining prior approval from the Court, exercise all such other rights and remedies under this DIP Term Sheet, the other DIP Loan Documents, the Court Orders and Applicable Law.

39.     **Set-Off:**     Subject to the Court Orders and approval of the Court, upon (a) the occurrence and during the continuance of any Event of Default and (b) the declaration by the DIP Agent that the DIP Obligations are due and payable pursuant to the provisions of Section 38, each DIP Lender and each of its respective affiliates may, to the fullest extent permitted by law, set off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such DIP Lender or such affiliate to or for the credit or the account of the Borrowers against any and all of the DIP Obligations of the Borrowers now or hereafter existing under this DIP Term Sheet or the other DIP Loan Documents. Each DIP Lender agrees promptly to notify the Borrowers two (2) days prior to any such set-off and application.  The rights of each DIP Lender and its respective affiliates under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) that such DIP Lender and its respective affiliates may have.

40.     **Governing Law:**     This DIP Term Sheet shall be governed by the laws of the Province of Alberta and the federal laws of Canada applicable therein. Without prejudice to the ability of the DIP Agent and the DIP Lenders to enforce this DIP Term Sheet in any other proper jurisdiction, the DIP Loan Parties irrevocably submit and attorn to the non-exclusive jurisdiction of the courts of the

LEGAL*71656698.2

001704

HIGHLY CONFIDENTIAL                                    EXECUTION COPY

Province of Alberta.

| | | |
|---|---|---|
| 41. | **DIP Lender Approvals and Consents:** | Any reference to the approval or consent of the DIP Agent herein (except where expressly stated otherwise) is subject to the prior approval of the Majority DIP Lenders. |
| 42. | **DIP Agent and Administration of DIP Credit Facility** | The provisions of Article 15 (*The Agent and Administration of the Credit Facilities*) of the Existing Senior Secured Credit Agreement are hereby incorporated by reference and shall apply *mutatis mutandis* with respect to the DIP Agent and the administration of the DIP Credit Facility. |
| 43. | **Assignments and Participations:** | None of the DIP Loan Parties may assign, transfer or delegate any of its rights or obligations under this DIP Term Sheet or the other DIP Loan Documents without the prior written consent of the Unanimous DIP Lenders. |
| | | Each of the DIP Lenders shall have the right to assign or sell participations in their DIP Commitments or Outstanding DIP Loans in accordance with and subject to the terms and conditions of the DIP Commitment Letter. |
| 44. | **Currency:** | Unless otherwise stated, all monetary denominations shall be in lawful currency of Canada and all payments made by the Borrowers or any DIP Guarantor under this DIP Term Sheet shall be in Canadian dollars, other than with respect to DIP Loans denominated in US Dollars, in respect of which payments shall be made in US Dollars. |
| 45. | **Judgment Currency:** | If for the purposes of obtaining judgment in any court it is necessary to convert all or any part of the DIP Obligations or any other amount due to the DIP Agent or any of the DIP Lenders in respect of this DIP Term Sheet or any of the other DIP Loan Documents in any currency (the "**Original Currency**") into another currency (the "**Other Currency**"), the Borrowers, to the fullest extent that they may effectively do so, agree that the rate of exchange used shall be that at which, in accordance with normal banking procedures, the DIP Agent or the applicable DIP Lender could purchase the Original Currency with the Other Currency on the Business Day preceding that on which final judgment is paid or satisfied. |
| | | The obligations of the Borrowers in respect of any sum due in the Original Currency from it to the DIP Agent or the applicable DIP Lender shall, notwithstanding any judgment in any Other Currency, be discharged only to the extent that on the Business Day following receipt by the DIP Agent or the |

DIP TERM SHEET

LEGAL*71656698.2

001705

HIGHLY CONFIDENTIAL   EXECUTION COPY

applicable DIP Lender of any sum adjudged to be so due in such Other Currency, the DIP Agent or the applicable DIP Lender may, in accordance with its normal banking procedures, purchase the Original Currency with such Other Currency.   If the amount of the Original Currency so purchased is less than the sum originally due to the DIP Agent or the applicable DIP Lender in the Original Currency, the Borrowers agree, as a separate obligation and notwithstanding any such judgment, to indemnify the DIP Agent or the applicable DIP Lender, as the case may be, against such loss, and if the amount of the Original Currency so purchased exceeds the sum originally due to the DIP Agent or the applicable DIP Lender in the Original Currency, the DIP Agent or the applicable DIP Lender, as the case may be, agrees to remit such excess to the applicable Borrowers.

| | | |
|---|---|---|
| 46. | **Indemnities:** | The DIP Loan Parties agree, on a joint and several basis, to indemnify and hold harmless the DIP Agent, each of the DIP Lenders, their respective affiliates, and each of their respective directors, officers, employees, agents, attorneys, counsel and advisors (all such Persons being referred to hereafter as "**Indemnified Persons**") from and against any and all actions, suits, proceedings, claims, losses, damages, liabilities or expenses of any kind or nature whatsoever (excluding indirect or consequential damages and claims for lost profits) which may be incurred by or asserted against any Indemnified Person as a result of or arising out of or in any way related to the DIP Credit Facility, this DIP Term Sheet, the DIP Commitment Letter and the other DIP Loan Documents and, upon demand, to pay and reimburse any Indemnified Person for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating, defending or preparing to defend any such action, suit, proceeding or claim; provided, however, the Borrowers and other DIP Loan Parties shall not be obligated to indemnify pursuant to this paragraph any Indemnified Person against any loss, claim, damage, expense or liability (x) to the extent it resulted from the gross negligence or wilful misconduct of such Indemnified Person as finally determined by a court of competent jurisdiction, or (y) to the extent arising from any dispute solely among Indemnified Persons other than any claims arising out of any act or omission on the part of the Borrowers or the other DIP Loan Parties.  The indemnities granted under this DIP Term Sheet shall survive any termination of the DIP Credit Facility. |
| 47. | **Taxes:** | All payments by the Borrowers and any other DIP Loan Parties |

DIP TERM SHEET

LEGAL*71656698.2

001706

HIGHLY CONFIDENTIAL

under this DIP Term Sheet or any of the other DIP Loan Documents to the DIP Agent or the DIP Lenders, including any payments required to be made from and after the exercise of any remedies available to the DIP Agent or the DIP Lenders upon an Event of Default, shall be made free and clear of, and without reduction for or on account of, any present or future taxes, levies, imposts, duties, charges, fees, deductions or withholdings of any kind or nature whatsoever or any interest or penalties payable with respect thereto now or in the future imposed, levied, collected, withheld or assessed by any country or any political subdivision of any country (collectively "**Taxes**"); provided, however, that if any Taxes are required by Applicable Law to be withheld ("**Withholding Taxes**") from any amount payable to the DIP Agent or the DIP Lenders under this DIP Term Sheet or any of the other DIP Loan Documents, the amount so payable to the DIP Agent or the DIP Lenders shall be increased to the extent necessary to yield to the DIP Agent or the DIP Lenders, as the case may be, on a net basis after payment of all Withholding Taxes, the amount payable under the DIP Term Sheet or such other DIP Loan Document, as applicable, at the rate or in the amount specified herein or therein and the Borrowers shall provide evidence satisfactory to the DIP Agent or the DIP Lenders, as the case may be, that the Taxes have been so withheld and remitted. The Borrowers' obligation to pay additional amounts shall be subject to customary exclusions for any Withholding Taxes arising as a result of a present or former connection between the DIP Agent or the DIP Lenders and the jurisdiction imposing Withholding Tax (excluding any connection arising solely in connection with the DIP Credit Facility). If the DIP Loan Parties are required to pay an additional amount to the DIP Agent or the DIP Lenders to account for any deduction or withholding, the DIP Agent or the applicable DIP Lenders, as the case may be, shall reasonably cooperate with the applicable DIP Loan Parties (i) to claim any available exemption or reduction of withholding, or (ii) to obtain a refund of the amounts so withheld, including in each case by filing income tax returns in applicable jurisdictions, claiming a refund of such tax and/or providing evidence of entitlement to the benefits of any applicable tax treaty, as applicable. The amount of any refund so received, and interest paid by the tax authority with respect to any refund, shall be paid over by the DIP Agent or the applicable DIP Lenders, as the case may be, to the applicable DIP Loan Parties promptly. If reasonably requested by the DIP Loan Parties, the DIP Agent or the applicable DIP Lenders, as the case may be, shall apply to the relevant taxing

HIGHLY CONFIDENTIAL

authority to obtain a waiver from such withholding requirement, and the DIP Agent or the applicable DIP Lenders, as the case may be, shall cooperate with the applicable DIP Loan Parties and assist such DIP Loan Parties to minimize the amount of deductions or withholdings required, including by providing the DIP Loan Parties with a duly completed copy of Canada Revenue Agency form NR-303, as may be applicable (or any other applicable form).  Notwithstanding the foregoing, the DIP Agent or the applicable DIP Lenders, as the case may be, may, in respect of any additional payment to which this Section 47 would otherwise apply and in its sole and unfettered discretion, decline to provide any of the information or cooperation (including the completion of any form) contemplated in this Section 47, provided it has waived its rights and entitlements thereunder in respect of such additional payment.

| | | |
|---|---|---|
| 48. | **Liabilities Joint and Several:** | The obligations and liabilities of the DIP Loan Parties hereunder are joint and several. |
| 49. | **Guarantee and Indemnity:** | Each of the DIP Guarantors, on a joint and several basis, unconditionally and fully guarantees the full and prompt payment and performance of the DIP Obligations to the DIP Agent and the DIP Lenders, subject to the terms and conditions of this DIP Term Sheet and any applicable Court Order, including any DIP Obligations owed by the Borrowers and each other DIP Guarantor and hereby waives all defences that any of them may now have or have in the future. |

As an original and independent obligation, each DIP Guarantor shall, on a joint and several basis:  (i) indemnify the DIP Agent and the DIP Lenders and keep the DIP Agent and the DIP Lenders indemnified against any cost, loss, expense or liability of whatever kind resulting from the failure by the Borrowers to make due and punctual payment of any of the DIP Obligations or resulting from any of the DIP Obligations or payments of the DIP Obligations being or becoming void, voidable, unenforceable or ineffective against the Borrowers (including, but without limitation, all legal and other costs, charges and expenses incurred by the DIP Agent and the DIP Lenders in connection with preserving or enforcing, or attempting to preserve or enforce, their rights against the DIP Guarantors under the DIP Term Sheet and the other DIP Loan Documents); and (ii) pay on demand the amount of such cost, loss, expense or liability whether or not the DIP Agent and the DIP Lenders have attempted to enforce any rights against the

DIP TERM SHEET

LEGAL*71656698.2

001708

HIGHLY CONFIDENTIAL

Borrowers or any other Person or otherwise.

| 50. | **Evidence of Indebtedness:** | The DIP Agent's accounts and records constitute, in the absence of manifest error, prima facie evidence of the indebtedness of the Borrowers to the DIP Lenders pursuant to the DIP Credit Facility. |
|---|---|---|
| 51. | **Further Assurances:** | The DIP Loan Parties shall, at their expense, from time to time do, execute and deliver, or will cause to be done, executed and delivered, all such further acts, documents (including, without limitation, certificates, declarations, affidavits, reports and opinions) and things as the DIP Agent may reasonably request for the purpose of giving effect to this DIP Term Sheet. |
| 52. | **Amendments and Waivers:** | No waiver or delay on the part of the DIP Agent or any DIP Lender in exercising any right or privilege hereunder will operate as a waiver hereof or thereof unless made in writing by the DIP Agent or such DIP Lender, as the case may be, and delivered in accordance with the terms of this DIP Term Sheet, and then such waiver shall be effective only in the specific instance and for the specific purpose given.  No amendment of this DIP Term Sheet shall be effective unless signed by all parties hereto. |
| 53. | **Severability:** | Any provision of this DIP Term Sheet or any of the other DIP Loan Documents that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. |
| 54. | **Notices:** | Any notice, request or other communication hereunder to any of the parties shall be in writing and be well and sufficiently given if delivered personally or sent by electronic mail to such party at its address set out on its signature page hereof. Any such notice, request or other communication hereunder shall be concurrently sent to the Monitor and its counsel. |
| | | Any such notice shall be deemed to be given and received when received, unless received after 3:00 p.m. Calgary Time or on a day other than a Business Day, in which case the notice shall be deemed to be received the next Business Day. |
| 55. | **Counterparts and Electronic Submission:** | This DIP Term Sheet may be executed in any number of counterparts and by facsimile or other electronic transmission |

- 26 -   DIP TERM SHEET

001709

HIGHLY CONFIDENTIAL   EXECUTION COPY

including "pdf email", each of which when executed and delivered shall be deemed to be an original, and all of which when taken together shall constitute one and the same instrument.

**[SIGNATURE PAGES FOLLOW]**

DIP TERM SHEET

LEGAL*71656698.2

001710

HIGHLY CONFIDENTIAL                                                    EXECUTION COPY

**IN WITNESS WHEREOF** the undersigned have executed this DIP Term Sheet on the date first above written.

| | |
|---|---|
| **Address:** | **MONETTE FARMS LTD.**<br>**as Borrower and DIP Guarantor** |
| P.O. Box 1298<br>Swift Current, Saskatchewan<br>S9H 3X4 | |
| | By: _____ |
| | Name:   Darrel Monette<br>Title:   Authorized Signatory |
| Attention:  Darrel Monette<br>　　　　　　David Kemp<br>Email:      darrel@monettefarms.com<br>　　　　　　david@monettefarms.com | |

with a copy to:

Cassels Brock & Blackwell LLP
Suite 3810, Bankers Hall West
888 3 St SW, Calgary, AB T2P 5C5

Attention:  Jeffrey Oliver
　　　　　　Danielle Marechal
　　　　　　Matteo Clarkson-Maciel
Email:      joliver@cassels.com
　　　　　　dmarechal@cassels.com
　　　　　　mclarksonmaciel@cassels.com

DIP TERM SHEET

LEGAL*71656698.2

001711

HIGHLY CONFIDENTIAL                                          EXECUTION COPY

**Address:**

P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4


Attention:  Darrel Monette
            David Kemp
Email:      darrel@monettefarms.com
            david@monettefarms.com

with a copy to:

Cassels Brock & Blackwell LLP
Suite 3810, Bankers Hall West
888 3 St SW, Calgary, AB T2P 5C5

Attention:  Jeffrey Oliver
            Danielle Marechal
            Matteo Clarkson-Maciel
Email:      joliver@cassels.com
            dmarechal@cassels.com
            mclarksonmaciel@cassels.com


**MONETTE FARMS USA, INC.
as Borrower and DIP Guarantor**


By: _____
      Name:   Darrel Monette
      Title:   Authorized Signatory


**Address:**

**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4


Attention:  Darrel Monette
            David Kemp
Email:      darrel@monettefarms.com
            david@monettefarms.com


**MONETTE FARMS ONTARIO CORP.
as a DIP Guarantor**


By: _____
      Name:   Darrel Monette
      Title:   Authorized Signatory


DIP TERM SHEET

LEGAL*71656698.2

001712

HIGHLY CONFIDENTIAL

**Address:**

**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4


Attention:  Darrel Monette
David Kemp
Email:      darrel@monettefarms.com
david@monettefarms.com

**NEXGEN SEEDS LTD.**
**as a DIP Guarantor**


By:  _____
Name:   Darrel Monette
Title:   Authorized Signatory

**Address:**

**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4


Attention:  Darrel Monette
David Kemp
Email:      darrel@monettefarms.com
david@monettefarms.com

**MONETTE PRODUCE LTD.**
**as a DIP Guarantor**


By:  _____
Name:   Darrel Monette
Title:   Authorized Signatory

**Address:**

**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4


Attention:  Darrel Monette
David Kemp
Email:      darrel@monettefarms.com
david@monettefarms.com

**MONETTE LAND CORP.**
**as a DIP Guarantor**


By:  _____
Name:   Darrel Monette
Title:   Authorized Signatory

S - 3

DIP TERM SHEET

LEGAL*71656698.2

001713

HIGHLY CONFIDENTIAL                                           EXECUTION COPY

**Address:**                                              **DMO HOLDINGS LTD.**
                                                          **as a DIP Guarantor**
**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4

                                                          By: _____
                                                                Name:   Darrel Monette
Attention:  Darrel Monette                                     Title:   Authorized Signatory
            David Kemp
Email:      darrel@monettefarms.com
            david@monettefarms.com


**Address:**                                              **GOAT'S PEAK WINERY LTD.**
                                                          **as a DIP Guarantor**
**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4

                                                          By: _____
                                                                Name:   Darrel Monette
Attention:  Darrel Monette                                     Title:   Authorized Signatory
            David Kemp
Email:      darrel@monettefarms.com
            david@monettefarms.com


**Address:**                                              **MONETTE FARMS BC LTD.**
                                                          **as a DIP Guarantor**
**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4

                                                          By: _____
                                                                Name:   Darrel Monette
Attention:  Darrel Monette                                     Title:   Authorized Signatory
            David Kemp
Email:      darrel@monettefarms.com
            david@monettefarms.com

DIP TERM SHEET
LEGAL*71656698.2

001714

HIGHLY CONFIDENTIAL                                    EXECUTION COPY

**Address:**                                              **MONETTE FARMS BC GP LTD.**
                                                          **as a DIP Guarantor**

**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4

                                                          By: _____
                                                               Name:   Darrel Monette
Attention:  Darrel Monette                                     Title:   Authorized Signatory
            David Kemp
Email:      darrel@monettefarms.com
            david@monettefarms.com


**Address:**                                              **MONETTE FARMS LAND GP LTD.**
                                                          **as a DIP Guarantor**

**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4

                                                          By: _____
                                                               Name:   Darrel Monette
Attention:  Darrel Monette                                     Title:   Authorized Signatory
            David Kemp
Email:      darrel@monettefarms.com
            david@monettefarms.com


**Address:**                                              **MONETTE FARMS LAND II GP LTD.**
                                                          **as a DIP Guarantor**

**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4

                                                          By: _____
                                                               Name:   Darrel Monette
Attention:  Darrel Monette                                     Title:   Authorized Signatory
            David Kemp
Email:      darrel@monettefarms.com
            david@monettefarms.com

DIP TERM SHEET

LEGAL*71656698.2

001715

HIGHLY CONFIDENTIAL                                                                            EXECUTION COPY

**Address:**                                                    **MONETTE SEEDS LTD.**
                                                                **as a DIP Guarantor**
**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4

                                                                By: _____
Attention:  Darrel Monette                                          Name:   Darrel Monette
            David Kemp                                              Title:   Authorized Signatory
Email:      darrel@monettefarms.com
            david@monettefarms.com


**Address:**                                                    **DMO HOLDINGS USA, INC.**
                                                                **as a DIP Guarantor**
**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4

                                                                By: _____
Attention:  Darrel Monette                                          Name:   Darrel Monette
            David Kemp                                              Title:   Authorized Signatory
Email:      darrel@monettefarms.com
            david@monettefarms.com


**Address:**                                                    **MONETTE SEEDS USA, LLC**
                                                                **as a DIP Guarantor**
**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4

                                                                By: _____
Attention:  Darrel Monette                                          Name:   Darrel Monette
            David Kemp                                              Title:   Authorized Signatory
Email:      darrel@monettefarms.com
            david@monettefarms.com

DIP TERM SHEET

LEGAL*71656698.2

001716

HIGHLY CONFIDENTIAL                                    EXECUTION COPY

**Address:**

**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4


Attention:  Darrel Monette
          David Kemp
Email:    darrel@monettefarms.com
          david@monettefarms.com

**MONETTE FARMS ARIZONA, LLC
as a DIP Guarantor**




By:  _____
      Name:   Darrel Monette
      Title:   Authorized Signatory




**Address:**

**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4


Attention:  Darrel Monette
          David Kemp
Email:    darrel@monettefarms.com
          david@monettefarms.com

**MONETTE PRODUCE, LLC
as a DIP Guarantor**




By:  _____
      Name:   Darrel Monette
      Title:   Authorized Signatory




**Address:**

**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4


Attention:  Darrel Monette
          David Kemp
Email:    darrel@monettefarms.com
          david@monettefarms.com

**1012595 DE INC.
as a DIP Guarantor**




By:  _____
      Name:   Darrel Monette
      Title:   Authorized Signatory

DIP TERM SHEET

LEGAL*71656698.2


001717

HIGHLY CONFIDENTIAL                                    EXECUTION COPY

**Address:**

**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4


Attention:  Darrel Monette
            David Kemp
Email:      darrel@monettefarms.com
            david@monettefarms.com

**MONETTE FARMS LAND LIMITED PARTNERSHIP**, by its general partner **MONETTE FARMS LAND GP LTD. as a DIP Guarantor**


By:  _____
            Name:   Darrel Monette
            Title:   Authorized Signatory


**Address:**

**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4


Attention:  Darrel Monette
            David Kemp
Email:      darrel@monettefarms.com
            david@monettefarms.com

**MONETTE FARMS LAND II LIMITED PARTNERSHIP**, by its general partner **MONETTE FARMS LAND II GP LTD. as a DIP Guarantor**


By:  _____
            Name:   Darrel Monette
            Title:   Authorized Signatory


**Address:**

**c/o Monette Farms Ltd.**
P.O. Box 1298
Swift Current, Saskatchewan
S9H 3X4


Attention:  Darrel Monette
            David Kemp
Email:      darrel@monettefarms.com
            david@monettefarms.com

**MONETTE FARMS BC LIMITED PARTNERSHIP**, by its general partner **MONETTE FARMS BC GP LTD. as a DIP Guarantor**


By:  _____
            Name:   Darrel Monette
            Title:   Authorized Signatory

DIP TERM SHEET
LEGAL*71656698.2

001718

HIGHLY CONFIDENTIAL                                                      EXECUTION COPY

**Address:**                                          **THE BANK OF NOVA SCOTIA**

The Bank of Nova Scotia
GWO Loan Operations
150 King Street West, 6th Floor              By:   _____
Toronto, ON M5H 1J9
                                                      Name:   James Cook
Attention:  Manager                                   Title:    Senior Manager
Email:
orporatelending.agencyops@scotiabank.com

with a copy to:

The Bank of Nova Scotia
Global Loan Syndication – Agency Services
40 Temperance Street, 6th Floor
Toronto, ON M5H 0B4
                                                      By:   _____

                                                      Name:   Justin Mitges
Attention:  Head of Agency Services                   Title:    Director
               Rocco Fabiano, Justin Mitges and
               Jim Cook
Email:      agency.services@scotiabank.com
               rocco.fabiano@scotiabank.com
               justinl.mitges@scotiabank.com
               james.cook@scotiabank.com

with a further copy to:

McMillan LLP
BCE Place, Suite 4400
Bay Wellington Tower, 181 Bay Street
Toronto, ON M5J 2T3

Attention:  Wael Rostom
Email:      wael.rostom@mcmillan.ca

DIP TERM SHEET

LEGAL*71656698.2

001719

HIGHLY CONFIDENTIAL                                                          EXECUTION COPY

**Address:**                                          **FARM CREDIT CANADA**


By: _____
     Name:
Attention:  Dale Snider                          Title:
           Olivia Chmelowski
Email:     dale.snider@fcc.ca
           olivia.chmelowski@fcc.ca

By: _____
     Name:
     Title:

HIGHLY CONFIDENTIAL                                                          DIP TERM SHEET
LEGAL*71656698.2

001720

HIGHLY CONFIDENTIAL
EXECUTION COPY

**Address:**

**BANK OF MONTREAL**

By: _____
     Name:
Attention:  Daniel To                  Title:
Email:      daniel.to@bmo

By: _____
     Name:
     Title:

DIP TERM SHEET
LEGAL*71656698.2

001721

HIGHLY CONFIDENTIAL                                    EXECUTION COPY

**Address:**                                    **EXPORT DEVELOPMENT CANADA**


By: _____
                                    Name:
Attention:  Trevor Kuhn                 Title:
            Stephano Carrera
Email:      tkuhn@edc.ca


By: _____
                                    Name:
                                    Title:

DIP TERM SHEET
LEGAL*71656698.2

001722

HIGHLY CONFIDENTIAL

EXECUTION COPY

**Address:**

**CANADIAN IMPERIAL BANK OF COMMERCE**

By:  _____

Name:
Title:

Attention:  Devang Shah
Email:      devang.shah@cibc.com

By:  _____

Name:
Title:

DIP TERM SHEET

LEGAL*71656698.2

001723

HIGHLY CONFIDENTIAL

**Address:**

**ROYAL BANK OF CANADA**

By: _____
    Name:
Attention:  Cameron Bailey        Title:
Email:      Cameron.bailey@rbc.com

By: _____
    Name:
    Title:

DIP TERM SHEET
LEGAL*71656698.2

001724

HIGHLY CONFIDENTIAL                                              EXECUTION COPY

**Address:**                                    **THE TORONTO-DOMINION BANK**


By:   _____
        Name:
Attention:  Christopher Creo          Title:
          Xiaoyu Jia
Email:      christopher.creo@td.com
          Xiaoyu.jia@td.com


By:   _____
        Name:
        Title:

DIP TERM SHEET

LEGAL*71656698.2

001725

HIGHLY CONFIDENTIAL                                                                EXECUTION COPY

**Address:**                                        **NATIONAL BANK OF CANADA**


By:   _____
         Name:
Attention:  Alexandre Leblanc          Title:
           Moneedb Hussain
Email:   moneeb.hussain@nbc.ca

By:   _____
         Name:
         Title:

DIP TERM SHEET
LEGAL*71656698.2

001726

HIGHLY CONFIDENTIAL

**Address:**                                    **CONEXUS CREDIT UNION**

By: _____

    Name:

Attention:  Brad Fennig                         Title:

            Tim Proseilo

Email:      brad.fennig@conexus.ca

            tim.proseilo@conexus.ca

By: _____

    Name:

    Title:

HIGHLY CONFIDENTIAL

S – 16

DIP TERM SHEET

LEGAL*71656698.2

HIGHLY CONFIDENTIAL                                                EXECUTION COPY

## Schedule A – Definitions

"**Administration Charge**" means an administration charge to secure the unpaid fees and expenses of the legal counsel for the DIP Loan Parties, the Monitor and the Monitor's legal counsel and the Borrowers' financial advisor in an amount not to exceed CDN$1,500,000 or such other amount agreed to by the Majority DIP Lenders.

"**Arranger Fee**" has the meaning given thereto in Section 26.

"**Applicable Law**" means, in respect of any Person, property, transaction or event, all applicable laws, statutes, rules, by-laws and regulations and all applicable official directives, orders, judgments and decrees of any Governmental Authority having the force of law.

"**ARIO**" means an amended and restated CCAA Initial Order of the Court in form and substance satisfactory to the DIP Agent and the DIP Lenders.

"**Availability**" has the meaning given thereto in Section 9.

"**Bank Products**" means any facilities or services related to cash management services, including centralized operating accounts, automated clearing house transactions, controlled disbursement services, treasury, depository, overdraft, credit or debit card, purchase card, electronic funds transfer, cash pooling, foreign exchange facilities, currency exchange transactions or agreements and options with respect thereto and other cash management arrangements and commercial credit card services provided to any DIP Loan Party by the Existing Senior Secured Lenders or their respective affiliates.

"**BIA**" means the *Bankruptcy and Insolvency Act* (Canada), as amended.

"**BNS Bi-Lateral Leased Equipment Debt**" means the attributable debt (as defined in the Existing Senior Secured Credit Agreement) owing by the applicable Loan Parties to The Bank of Nova Scotia in connection with leasing facilities in the maximum amount of CDN$10,000,000.

"**Borrowers**" has the meaning given thereto in Section 1.

"**Business Days**" means any day other than a Saturday, Sunday or any other day on which banks in Calgary, Alberta are not open for business.

"**CAD Prime Rate**" means, on any day, the interest rate expressed as a percentage rate per annum calculated on the basis of a 365 or 366 day year, as the case may be, equal to the annual rate of interest announced from time to time by the DIP Agent as being its reference rate then in effect on such day for determining interest rates on Canadian Dollar denominated commercial loans made by it in Canada, as adjusted automatically with each announced, displayed or quoted change in such rate without the necessity of notice to the Borrowers or any other Person.  Any change in the CAD Prime Rate determined by the DIP Agent shall be effective on the date the change becomes effective generally.

"**Canadian Dollar**", "**CAD**" or "**CDN$**" mean lawful money of Canada.

DIP TERM SHEET

LEGAL*71656698.2

001728

HIGHLY CONFIDENTIAL

"**Cash Management Banks**" means The Bank of Nova Scotia and BMO Bank N.A..

"**CCAA**" has the meaning given in the recitals.

"**CCAA Applicants**" means, collectively, the Borrowers and the DIP Guarantors (other than the CCAA Non-Applicant Stay Parties).

"**CCAA Filing Date**" means the date of commencement of the CCAA Proceedings.

"**CCAA Initial Order**" means a CCAA Initial Order of the Court in form and substance satisfactory to the DIP Agent pursuant to which the DIP Loan Parties commence the CCAA Proceedings.

"**CCAA Non-Applicant Stay Parties**" means Monette Farms Land Limited Partnership, Monette Farms Land II Limited Partnership, and Monette Farms BC Limited Partnership.

"**CCAA Proceedings**" has the meaning given in the recitals.

"**Collateral**" has the meaning given thereto in Section 30.

"**Commitment Fee**" has the meaning given thereto in Section 28.

"**Court**" has the meaning given in the recitals.

"**Court Order**" means any of the CCAA Initial Order, the US Provisional Recognition Order, the US Recognition Order, the ARIO, the SISP Order, any SISP Transaction Approval Order and any other orders of the Court or the US Bankruptcy Court entered in connection with the CCAA Proceedings or the US Chapter 15 Proceedings, as at the relevant time.

"**Cumulative Actual Disbursements**" means, as of any date, the aggregate of the actual total disbursements of the DIP Loan Parties for the period beginning on the Effective Date, to such date.

"**Cumulative Actual Receipts**" means, as of any date, the aggregate of the actual total receipts of the DIP Loan Parties for the period beginning on the Effective Date, to such date.

"**Cumulative Budgeted Disbursements**" means, as of any date, the aggregate total disbursements of the DIP Loan Parties for the period beginning on the Effective Date, to the last Business Day of the week in which such date falls, as set forth in the then-current DIP Budget.

"**Cumulative Budgeted Receipts**" means, as of any date, the aggregate total receipts of the DIP Loan Parties for the period beginning on the Effective Date, to the last Business Day of the week in which such date falls, as set forth in the then-current DIP Budget.

"**Default**" means an event or circumstance which, after the giving of notice or the passage of time, or both, would result in an Event of Default.

"**Deficiency**" has the meaning given thereto in Section 32.

HIGHLY CONFIDENTIAL

"**DIP Agent**" has the meaning given thereto in Section 4.

"**DIP Agent Fee**" has the meaning given thereto in Section 27.

"**DIP Budget**" means the approved Rolling Cash Flow prepared by the Borrowers' management and advisors, which shall be in form and substance acceptable to the DIP Agent, and which, for greater certainty, shall set forth all forecasted revenues, operating and non-operating cash receipts, professional fees, disbursements, net operating cash flow and liquidity of the Borrowers and the DIP Guarantors, on a weekly basis for such 13-week period beginning on the Effective Date, broken down by week, including the anticipated weekly borrowings and uses of the DIP Loans for such period, and which shall include, among other things, available cash, cash flow, trade payables and Ordinary Course expenses, total expenses and capital expenditures, fees and expenses relating to the DIP Credit Facility, fees and expenses related to the CCAA Proceedings (including professional fees), as applicable, and working capital and other general corporate needs (such DIP Budget shall be updated and supplemented in the manner required pursuant to Section 37).  For greater certainty, for purposes of this DIP Term Sheet, the DIP Budget shall include all supporting documentation provided in respect thereof to the DIP Agent.

"**DIP Charge**" has the meaning given thereto in Section 30.

"**DIP Commitments**" has the meaning given thereto in Section 6.

"**DIP Commitment Letter**" has the meaning given thereto in Section 6.

"**DIP Credit Facility**" has the meaning given thereto in Section 8.

"**DIP Expenses**" has the meaning given thereto in Section 18.

"**DIP Guarantors**" has the meaning given thereto in Section 2.

"**DIP Intercompany Loans**" has the meaning given thereto in Section 19.

"**DIP Lenders**" has the meaning given thereto in Section 6.

"**DIP Loan Documents**" means, collectively, the DIP Term Sheet, the DIP Commitment Letter, the Fee Letter, any deposit account control agreements contemplated by the DIP Term Sheet and any other agreement between the DIP Loan Parties and the DIP Agent or the DIP Lenders contemplated by the DIP Term Sheet or the DIP Commitment Letter.

"**DIP Loan Parties**" has the meaning given thereto in Section 2.

"**DIP Loans**" has the meaning given thereto in Section 8.

"**DIP Milestones**" means the actions and timelines described in Schedule J attached hereto.

"**DIP Obligations**" shall mean any and all DIP Loans and all other obligations, liabilities and indebtedness of every kind, nature and description owing by one or more DIP Loan Parties to the DIP Lenders, the DIP Agent and/or their respective affiliates, including principal, interest,

LEGAL*71656698.2

001730

HIGHLY CONFIDENTIAL

EXECUTION COPY

charges, fees, costs and expenses and indemnities solely pursuant to or in connection with this DIP Term Sheet or any of the other DIP Loan Documents, any obligations arising under or in connection with Bank Products, whether arising before, during or after the initial or any renewal of term of this DIP Term Sheet or after the commencement of any proceeding with respect to any DIP Loan Party under the CCAA, BIA, the US Bankruptcy Code or any similar statute in any jurisdiction (including payment of interest and other amounts which would accrue and become due but for the commencement of such proceedings, whether or not such amounts are allowed or allowable in whole or in part in such proceeding), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated.

"**DIP Outside Date**" means March 31, 2027.

"**DIP Term Sheet**" has the meaning given in the recitals.

"**Directors' Charge**" means a directors and officers liability charge in an amount not to exceed CDN$1,500,000 or such other amount agreed to by the Unanimous DIP Lenders.

"**Draw Request**" has the meaning given thereto in Section 13.

"**Effective Date**" has the meaning given thereto in Section 10.

"**Equivalent Amount**" means, on any date, the equivalent amount in Canadian Dollars or US Dollars, as the case may be, after giving effect to a conversion of a specified amount of US Dollars to Canadian Dollars or Canadian Dollars to US Dollars, as the case may be, at the Exchange Rate.

"**Event of Default**" means the occurrence of any of the events described in <u>Schedule E</u> attached hereto.

"**Excess Cash**" means the amount by which, as determined at the end of each two-week reporting period, the DIP Loan Parties' unrestricted cash is greater than CDN$5,000,000 (or the Equivalent Amount thereof) more than the net cash flow required to fund the operating and financing activities of the DIP Loan Parties taking into account projected availability under the DIP Credit Facility, as forecast in the DIP Budget for the following two-week reporting period.

"**Exchange Rate**" means, on any day, with respect to the exchange of either of Canadian Dollars or US Dollars  into the other of those currencies, the 4:30 p.m. rate of the Bank of Canada on the immediately preceding Business Day for purchases of the Other Currency with the Original Currency, or if such rate is not or has not yet been quoted on such day, the last preceding 4:30 p.m. rate of the Bank of Canada.

"**Existing Senior Secured Agent**" means The Bank of Nova Scotia in its capacity as agent under the Existing Senior Secured Credit Agreement.

"**Existing Senior Secured Credit Agreement**" means the fifth amended and restated credit agreement originally made as of December 5, 2018, amended and restated as of March 18, 2021, further amended and restated as of October 18, 2021, further amended and restated as of March

HIGHLY CONFIDENTIAL

18, 2022, further amended and restated as of March 31, 2023 and further amended and restated as of April 15, 2024 between the Borrowers, as borrowers, the Existing Senior Secured Lenders, as lenders, and the Existing Senior Secured Agent, as amended and supplemented to the date hereof including pursuant to an accordion exercise agreement made as of May 13, 2024, as further amended by the following:

(a)     the waiver and covenant agreement dated October 31, 2024, delivered to the Borrowers by the Existing Senior Secured Agent on behalf of the Existing Senior Secured Lenders, which was accepted, acknowledged and agreed to by the Borrowers,

(b)     the first amending agreement made as of November 22, 2024, between the Borrowers, the Existing Senior Secured Lenders and the Existing Senior Secured Agent;

(c)     the second waiver and covenant agreement dated March 19, 2025, from the Existing Senior Secured Agent, on behalf of the majority of the Existing Senior Secured Lenders, which was accepted, acknowledged and agreed to by the Borrowers;

(d)     the second amending agreement made as of January 31, 2025, between the Borrowers, the Existing Senior Secured Lenders and the Existing Senior Secured Agent;

(e)     the third amending agreement made as of February 21, 2025, between the Borrowers, the Existing Senior Secured Lenders and the Existing Senior Secured Agent;

(f)     the fourth amending agreement made as of April 15, 2025, between the Borrowers, the Existing Senior Secured Lenders and the Existing Senior Secured Agent;

(g)     the fifth amending agreement made as of May 2, 2025, between the Borrowers, the Existing Senior Secured Lenders and the Existing Senior Secured Agent;

(h)     the sixth amending agreement made as of June 10, 2025, between the Borrowers, the Existing Senior Secured Lenders and the Existing Senior Secured Agent;

(i)     the seventh amending agreement made as of July 30, 2025, between the Borrowers, the Existing Senior Secured Lenders and the Existing Senior Secured Agent;

(j)     the eighth amending agreement made as of October 31, 2025, between the Borrowers, the Existing Senior Secured Lenders and the Existing Senior Secured Agent; and

DIP TERM SHEET

LEGAL*71656698.2

001732

HIGHLY CONFIDENTIAL

EXECUTION COPY

(k)   the forbearance agreement dated November 7, 2025, between the Borrowers, the Individual Borrower, the Existing Senior Secured Lenders and the Existing Senior Secured Agent.

"**Existing Senior Secured Lenders**" means the Persons to whom Existing Senior Secured Obligations are owed under the Existing Senior Secured Credit Agreement.

"**Existing Senior Secured Obligations**" means the "Obligations" as defined in the Existing Senior Secured Credit Agreement, which, for greater certainty, shall include the Swap Unwind Amounts.

"**FCC Lien**" means any valid, enforceable, perfected, first ranking security interests granted by the Borrowers in favour of Farm Credit Canada as described in the Loan and Security Agreement (Livestock), dated December 4, 2024.

"**Fee Letter**" means the fee letter dated as of the date hereof, between the Borrowers and The Bank of Nova Scotia, in its capacity as arranger of the DIP Credit Facility.

"**Further Availability Amount**" has the meaning given thereto in Section 9.

"**Further Availability Conditions**" has the meaning given thereto in Section 12.

"**GAAP**" means the generally accepted accounting principles which are in effect from time to time approved by the Canadian Accounting Standards Board or any successor thereto, as applicable, which are currently the International Financial Reporting Standards as adopted by Chartered Professional Accountants Canada.

"**Governmental Authority**" means any federal, provincial, state, municipal, local or other government, governmental or public department, commission, board, bureau, agency or instrumentality, domestic or foreign and any subdivision, agency, commission, board or authority of any of the foregoing.

"**Individual Borrower**" means Darrel Noel Monette, an individual.

"**Initial Availability Amount**" has the meaning given thereto in Section 9.

"**Initial Availability Conditions**" has the meaning given thereto in Section 11.

"**Indemnified Persons**" has the meaning given thereto in Section 46.

"**Liens**" means all liens, hypothecs, charges, mortgages, trusts, deemed trusts (statutory or otherwise), encumbrances and security interests of every kind and nature whatsoever.

"**Majority DIP Lenders**" means, at any time, (i) the DIP Lenders whose DIP Commitments represent, in the aggregate, at least 66 2/3% of the total DIP Commitments under the DIP Credit Facility at such time or, if no DIP Commitments are in effect at such time, at least 66 2/3% of the sum of Outstanding DIP Loans at such time, and (ii) no fewer than two DIP Lenders.

HIGHLY CONFIDENTIAL

"**Material Adverse Effect**" means, as determined by the DIP Agent, anything that would reasonably be expected to cause a material adverse effect on (a) the business, assets, liabilities, operations, condition (financial or otherwise), operating results, properties or prospects of the DIP Loan Parties, taken as a whole (other than events publicly disclosed in public filings prior to the commencement of the CCAA Proceedings and the commencement and continuation of the CCAA Proceedings and the consequences that would normally result therefrom), (b) the rights and remedies of the DIP Agent or any DIP Lender under this DIP Term Sheet or any of the other DIP Loan Documents, (c) the ability of any DIP Loan Party to perform its obligations under this DIP Term Sheet or any of the other DIP Loan Documents or (d) the ability of the DIP Loan Parties to conduct the SISP or close a SISP Transaction.

"**Maturity Date**" has the meaning given thereto in Section 15.

"**Maximum Amount**" has the meaning given thereto in Section 8.

"**Monitor**" has the meaning given thereto in Section 3.

"**Ordinary Course**" means, in respect of any DIP Loan Party, the ordinary course of business of such DIP Loan Party consistent with past practice, as such practice is, may have been or may be modified as a result of the CCAA Proceedings or by any Applicable Laws which were in effect on the CCAA Filing Date and with which such DIP Loan Party is required to comply.

"**Original Currency**" has the meaning given thereto in Section 45.

"**Other Currency**" has the meaning given thereto in Section 45.

"**Outstanding DIP Loans**" has the meaning given thereto in Section 8.

"**Permit**" means governmental licences, authorizations, consents, registrations, exemptions, permits and other approvals required by each DIP Loan Party under Applicable Law in order to conduct its business in the Ordinary Course.

"**Permitted Fees and Expenses**" has the meaning given thereto in Section 17.

"**Permitted Liens**" means (i) the DIP Charge; (ii) the Administration Charge, (iii) any charges created under the CCAA Initial Order (as amended from time to time) or any other Court Order subsequent in priority to the DIP Charge and approved in writing by the DIP Agent, with the consent of the Majority DIP Lenders, in their sole discretion; (iv) validly perfected Liens existing prior to the CCAA Filing Date permitted under the Existing Senior Secured Credit Agreement; (v) inchoate statutory Liens arising after the CCAA Filing Date in respect of any accounts payable arising after the CCAA Filing Date in the Ordinary Course, provided that the Borrowers shall pay all such amounts as and when due; (vi) any validly perfected Liens created as part of the Soderglen vendor take-back loan owing to Soderglen Ranches Ltd and Jane E. Grad in connection with the purchase by the Canadian Borrower of certain real property in Airdrie, Alberta; and (vii) any Permitted Priority Liens not already included in clauses (i) through (v) of this defined term.

HIGHLY CONFIDENTIAL

"**Permitted Pre-Filing Payments**" means all payments on account of obligations of any DIP Loan Party incurred before the CCAA Filing Date that are either: (a) pre-filing payments, including credit card charges, in respect of amounts permitted to be paid under the CCAA Initial Order or the ARIO; (b) pre-filing payments to the DIP Agent permitted hereunder; (c) pre-filing payments, which shall require the approval of the Monitor and the DIP Agent, that do not exceed CDN$3,000,000 in aggregate, provided that, in each case, such pre-filing payments are contemplated by the DIP Budget; or (d) pre-filing payments in respect of feeder cattle financing debt owing by the DIP Loan Parties to Farm Credit Canada in the aggregate maximum principal amount of CDN$20,000,000 (or the Equivalent Amount thereof in United States Dollars), to the extent that such pre-filing payments are made from the proceeds of disposition of feeder cattle subject to the FCC Lien.

"**Permitted Priority Liens**" means (a) at any time following the commencement of the CCAA Proceedings, the FCC Lien, (b) from the commencement of the CCAA Proceedings through to the granting of the ARIO, (i) the Administration Charge and (ii) valid and perfected security interests in specific financed or leased equipment and (c) after the granting of the ARIO, (i) the Administration Charge and (ii) any other charge to which the DIP Agent consents in writing from time to time.

"**Person**" means an individual, partnership, corporation, business trust, joint stock company, limited liability company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"**Rolling Cash Flow**" has the meaning given thereto in Section 37.

"**Senior Secured Lenders**" means, collectively, the Existing Senior Secured Lenders, the DIP Lenders and the Cash Management Banks.

"**Senior Secured Obligations**" means, collectively, the Existing Senior Secured Obligations and the DIP Obligations.

"**SISP**" means the sale and investor solicitation process for the sale, recapitalization or refinancing of the DIP Loan Parties' business, including a purchase of all or any portion of the assets of the DIP Loan Parties, designed to, among other things, achieve the DIP Milestones, to be conducted in accordance with the SISP Procedures, which transactions shall be approved pursuant to one or more SISP Transaction Approval Orders.

"**SISP Order**" has the meaning given thereto in Schedule J.

"**SISP Procedures**" means the procedures for the SISP, as approved as to form and substance by the DIP Agent to be set out as a schedule to the SISP Order.

"**SISP Transaction**" means any transaction for the sale, recapitalization or refinancing of the DIP Loan Parties or a purchase of all or any portion of the assets of the DIP Loan Parties in accordance with the SISP Procedures.

DIP TERM SHEET

LEGAL*71656698.2

001735

HIGHLY CONFIDENTIAL

"**SISP Transaction Approval Order**" means, with respect to any SISP Transaction, a Court Order approving such SISP Transaction.

"**Swap Unwind Amounts**" means, in respect of any Lender Financial Instruments (as defined in the Existing Senior Secured Credit Agreement) which are terminated, the amounts owing by the Borrowers on account of such terminations as confirmed to the DIP Agent by the counterparties referenced therein as an accurate representation of the amounts owing thereunder.

"**Taxes**" has the meaning given thereto in Section 47.

"**Unanimous DIP Lenders**" means, at any time, all of the DIP Lenders with outstanding DIP Commitments at such time or, if no DIP Commitments are in effect at such time, all of the DIP Lenders with Outstanding DIP Loans at such time.

"**US Bankruptcy Code**" means Title 11 of the United States Code.

"**US Bankruptcy Court**" has the meaning given to it in Section 11(b).

"**US Base Rate**" means, on any day, the interest rate expressed as percentage rate per annum calculated on the basis of a 365 or 366 day year, as the case may be, equal to the rate of interest per annum determined by the DIP Agent from time to time as the reference rate of interest for the determination of the interest rates that it will charge customers for US Dollar loans made by it in Canada, as adjusted automatically with each announced, displayed or quoted change in such rate without the necessity of notice to the Borrowers or any other Person.  Any change in the US Base Rate determined by the DIP Agent shall be effective on the date the change becomes effective generally.

"**US Chapter 15 Proceedings**" means the proceeding in the United States pursuant to Chapter 15 of the US Bankruptcy Code before the US Bankruptcy Court in respect of the recognition of the CCAA Proceedings.

"**US Dollars**", "**USD**" or "**US$**" means lawful money of the United States of America.

"**US Provisional Recognition Order**" means an order of the US Bankruptcy Court granting provisional relief pending entry of the US Recognition Order pursuant to s1519 of the US Bankruptcy Code, which provides for, among other things, (i) a nationwide stay of proceedings, and (ii) provisional recognition of the CCAA Initial Order, including by giving full force and effect to the advances under the DIP Credit Facility and DIP Charge authorized under the CCAA Initial Order.

"**US Recognition Order**" means an order of the US Bankruptcy Court that, among other things, grants (i) recognition of the CCAA Proceedings pursuant to s1517 of the US Bankruptcy Code and (ii) recognition of the CCAA Initial Order and the ARIO, including by giving full force and effect to the advances under the DIP Credit Facility and the DIP Charge authorized under such orders, which shall be in form and substance satisfactory to the DIP Agent.

"**Variance Report**" has the meaning given thereto in Section 37.

DIP TERM SHEET

LEGAL*71656698.2

001736

HIGHLY CONFIDENTIAL    EXECUTION COPY

"**Withholding Taxes**" has the meaning given thereto in Section 47.

LEGAL*71656698.2

001737

HIGHLY CONFIDENTIAL

## Schedule B – DIP Guarantors

| |
| --- |
| Monette Farms Ltd. |
| Monette Farms Ontario Corp. |
| NexGen Seeds Ltd. |
| Monette Produce Ltd. |
| Monette Land Corp. |
| DMO Holdings Ltd. |
| Goat's Peak Winery Ltd. |
| Monette Farms BC Ltd. |
| Monette Farms BC GP Ltd. |
| Monette Farms Land GP Ltd. |
| Monette Farms Land II GP Ltd. |
| Monette Seeds Ltd. |
| DMO Holdings USA, Inc. |
| Monette Seeds USA, LLC |
| Monette Farms Arizona, LLC |
| Monette Farms USA, Inc. |

HIGHLY CONFIDENTIAL   EXECUTION COPY

| Monette Produce, LLC |
| --- |
| 1012595 DE Inc. |
| Monette Farms Land Limited Partnership |
| Monette Farms Land II Limited Partnership |
| Monette Farms BC Limited Partnership |

DIP TERM SHEET

LEGAL*71656698.2

001739

HIGHLY CONFIDENTIAL EXECUTION COPY

## Schedule C – Representations and Warranties

Each DIP Loan Party hereby represents and warrants to the DIP Agent and each of the DIP Lenders as follows:

(1)     ***Organization; Qualification; Authority***.  Each DIP Loan Party (i) is a corporation, partnership, limited liability company or other organization duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, (ii) is duly qualified and in good standing in each other jurisdiction in which it owns or leases property or in which the conduct of its business requires it to so qualify or be licensed, and (iii) has all requisite power and authority (including, without limitation, all governmental licenses, permits and other approvals) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.  Subject to obtaining approval of the Court and the recognition by the US Bankruptcy Court, each DIP Loan Party has the requisite power and authority to enter into this DIP Term Sheet and the other DIP Loan Documents and perform its obligations hereunder.

(2)     ***Authorization; Enforceability***.  Subject to obtaining the approval of the Court and the recognition by the US Bankruptcy Court, all necessary action, corporate or otherwise, has been taken to authorize the execution, delivery and performance by each DIP Loan Party of this DIP Term Sheet and the other DIP Loan Documents.  Each DIP Loan Party has duly executed and delivered this DIP Term Sheet and the other DIP Loan Documents and such DIP Term Sheet and such DIP Loan Documents constitute legal, valid and binding obligations of such DIP Loan Party, enforceable against such DIP Loan Party in accordance with their respective terms, subject only to any limitation under Applicable Laws relating to (i) bankruptcy, insolvency, reorganization, moratorium or creditors' rights generally; and (ii) the discretion that a court may exercise in the granting of equitable remedies.

(3)     ***Governmental Approvals***.  Except for the granting of the CCAA Initial Order, the ARIO and the US Provisional Recognition Order, and those filings or recordings already made or to be made pursuant to any Applicable Law, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority or other Person, is required for:

(a)     the due execution, delivery, recordation, filing or performance by any DIP Loan Party of this DIP Term Sheet, the other DIP Loan Documents or for the consummation of each of the transactions contemplated hereby; or

(b)     the grant by any DIP Loan Party of the DIP Charge and other Liens granted or to be granted by it pursuant to this DIP Term Sheet or the other DIP Loan Documents.

(4)     ***Duly Licensed***.  Each DIP Loan Party is duly licensed, registered or qualified in all jurisdictions where the character of its owned or leased property or assets (of whatever kind) or the nature of the activities conducted by it make such licensing, registration or qualification necessary or desirable, except where failure to do so would not have a Material Adverse Effect.

HIGHLY CONFIDENTIAL

(5)      *Permits*.  No DIP Loan Party requires any Permits to enter into and perform its respective obligations under this DIP Term Sheet or the other DIP Loan Documents, or to conduct the business in which such DIP Loan Party is currently engaged, other than the Permits currently held, all of which are in good standing in all material respects.

(6)      *Financial Position*.  Each of the monthly, quarterly and annual financial statements that have been furnished to the DIP Agent and the DIP Lenders, or any of them, in connection with this DIP Term Sheet or the other DIP Loan Documents are complete in all material respects and fairly present its financial position as of the dates referred to therein and have been prepared in accordance with GAAP.

(7)      *Proceedings*.  Except as previously disclosed to the DIP Agent in writing, there is no action, suit, investigation, liability or proceeding affecting any of the DIP Loan Parties pending or, to the best knowledge of the DIP Loan Parties, threatened before any court, governmental agency or arbitrator that (i) is reasonably expected to be determined adversely to such DIP Loan Party and, if so adversely determined, could reasonably be expected to have a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of this DIP Term Sheet or the other DIP Loan Documents.

(8)      *Compliance with Laws*.  The business operations of the DIP Loan Parties have been and continue to be conducted in material compliance with all Applicable Laws, including without limitation all environmental laws, of each jurisdiction in which the business or properties of the DIP Loan Parties are or have been located or carried out.

(9)      *Taxes*.  Each DIP Loan Party has filed or caused to be filed all tax returns and reports (federal, provincial, local and foreign) which are required to have been filed and has paid or caused to be paid all Taxes, payroll and source deductions required to have been paid by it, together with applicable interest and penalties, except (i) Taxes that are being contested in good faith by appropriate proceedings and for which such DIP Loan Party has set aside on its books adequate reserves or (ii) to the extent that the failure to do so would not have a Material Adverse Effect.

(10)     *DIP Budgets*.  The DIP Budget (and any revised DIP Budget delivered to the DIP Agent), the Variance Reports and all projected consolidated balance sheets, income statements and cash flow statements of the DIP Loan Parties delivered to the DIP Agent and the DIP Lenders in accordance with this DIP Term Sheet and the other DIP Loan Documents were prepared and will be prepared, as applicable, in good faith on the basis of the assumptions stated therein, which assumptions were fair and will be fair in the light of conditions existing at the time of delivery of such DIP Budgets, Variance Reports or projections, as the case may be, and represented and will represent, at the time of delivery, the DIP Loan Parties' best estimate of their future financial performance.

(11)     *Information Disclosure*.  No written information, exhibits and reports furnished by or on behalf of any DIP Loan Party to the DIP Agent or any DIP Lender from time to time in connection with this DIP Term Sheet or any other DIP Loan Document (other than to the extent that any such information, exhibits and reports constitute projections described in paragraph (10)

DIP TERM SHEET

LEGAL*71656698.2

HIGHLY CONFIDENTIAL

above), taken as a whole and in light of the circumstances in which made, contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements made therein, in light of the circumstances in which any such statements were made, not misleading.

(12)   *Title to Property*.   Each DIP Loan Party has good and marketable title to, or has duly leased or licensed, all of its property, assets and undertaking, in each case free from any Lien other than Permitted Liens.  Each DIP Loan Party owns or has licensed for use all of the software now used in conducting the Ordinary Course business of such DIP Loan Party except where failure to do so could not reasonably be expected to have a Material Adverse Effect.  All computer equipment owned by or used by the DIP Loan Parties has been properly maintained and is in good working order for the purposes of an on-going operation, subject to ordinary wear and tear for computer equipment of comparable age.

(13)   *Insurance*.   Each DIP Loan Party maintains adequate insurance coverage, as is customary with companies in the same or similar business of such type, in such amounts and against such risks as is prudent for a business of its nature with financially sound and reputable insurers and that contain reasonable coverage and scope.

(14)   *No Other Transactions.*   Except as disclosed to the DIP Agent and the DIP Lenders in writing (including as disclosed in materials filed in connection with the CCAA Proceedings) there are no agreements of any kind between any DIP Loan Party and any other third party or any holder of debt or equity securities of any DIP Loan Party with respect to any restructuring, refinancing or recapitalization matters except for this DIP Term Sheet and the transactions contemplated hereunder.

(15)   *Subsidiaries.* As of the date hereof, the organizational chart set out in Schedule K attached hereto accurately list all subsidiaries of the Borrowers and accurately describe the percentage interest in the issued and outstanding capital of each such subsidiary.

(16)   *Relevant Jurisdictions.* As of the date hereof, Schedule L attached hereto sets forth for each DIP Loan Party (a) its jurisdiction of organization, (b) the location of its registered office and (c) the locations of its chief executive office, head office, or domicile (within the meaning of the Civil Code of Quebec) or sole place of business, as the case may be.

(17)   *Bank Accounts*.   The DIP Loan Parties maintain all bank accounts with the Cash Management Banks and have no bank accounts with any other financial institution.

(18)   *No Default*.  No Default or Event of Default has occurred and is continuing.

LEGAL*71656698.2

001742

HIGHLY CONFIDENTIAL

## Schedule D – Covenants

1. **Affirmative Covenants**

Each DIP Loan Party hereby covenants and agrees in favour of the DIP Agent and the DIP Lenders that, so long as the DIP Lenders are committed to make loans under the DIP Credit Facility and thereafter so long as any indebtedness remains outstanding under the DIP Credit Facility, such DIP Loan Party shall:

(a)     have filed an application record with the Court, in form and substance satisfactory to the DIP Agent, acting reasonably, seeking the ARIO by no later than April 28, 2026;

(b)     duly and punctually pay, or cause to be duly and punctually paid, to the DIP Agent, the DIP Lenders and the Cash Management Banks, as applicable, all amounts payable hereunder and under the other Loan Documents when due in accordance with the CCAA Initial Order, the ARIO and each other applicable Court Order;

(c)     perform its obligations under this DIP Term Sheet and the other DIP Loan Documents, as applicable, and under any other contract or agreement with the DIP Agent, the DIP Lenders, the Cash Management Banks and any of their respective affiliates as and when required and in the manner required;

(d)     comply with the provisions of all Court Orders and take all actions necessary or available to defend the Court Orders from any appeal, reversal, modifications, amendment, stay or vacating not expressly consented to in writing in advance by the DIP Agent and the Majority DIP Lenders;

(e)     treat as unaffected the DIP Obligations in any plan of compromise or arrangement, proposal or any other restructuring whatsoever, unless the DIP Agent and the Unanimous DIP Lenders, acting reasonably, consent to a different treatment;

(f)     at all times be and remain subject to the CCAA Proceedings and the US Chapter 15 Proceedings until the DIP Obligations are irrevocably and unconditionally repaid in full, with no further right to DIP Loans;

(g)     comply with all Applicable Laws applicable to it or its property, including all applicable environmental laws, laws for the welfare and protection of animals, sanctions laws and anti-money laundering laws, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect;

(h)     ensure that all proceeds of the DIP Intercompany Loans are paid only to DIP Guarantors and in accordance with the DIP Budget and to bank accounts

HIGHLY CONFIDENTIAL

maintained with the Cash Management Banks which are subject to the DIP Charge;

(i)   within 30 calendar days after the date that the ARIO is granted, enter into deposit account control agreement(s), in form and substance satisfactory to the DIP Agent, in respect of all their accounts with BMO Bank N.A.;

(j)   comply with the DIP Budget, subject to the variances which may include either (i) variances which do not constitute an Event of Default pursuant to Section 1.1(26) or Section 1.1(27) of Schedule E or (ii) variances that have been consented to by the DIP Agent on behalf of the DIP Lenders;

(k)   pay all its obligations arising after the CCAA Filing Date promptly and in accordance with their terms as provided for in the current DIP Budget, and pay and discharge all lawful claims for labour, materials and supplies or otherwise arising after the CCAA Filing Date which, if unpaid, would become a Lien or charge upon such properties or any part thereof ranking senior in priority to the Liens securing the obligations under the Existing Senior Secured Credit Agreement; provided, however, that the DIP Loan Parties shall not be required to pay and discharge or to cause to be paid and discharged any such Tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings, in each case, if the DIP Loan Parties shall have set aside on their books adequate reserves therefor in conformity with GAAP;

(l)   provide the DIP Agent with copies of all motions, applications, petitions, proposed Court Orders (including without limitation, the draft CCAA Initial Order, the ARIO, the SISP Order and any SISP Transaction Approval Orders) or other materials or documents that any of the DIP Loan Parties intend to file in the CCAA Proceedings or the US Chapter 15 Proceedings at least three (3) Business Days prior to any such filing or, where it is not practically possible to do so within such time, as soon as possible and in any event not less than one day prior to the date on which such motion, application, petition, proposed Court Order or other materials or document is served on the service list in respect of the CCAA Proceedings or the US Chapter 15 Proceedings; provided that prior to the filing or service, all such materials and documents by the DIP Loan Parties shall be in form and substance acceptable to the DIP Agent, acting reasonably, to the extent that any such materials or documents may have a Material Adverse Effect;

(m)   conduct the SISP in a timely fashion and in accordance with the SISP Procedures (including to achieve the related DIP Milestones and timelines) and strictly comply with the SISP Order;

(n)   achieve, in a timely fashion, the DIP Milestones by the dates set forth in Schedule J for the achievement of such DIP Milestones;

DIP TERM SHEET

LEGAL*71656698.2

001744

HIGHLY CONFIDENTIAL

(o)     provide the DIP Agent with regular updates with respect to the conduct of the SISP, the status of any SISP Transactions, progress towards the achievement of the DIP Milestones, the collection of accounts and any process conducted to sell or assign other material assets, including, without limitation, hosting weekly update calls with the Monitor, as well as all additional material information impacting the CCAA Proceedings or the US Chapter 15 Proceedings;

(p)     deliver to the DIP Agent the reporting and other information from time to time reasonably requested by the DIP Agent and that are set out in this DIP Term Sheet and the other DIP Loan Documents including, without limitation, the Variance Reports at the times set out herein;

(q)     use the proceeds of the DIP Credit Facility only in accordance with Section 16 and in accordance with the restrictions set out herein and not use the proceeds of the DIP Credit Facility to repay any pre-filing obligations other than as authorized under the CCAA Initial Order, the ARIO or any other applicable Court Order;

(r)     promptly notify the DIP Agent of any Default or Event of Default, or any material claims, proceedings, litigation or actions in respect of which a complaint, notice of claim or a statement of claim has been served upon a DIP Loan Party or of which a DIP Loan Party otherwise has notice;

(s)     promptly notify the DIP Agent of all material developments with respect to the business affairs of the DIP Loan Parties, the SISP, any SISP Transaction, the DIP Milestones, the CCAA Proceedings and the US Chapter 15 Proceedings;

(t)     ensure that the Monitor is appointed as the foreign representative in the US Chapter 15 Proceedings;

(u)     preserve and maintain in full force and effect such DIP Loan Party's corporate or other existence and all governmental rights, privileges, qualifications, permits, licenses and franchises necessary or desirable in the Ordinary Course of its business, including without limitation, all relevant Permits; provided that, notwithstanding the foregoing, such failure to preserve the same shall only be permitted if it could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

(v)     at all times maintain adequate insurance coverage, including crop insurance and necessary or desirable flood insurance, with the DIP Agent and the DIP Lenders named as additional insureds and loss payees, as is customary with companies in the same or similar business of such type, in such amounts and against such risks as is prudent for a business of its nature with financially sound and reputable insurers and that contain reasonable coverage and scope, provided that the DIP Loan Parties shall provide the DIP Agent with copies of drafts of all new insurance policies, amendments or renewals and shall not enter into such insurance policies, amendments or renewals without the DIP Agent's prior written consent, not to be unreasonably withheld or delayed;

HIGHLY CONFIDENTIAL

(w)     subject to the CCAA and the Court Orders, grant the DIP Agent and its professional advisors reasonable access to the Collateral and the DIP Loan Parties' business, properties, and books and records in connection with matters reasonably related to the DIP Credit Facility, the SISP or any SISP Transaction;

(x)     ensure that the DIP Loan Parties' financial advisor, their other advisors and their senior management team are available to meet with and respond to enquiries and information requests from the DIP Agent, the DIP Lenders and their advisors as may be reasonably required, and in any event no less frequently than once per month (and in the case of senior management not more than once a week), and to provide them with updates as to progress of the SISP, any SISP Transaction and progress in achieving the DIP Milestones;

(y)     maintain all of their cash management services, bank accounts and investment accounts with the Cash Management Banks;

(z)     the DIP Loan Parties shall (i) not renew or apply for any Canadian Grain Commission license, and (ii) use their commercially reasonable efforts, taking into account the Canadian Grain Commissions (the "**CGC**") procedures, to arrange for Letter of Credit No. OSB82312CGY issued to the CGC to be returned to The Bank of Nova Scotia for cancellation within one-hundred and twenty (120) days from the Effective Date; and

(aa)    promptly pay interest when due in respect of the Existing Senior Secured Obligations and the BNS Bi-Lateral Leased Equipment Debt, and for greater certainty, the Borrowers shall, upon the satisfaction of the Further Availability Conditions, pay all such interest due in respect of the Existing Senior Secured Obligations but unpaid prior to the commencement of the CCAA Proceedings.

## 2.     Negative Covenants

Each DIP Loan Party hereby covenants and agrees in favour of the DIP Agent and the DIP Lenders that, so long as the DIP Lenders are committed to make loans under the DIP Credit Facility and thereafter so long as any indebtedness remains outstanding under the DIP Credit Facility, such DIP Loan Party shall not:

(a)     make any payment, including, without limitation, any payment of principal, interest or fees, in respect of pre-filing indebtedness, or in respect of any other pre-filing liabilities, including payments with respect to pre-filing trade or unsecured liabilities of the DIP Loan Parties, other than as required or permitted pursuant to the CCAA Initial Order or the ARIO or as otherwise expressly permitted under this DIP Term Sheet or the DIP Budget;

(b)     make any payment, prepayment, redemption, purchase or exchange of any equity, or amend or modify any of the terms thereof, except as expressly permitted by the terms of the CCAA Initial Order or the ARIO;

DIP TERM SHEET

LEGAL*71656698.2

001746

HIGHLY CONFIDENTIAL   EXECUTION COPY

(c)     use any of the proceeds of the DIP Loans to make any investment, payment, distribution, loan, return of equity or other payment, to the Individual Borrower or any person related to the Individual Borrower, other than as required or permitted under the DIP Budget;

(d)     pay any dividends, distributions or advances to shareholders of the DIP Loan Parties, or any management bonus or similar payments, except to the extent expressly provided for in the approved DIP Budget;

(e)     enter into any transaction with any affiliate or related person, unless such transaction is on terms that are not less favorable to such DIP Loan Party or such subsidiary, as the case may be, other than any DIP Intercompany Loans and those transactions that might be obtained at the time in a comparable arm's-length transaction from a Person who is not an affiliate or related Person (as reasonably determined by such DIP Loan Party in good faith);

(f)     undertake any actions with respect to their business operations and/or capital structure which would have a Material Adverse Effect;

(g)     change its fiscal year;

(h)     issue any equity;

(i)     enter into any other credit facilities (whether before or after the CCAA Filing Date) secured senior in priority or *pari passu* to the DIP Charge;

(j)     (i) create or permit to exist any indebtedness, including the giving of any guarantees, other than (A) the indebtedness existing as of the date of this DIP Term Sheet and disclosed to the DIP Agent and the DIP Lenders in writing, (B) the DIP Obligations, (C) post-filing trade payables or other unsecured obligations incurred in the Ordinary Course in accordance with the DIP Budget and the CCAA Initial Order or the ARIO, (D) the DIP Intercompany Loans or (E) any indebtedness secured by the Permitted Liens; or (ii) make or give any financial assurances, in the form of bonds, letter of credit, financial guarantees or otherwise to any Person or Governmental Authority;

(k)     create or permit to exist any Liens on any of its properties or assets other than the Permitted Liens;

(l)     challenge, or support any challenge of, the DIP Term Sheet or the other DIP Loan Documents, the DIP Obligations, the DIP Charge or the Existing Senior Secured Obligations or the priorities thereof;

(m)    enter into any merger, amalgamation, consolidation, reorganization or recapitalization, sale or any transaction resulting in the change of ownership or control of the Borrowers or any of the other DIP Loan Parties, without the prior written consent of the DIP Agent or pursuant to one or more SISP Transactions;

LEGAL*71656698.2

001747

HIGHLY CONFIDENTIAL

(n)     without the prior written consent of the DIP Agent, (i) declare or pay any dividends on, or make any other distributions (whether by reduction of capital or otherwise) with respect to any of their issued and outstanding shares or other equity interest except to other DIP Loan Parties, (ii) make any intercompany loans other than the DIP Intercompany Loans, or (iii) make any other payment or other transfer of funds;

(o)     sell or otherwise dispose of any of its assets out of the Ordinary Course of its business or which have an aggregate net book value in excess of CDN$10,000,000 million except as contemplated by the SISP and as authorized by a Court Order in form and substance reasonably satisfactory to the DIP Agent; notwithstanding the foregoing, the Borrowers may consummate dispositions outside the Ordinary Course (i) with prior approval of the DIP Agent, the Court and the Monitor, that are necessary for operational stability or value preservation not contemplated by the SISP, provided net proceeds are applied in accordance with Section 34 or (ii) with the consent of the Monitor, of feeder cattle subject to the FCC Lien as provided for in the then-current DIP Budget;

(p)     enter into any agreements (including any amendments thereto) relating to any SISP Transaction that do not provide for the indefeasible repayment in cash of the DIP Obligations and the Existing Senior Secured Obligations without the prior written consent of (i) the DIP Agent and the DIP Lenders and (ii) the Existing Senior Secured Agent and the Existing Senior Secured Lenders;

(q)     make any material change to its existing senior management arrangements without the prior written consent of the DIP Agent;

(r)     seek, obtain or support any Court Order or any amendment or modification to a Court Order except with the prior written consent of the DIP Agent, in its sole discretion, (i) in respect of any Court Order or amendment thereto relating to the DIP Credit Facility, the SISP, any SISP Transaction or any other matter that adversely affects the DIP Agent or the DIP Lenders and (ii) acting reasonably in respect of any other Court Order or amendment or modification thereto;

(s)     other than the SISP Order or a SISP Transaction Approval Order with respect to a SISP Transaction, commence, continue or seek Court approval of any other sale, liquidation or restructuring transaction without the prior written consent of the DIP Agent and the Majority DIP Lenders, acting reasonably;

(t)     change its jurisdiction of organization, change its name, or change its corporate or capital structure (including its organizational documents) or enter into any agreement committing to such actions;

(u)     enter into any settlement agreement or agree to any settlement arrangements in connection with any litigation, arbitration, other investigations, proceedings or disputes or other similar proceedings which are threatened or pending against any one of them without the prior written consent of the DIP Agent, or make any

LEGAL*71656698.2

001748

payments or repayments to customers, outside the Ordinary Course, other than those set out in the DIP Budget, provided that the foregoing shall not limit the ability of the DIP Loan Parties to provide a discount or enter into a settlement with a customer in connection with the collection of accounts receivable provided that the aggregate amount of such discounts or settlements does not exceed $500,000 (or its US Dollar Equivalent Amount) without the prior approval of the Monitor;

(v)   open any deposit, securities or other account with any financial institution other than the Cash Management Banks;

(w)   create any new subsidiary; or

(x)   seek, or consent to the appointment of, a receiver, interim receiver, receiver and manager or trustee in bankruptcy or any similar official in respect of any DIP Loan Party in any jurisdiction.

## 3.    Reporting Covenants

Each DIP Loan Party hereby covenants and agrees in favour of the DIP Agent and the DIP Lenders that, so long as the DIP Lenders are committed to make loans under the DIP Credit Facility and thereafter so long as any indebtedness remains outstanding under the DIP Credit Facility, such DIP Loan Party shall:

(a)   ***Pre-Filing Payments Report***:  deliver, a written report to the DIP Agent not less than 24 hours prior to making any Permitted Pre-Filing Payment in excess of CDN$100,000, providing details as to the amount, recipient and nature of any such proposed pre-filing payment together with a statement as to the cumulative balance of all pre-filing payments including such proposed payment and, for greater certainty, including payments which are individually less than CDN$100,000; provided that if such report is not delivered to the DIP Agent at least 24 hours prior to making any such payment, the Borrowers shall, and shall request the Monitor to, deliver such report to the DIP Agent as soon as possible and not later than close of business on the date such payment is made;

(b)   ***Quarterly Financials***:  commencing with the fiscal quarter ending April 30, 2026, as soon as available and in any event within 45 days after the end of each of the first three quarters of each fiscal year of the DIP Loan Parties, a consolidated balance sheet of the DIP Loan Parties as of the end of such quarter, and consolidated statements of income and cash flows of the DIP Loan Parties for the period commencing at the end of their previous quarter and ending with the end of such quarter, and consolidated statements of income and cash flows of the DIP Loan Parties for the period commencing at the end of their previous fiscal year and ending with the end of such quarter, setting forth, in each case in comparative form the corresponding figures for the corresponding period of their immediately preceding fiscal year, all in reasonable detail and duly certified (subject to normal year-end audit adjustments) by a responsible officer of the Canadian Borrower as

having been prepared in accordance with GAAP, together with a certificate of said officer stating that no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that the DIP Loan Parties have taken and propose to take with respect thereto along with schedules (A) setting out the basis of the combination and consolidation of such financial information in respect of the DIP Loan Parties and (B) commencing with the quarterly financial statements delivered in connection with the fiscal quarter end of April 30, 2026, setting out results of each business unit consisting of "grain and oilseeds", "vegetables", "cattle" and "seed & marketing" operations;

(c)     ***DIP Budgets***:  promptly provide to the DIP Agent the DIP Budget, revised DIP Budgets and Variance Reports as required in accordance with Section 37;

(d)     ***Crop Harvest Report***:  as soon as available and, in any event, by October 31 in each year, a management report on the crop harvest results, such report to be in a form and containing such information as may be required by the DIP Agent, acting reasonably;

(e)     ***Insurance Policies*** – (A) prior to any establishment, amendment or renewal of any new or existing crop, revenue or gross margin insurance policy, drafts of such new policy or amendment or renewal, (B) promptly following the establishment, amendment or renewal of any insurance policy, and also upon request by the DIP Agent, copies of all insurance policies in respect of the Borrowers and the other DIP Loan Parties and their assets and operations and any amendments or renewals and (C) within 10 days of the issuance, re-issuance or extension of any "Receivables Insurance Policy", and also upon any additional request by the DIP Agent, a copy of such receivables insurance policy along with all supporting documentation in connection therewith;

(f)     ***Leased Land***:  from time to time, at the request of the DIP Agent, a detailed listing of all land leased by the Borrowers and the other DIP Loan Parties (excluding Crown lands), which report shall be in form and substance satisfactory to the DIP Agent, acting reasonably, and, without limitation, shall include the jurisdiction, the land legal description and lease maturity date and shall indicate if harvested crops are stored on the leased land; and

(g)     ***Appraisals***:  from time to time, at the request of the DIP Agent, the Borrowers and the other DIP Loan Parties shall deliver bare land appraisals on all land or appraisals of any other real estate assets of the DIP Loan Parties that are subject to the DIP Charge, by an appraiser or appraisers satisfactory to the DIP Agent, acting reasonably, which appraisals shall be satisfactory to the DIP Agent, acting reasonably.

LEGAL*71656698.2

HIGHLY CONFIDENTIAL

## Schedule E – Events of Default

The occurrence or continuance of any of the following events shall constitute an "**Event of Default**" for the purposes of this DIP Term Sheet:

(1)    any of the DIP Loan Parties fails to pay any principal of any DIP Loan when the same shall become due and payable or any DIP Loan Party fails to make any payment of interest or fees or any other payment under this DIP Term Sheet or any DIP Loan Document within three (3) Business Days after the same becoming due and payable;

(2)    any representation or warranty made by any DIP Loan Party (or any of its officers) under or in connection with this DIP Term Sheet or the other DIP Loan Documents shall prove to have been incorrect in any material respect when made or deemed made;

(3)    any DIP Loan Party fails to perform or observe (i) any term, covenant or agreement contained in Section 1 or Section 2 of Schedule D, (ii) any other term, covenant or agreement contained in Section 3 of Schedule D if such failure remains unremedied for three (3) Business Days or (iii) any other term, covenant or agreement (other than those listed in clause (i) and (ii) above) contained in this DIP Term Sheet or the other Loan Documents, if such failure shall remain unremedied for 10 Business Days;

(4)    the issuance of a CCAA Initial Order or ARIO (and any other required orders in the CCAA Proceedings), unless such CCAA Initial Order or ARIO is satisfactory in form and substance to the DIP Agent, and such CCAA Initial Order or ARIO approves and authorizes the DIP Loan Parties to file for protection under the CCAA, approves the DIP Credit Facility as interim financing, grants the DIP Charge with the priority contemplated herein, authorizes the payment by the DIP Loan Parties of all principal, interest and fees provided for under the DIP Credit Facility, and grants all relief customarily associated with such a filing including the provision of stays against the Borrowers' and the other DIP Loan Parties' creditors;

(5)    failure of the DIP Loan Parties to have filed an application with the Court, in form and substance satisfactory to the DIP Agent, seeking an ARIO, on or before April 28, 2026;

(6)    the ARIO is not approved by the Court on or prior to May 6, 2026;

(7)    the DIP Loan Parties fail to receive the US Provisional Recognition Order from the US Bankruptcy Court by April 24, 2026;

(8)    the US Bankruptcy Court refuses to recognize any order in the CCAA Proceeding, and such refusal has or could reasonably be expected to have a Material Adverse Effect;

(9)    (i) any of the CCAA Proceedings shall be dismissed or converted to a proceeding under the BIA, or any of the US Chapter 15 Proceedings shall be dismissed or converted to a proceeding under Chapter 7 of the US Bankruptcy Code, or a receiver, interim receiver or receiver-manager is appointed for any of the DIP Loan Parties (without the consent of the DIP Agent), or any DIP Loan Party shall file an application, motion, petition or other pleading or

LEGAL*71656698.2

HIGHLY CONFIDENTIAL

support an application, petition, motion or other pleading filed by any other Person seeking, or fail to contest in a timely and appropriate manner, any of the foregoing actions or proceedings; (ii) the Court or the US Bankruptcy Court, as the case may be, shall enter any material (in the discretion of the DIP Agent or the Majority DIP Lenders, acting reasonably) Court Order or Court Orders granting relief from any stay, including any Court Order or Court Orders granting relief from the stay of proceedings contained in the CCAA Initial Order, the ARIO or the US Provisional Recognition Order, including to the holder or holders of any security interest to permit foreclosure or enforcement (or the granting of a deed in lieu of foreclosure or the like) or other exercise of rights or remedies on any assets of the DIP Loan Parties, or any DIP Loan Party shall file a motion or other pleading or support a motion or other pleading filed by any other Person seeking, or fail to contest in a timely and appropriate manner, any of the foregoing Court Orders; or (iii) an application shall be filed by any DIP Loan Party for the approval of any other Lien in any of the CCAA Proceedings or US Chapter 15 Proceedings which is *pari passu* with or senior to the claims of the DIP Agent and the DIP Lenders against any DIP Loan Parties pursuant to this DIP Term Sheet, the other DIP Loan Documents and the Court Orders, or there shall arise or be granted any such *pari passu* or senior Lien other than the Permitted Liens, to the extent of the scope and priority provided therein; or (iv) an application shall be filed by any DIP Loan Party for any refinancing of the DIP Obligations, in whole or in part, or (v) an application shall be filed by any DIP Loan Party for the approval of any other priority charge in any of the CCAA Proceedings or the US Chapter 15 Proceedings which is *pari passu* with or senior to the DIP Charge, or there shall arise or be granted any such *pari passu* or senior charge; or (vi) any of the stays granted pursuant to the CCAA Initial Order, the ARIO or the US Provisional Recognition Order expires without being extended;

(10)     any DIP Loan Party shall make, bring or file an application, motion or petition in the CCAA Proceedings or in the US Chapter 15 Proceedings: (i) to obtain financing from any Person other than DIP Lenders that does not satisfy in full all Senior Secured Obligations; or (ii) to obtain financing or interim financing for such DIP Loan Party from any Person other than the DIP Lenders or with respect to the existence of any charge, in each case which is or which is claimed to be senior to or *pari passu* with the priority of the DIP Lenders' claims or DIP Charge (except as expressly provided herein) (in each case, other than with respect to a financing or interim financing used, in whole or part, to repay in full the Existing Senior Secured Obligations); or (iii) to effect any other action or actions adverse to the DIP Agent or DIP Lenders or their rights and remedies hereunder or their interest in the Collateral that would, individually or in the aggregate, have a Material Adverse Effect;

(11)     an order of the Court or the US Bankruptcy Court shall be granted or entered (i) without the prior written consent of the DIP Agent and the Majority DIP Lenders, reversing, staying, vacating, amending, supplementing or modifying CCAA Initial Order, the US Provisional Recognition Order or the ARIO; or (ii) granting a claim which is senior or *pari passu* with the priority of the Liens of the DIP Agent and the DIP Lenders pursuant to the DIP Loan Documents and the CCAA Initial Order, the US Provisional Recognition Order or the ARIO or a priority charge which is senior to or *pari passu* with the DIP Charge, or any DIP Loan Party shall file an application, motion, petition or other pleading or support an application, motion, petition or other pleading filed by any other Person seeking, or fail to contest in a timely and appropriate manner, any of the foregoing Court Orders in this paragraph (11);

DIP TERM SHEET

LEGAL*71656698.2

001752

HIGHLY CONFIDENTIAL

EXECUTION COPY

(12)    an order of the Court or the US Bankruptcy Court shall be granted or entered avoiding or requiring disgorgement of any portion of the payments made on account of the obligations owing to the DIP Agent, the Cash Management Banks or the DIP Lenders under this DIP Term Sheet or the other DIP Loan Documents.

(13)    any DIP Loan Party defaults in any material respect in the due observance or performance of any term or condition contained in any Court Order, including the making of payments of any kind not permitted by the CCAA Initial Order, the US Provisional Recognition Order or the ARIO (as amended in accordance with the consent of the DIP Agent and the Majority DIP Lenders);

(14)    if any DIP Loan Party fails to achieve any DIP Milestone by the date it is required to be so achieved, as set forth in Schedule J;

(15)    the unpaid and overdue amount secured by the Permitted Priority Liens of any DIP Loan Party (not including any unpaid and overdue amounts secured by the FCC Lien) at any time after the date the ARIO has been approved exceeds CDN$5,000,000 unless the amount of same is being contested by the applicable DIP Loan Party in good faith by appropriate proceedings promptly instituted and diligently conducted, and so long as the DIP Agent is satisfied that the value of the Collateral is sufficient to ensure payment of the DIP Obligations;

(16)    any of the DIP Loan Parties ceases (or threatens to cease) to carry on business in the Ordinary Course or undertakes any actions with respect to its business operations and/or capital structure which would, in the sole determination of the DIP Agent, have a Material Adverse Effect on such DIP Loan Party;

(17)    any provision of this DIP Term Sheet or any of the other DIP Loan Documents shall for any reason cease to be valid and binding on or enforceable against any DIP Loan Party intended to be a party to such provision;

(18)    the denial or repudiation by any DIP Loan Party of the legality, validity, binding nature or enforceability of (i) this DIP Term Sheet or any of the other DIP Loan Documents, or (ii) Existing Senior Secured Obligations;

(19)    if the DIP Charge shall for any reason cease to create a valid and perfected lien on and security interest (or charge, as applicable) in the Collateral purported to be covered thereby;

(20)    if a competent Governmental Authority fails to renew any Permit and such failure has a Material Adverse Effect;

(21)    if there is a change to the Borrowers' existing senior management compensation that is not acceptable to the DIP Agent or the Majority DIP Lenders;

(22)    if there occurs a change of ownership or control of any of the DIP Loan Parties;

(23)    if any of the DIP Loan Parties makes any payments of any kind not permitted by the CCAA Initial Order or ARIO as either may be amended from time to time or not permitted under

HIGHLY CONFIDENTIAL

this DIP Term Sheet or the other DIP Loan Documents which is not materially consistent with the DIP Budget;

(24)    if there is any change to the governance of the Borrowers that is not acceptable to the DIP Agent;

(25)    a Variance Report is not delivered when due under this DIP Term Sheet, unless agreed among the DIP Loan Parties, the Monitor and the DIP Agent;

(26)    for a relevant bi-weekly period in the DIP Budget, the Cumulative Actual Disbursements calculated as of the last Business Day of such bi-weekly period exceed the Cumulative Budgeted Disbursements for such bi-weekly period by more than the greater of (x) fifteen percent (15%) and  $1,000,000 or (y) such other amount as requested by the Borrowers and agreed by the DIP Agent; or

(27)    for a relevant bi-weekly period in the DIP Budget, the Cumulative Actual Receipts calculated as of the last Business Day of such bi-weekly period are less than the Cumulative Budgeted Receipts for such bi-weekly period by more than the greater of (x) fifteen percent (15%) and $1,000,000 or (y) such other amount as requested by the Borrowers and agreed by the DIP Agent.

HIGHLY CONFIDENTIAL    EXECUTION COPY

## Schedule F – [Not used]

HIGHLY CONFIDENTIAL    Sch.F - 1

LEGAL*71656698.2

001755

HIGHLY CONFIDENTIAL

EXECUTION COPY

## Schedule G – Form of Draw Request

## DIP CREDIT FACILITY – DRAW REQUEST

TO:   **THE BANK OF NOVA SCOTIA** (the "**DIP Agent**")

AND TO:   **FTI CONSULTING CANADA INC.** (the "**Monitor**")

FROM:   **MONETTE FARMS LTD. and MONETTE FARMS USA, INC.** (collectively, the "**Borrowers**")

DATE:   **●, 20●**

We refer to the Senior Secured Debtor-In-Possession Interim Financing Term Sheet Agreement dated as of April 17, 2026 (as amended, restated and otherwise modified from time to time, the "**DIP Term Sheet**"), among the Borrowers, the DIP Guarantors signatory thereto, the financial institutions signatory thereto as lenders (the "**DIP Lenders**") and the DIP Agent. Unless otherwise defined herein, all capitalized terms used in this Draw Request will have the meanings given to such terms in the DIP Term Sheet.

The Borrowers hereby irrevocably request the following advance of DIP Loans under the DIP Credit Facility in accordance with Section 13:

(1)   the advance of the DIP Loan(s) is in respect of *(check one)*:

| | | **Availability** |
|---|---|---|
| Initial Availability Amount | ☐ | [●] |
| Further Availability Amount | ☐ | [●] |

(2)   the type, amount and currency of the Loan(s) are as follows *(check all that apply)*:

| **Type of Loan** | **Currency** | **Amount** |
|---|---|---|
| CAD Prime Rate Loan | CDN$ | [●] |
| US Base Rate Loan | US$ | [●] |

DIP TERM SHEET

LEGAL*71656698.2

001756

(3)    the proceeds of the Loan(s) shall be deposited in the following account(s) at the Cash Management Banks:

| Currency | Account Particulars |
|----------|---------------------|
| CDN$ Loan Proceeds | [●] |
| US Base Rate Loan | [●] |

(4)    the draw down date for the Loan(s) is:  [●], 2026

Each of the Borrowers hereby represents and warrants to the DIP Agent and the DIP Lenders as follows:

(a)    the advance of DIP Loans requested under this Draw Request is in accordance with Section 13 of the DIP Term Sheet;

(b)    the Initial Availability Conditions or the Further Availability Conditions, as the case may be, have been satisfied or waived in writing by the DIP Agent and the Majority DIP Lenders;

(c)    the representations and warranties set forth in Schedule C of the DIP Term Sheet are true and accurate in all material respects as of the date hereof, as though made on and as of the date hereof;

(d)    the proceeds of the DIP Loans shall be used only as permitted by Section 16 of the DIP Term Sheet;

(e)    the DIP Loan Parties are in compliance with the covenants and all other terms and conditions set forth in the DIP Term Sheet, other than those that have been waived in writing by the DIP Agent and the Majority DIP Lenders; and

(f)    no Default or Event of Default has occurred and is continuing nor will the making of the requested advance result in the occurrence of any such event.

**[SIGNATURE PAGE FOLLOWS]**

HIGHLY CONFIDENTIAL

EXECUTION COPY

**IN WITNESS WHEREOF** the undersigned has executed this Draw Request on the date first above written.

**MONETTE FARMS LTD.**

By: _____
  Name:
  Title:

**MONETTE FARMS USA, INC.**

By: _____
  Name:
  Title:

DIP TERM SHEET

LEGAL*71656698.2

001758

HIGHLY CONFIDENTIAL

EXECUTION COPY

## Schedule H – Form of CCAA Initial Order

(See attached)

HIGHLY CONFIDENTIAL

Sch.H - 1

DIP TERM SHEET

LEGAL*71656698.2

001759

HIGHLY CONFIDENTIAL
EXECUTION COPY

## Schedule I – Initial DIP Budget

(See attached)

HIGHLY CONFIDENTIAL

DIP TERM SHEET

LEGAL*71656698.2

001760

HIGHLY CONFIDENTIAL

EXECUTION COPY

## Schedule J – DIP Milestones

| No. | Milestone | Deadline |
|---|---|---|
| 1. | The Court shall have granted a Court Order, in form and substance acceptable to the DIP Agent, acting reasonably, approving the SISP and the SISP Procedures (the "**SISP Order**"). | **Within 45 calendar days of the granting of the ARIO** |
| 2. | The DIP Loan Parties shall enter into binding definitive purchase and sale agreements in respect of owned lands, equipment, fixtures (and any inventory or other personal property directly related to such sales), in each case on terms acceptable to the DIP Agent, such that the aggregate of: (i) gross cash proceeds of sales of owned lands received by the DIP Loan Parties after January 1, 2026; and (ii) the anticipated gross cash proceeds of (A) sales of owned lands completed prior to the date of this DIP Term Sheet that have closed in the fiscal year 2026, plus (B) sales of owned lands that are the subject of binding definitive purchase and sale agreements entered into by the DIP Loan Parties, is not less than CDN$▮▮▮▮▮ (or the Equivalent Amount thereof). | **October 31, 2026** |
| 3. | The net proceeds of the transactions referred to in Milestone 2 have been applied in permanent reduction of the Existing Senior Secured Obligations. | **December 1, 2026** |
| 4. | The DIP Loan Parties shall have applied for one or more SISP Transaction Approval Orders to approve bids identified in the SISP that, when closed, would successfully recapitalize or refinance the DIP Loan Parties' business and, among other things, repay the Existing Senior Secured Obligations in full. | **January 15, 2027** |
| 5. | The Existing Senior Secured Obligations shall be indefeasibly repaid in full in cash. | **March 1, 2027** |

DIP TERM SHEET

LEGAL*71656698.2

HIGHLY CONFIDENTIAL EXECUTION COPY

## Schedule K – Organizational Chart

(See attached)

LEGAL*71656698.2

DIP TERM SHEET

001762

HIGHLY CONFIDENTIAL                                                  EXECUTION COPY

## Schedule L – Jurisdictions and Locations

| Loan Party | Jurisdiction of Organization | Registered Office Address | Chief Executive Office and Principal Place of Business |
|---|---|---|---|
| Monette Farms Ltd. | Saskatchewan | 717 South Railway Street West, Swift Current Saskatchewan S9H 2Y9 | Alberta |
| Monette Farms Ontario Corp. | Ontario | 16 Neekaunis Road, Waubaushene, Ontario L0K 2C0 | Alberta |
| NexGen Seeds Ltd. | Saskatchewan | 51 1st Ave NW, Swift Current, Saskatchewan S9H 0M5 | Alberta |
| Monette Produce Ltd. | Saskatchewan | 410-475 2nd Avenue South, Saskatoon, Saskatchewan S7K 1P4 | Alberta |
| Monette Land Corp. | Saskatchewan | 51 1st Ave NW, Swift Current, Saskatchewan, Canada, S9H 0M5 | Alberta |
| DMO Holdings Ltd. | Saskatchewan | 51 1st Ave NW, Swift Current, Saskatchewan S9H 0M5 | Alberta |
| Goat's Peak Winery Ltd. | British Columbia | 1800 - 1631 Dickson Avenue, Kelowna, British Columbia V1Y 0B5, Canada | Alberta |
| Monette Farms BC Ltd. | British Columbia | 1800 – 1631 Dickson Avenue, Kelowna, British Columbia V1Y 0B5 | Alberta |
| Monette Farms BC GP Ltd. | British Columbia | 1800 – 1631 Dickson Avenue, Kelowna, British Columbia V1Y 0B5 | Alberta |
| Monette Farms BC Limited Partnership | British Columbia | 1800 – 1631 Dickson Avenue, Kelowna, British Columbia V1Y 0B5 | Alberta |
| Monette Farms Land GP Ltd. | Ontario | 222 Bay Street, Suite 3000, Toronto, Ontario M5K 1E7 | Alberta |
| Monette Farms Land Limited Partnership | Ontario | 222 Bay Street, Suite 3000, Toronto, Ontario M5K 1E7 | Alberta |
| Monette Farms Land II GP Ltd. | Ontario | 222 Bay Street, Suite 3000, Toronto, Ontario | Alberta |

DIP TERM SHEET

LEGAL*71656698.2

001763

HIGHLY CONFIDENTIAL

EXECUTION COPY

| Loan Party | Jurisdiction of Organization | Registered Office Address | Chief Executive Office and Principal Place of Business |
|---|---|---|---|
| | | M5K 1E7 | |
| Monette Farms Land II Limited Partnership | Ontario | 222 Bay Street, Suite 3000, Toronto, Ontario, M5K 1E7 | Alberta |
| Monette Seeds Ltd. | Saskatchewan | 51 1st Ave NW, Swift Current, Saskatchewan S9H 0M5 | Alberta |
| DMO Holdings USA, Inc. | Arizona | 39332 W. Camelback Rd. Tonopah, Arizona Maricopa 85354 USA | Alberta |
| Monette Seeds USA, LLC | Arizona | 39332 W. Camelback Rd. Tonopah, Arizona Maricopa 85354 USA | Arizona |
| Monette Farms Arizona, LLC | Arizona | 39332 W. Camelback Rd. Tonopah, Arizona Maricopa 85354 USA | Arizona |
| Monette Farms USA, Inc. | Montana | 1555 Campus Way Suite 201 Steven T. Small Billings, Montana 59102 USA | Montana |
| Monette Produce, LLC | Arizona | 39332 W. Camelback Rd. Tonopah, Arizona Maricopa 85354 USA | Arizona |
| 1012595 DE Inc. | Delaware | 800 North State Street – Suite 304 – Dover DE 19901 | Montana |

Sch. G - 2

DIP TERM SHEET

LEGAL*71656698.2

001764