## EXHIBIT B

**Initial Order**

I hereby certify this to be a true copy of

the original _Order_

Dated this 21 day of _April 2026_

_[signature]_

for Clerk of the Court

Clerk's Stamp

*JUDICIAL CENTRE OF CALGARY*
**FILED**
**APR 21 2026**
*Clerk of the Court of King's Bench*

| | |
|---|---|
| COURT FILE NUMBER | 2601-07148 |
| COURT | COURT OF KING'S BENCH OF ALBERTA |
| JUDICIAL CENTRE | CALGARY |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, RSC 1985, c C-36, as amended

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF MONETTE FARMS LTD., MONETTE FARMS ONTARIO CORP., NEXGEN SEEDS LTD., MONETTE PRODUCE LTD., MONETTE SEEDS LTD., MONETTE LAND CORP., DMO HOLDINGS LTD., DMO HOLDINGS USA, INC., MONETTE SEEDS USA, LLC, MONETTE FARMS ARIZONA, LLC, MONETTE FARMS USA, INC., 1012595 DE INC., MONETTE PRODUCE, LLC, GOAT'S PEAK WINERY LTD., MONETTE FARMS BC LTD., MONETTE FARMS LAND GP LTD., MONETTE FARMS LAND II GP LTD., AND MONETTE FARMS BC GP LTD.

APPLICANTS

MONETTE FARMS LTD., MONETTE FARMS ONTARIO CORP., NEXGEN SEEDS LTD., MONETTE PRODUCE LTD., MONETTE SEEDS LTD., MONETTE LAND CORP., DMO HOLDINGS LTD., DMO HOLDINGS USA, INC., MONETTE SEEDS USA, LLC, MONETTE FARMS ARIZONA, LLC, MONETTE FARMS USA, INC., 1012595 DE INC., MONETTE PRODUCE, LLC, GOAT'S PEAK WINERY LTD., MONETTE FARMS BC LTD., MONETTE FARMS LAND GP LTD., MONETTE FARMS LAND II GP LTD., AND MONETTE FARMS BC GP LTD.

**DOCUMENT**

**CCAA INITIAL ORDER**

ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT

Cassels Brock & Blackwell LLP
Suite 3700, Bankers Hall West
888 3rd Street SW
Calgary, Alberta, T2P 5C5

Telephone:    (403) 351-2920
Facsimile:    (403) 648-1151
Email:    joliver@cassels.com / dmarechal@cassels.com / mclarksonmaciel@cassels.com

File No.: 063030-01

Attention: Jeffrey Oliver / Danielle Maréchal / Matteo Clarkson-Maciel

**DATE ON WHICH ORDER WAS PRONOUNCED:**    April 21, 2026
**NAME OF JUDGE WHO MADE THIS ORDER:**    The Honourable Justice C.M. Jones
**LOCATION OF HEARING:**    Calgary, Alberta

-2-

**UPON** the application (the "**Originating Application**") of Monette Farms Ltd., Monette Farms Ontario Corp., Nexgen Seeds Ltd., Monette Produce Ltd., Monette Seeds Ltd., Monette Land Corp., DMO Holdings Ltd., DMO Holdings USA, Inc., Monette Seeds USA, LLC, Monette Farms Arizona, LLC, Monette Farms USA, Inc., 1012595 DE INC., Monette Produce, LLC, Goat's Peak Winery Ltd., Monette Farms BC Ltd., Monette Farms Land GP Ltd., Monette Farms Land II GP Ltd., and Monette Farms BC GP Ltd. (the "**Applicants**"); **AND UPON** having read the Originating Application, the Affidavit of Darrel Noel Monette sworn April 17, 2026 (the "**Monette Affidavit**"); the Confidential Affidavit of Darrel Noel Monette sworn April 17, 2026 (the "**Confidential Affidavit**"); and the Affidavit of Service of Angeline Gagnon, sworn April 17, 2026; **AND UPON** reading the consent of FTI Consulting Canada Inc. ("**FTI**") to act as court-appointed monitor (the "**Monitor**"); **AND UPON** being advised that the secured creditors who are likely to be affected by the Charges created herein have been provided notice of this application; **AND UPON** reading the Pre-Filing Report of FTI, in its capacity as proposed Monitor, filed April 20, 2026

**IT IS HEREBY ORDERED AND DECLARED THAT**:

**SERVICE**

1.      The time for service of the notice of application for this order (the "**Order**") is hereby abridged and deemed good and sufficient and this application is properly returnable today.

**APPLICATION**

2.      The Applicants are companies to which the *Companies' Creditors Arrangement Act* (the "**CCAA**") applies.

**NON-APPLICANT STAY PARTIES**

3.      Monette Farms Land I LP, Monette Farms Land II LP, and Monette Farms BC LP (together, the "**Non-Applicant Stay Parties**", and together with the Applicants, the "**Group**") are integrally related to the Applicants' business and are hereby granted and shall have the same benefits, protections, duties, obligations, and authorizations provided to the Applicants in this Order, and all the property and business of the Non-Applicant Stay Parties shall henceforth be deemed to be included within the Property and Business (each as defined below) of the Applicants, notwithstanding that none of these entities are a "company" pursuant to the CCAA.

**PLAN OF ARRANGEMENT**

4.      The Applicants shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (the "**Plan**").

**POSSESSION OF PROPERTY AND OPERATIONS**

5.      The Group shall:

   (a)      remain in possession and control of their current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "**Property**");

-3-

(b)     subject to further order of this Court, continue to carry on business in a manner consistent with the preservation of its business (the "**Business**") and Property;

(c)     be authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, accountants, counsel and such other persons (collectively, "**Assistants**") currently retained or employed by them, with liberty to retain such further Assistants as it deems reasonably necessary or desirable in the ordinary course of business or for the carrying out of the terms of this Order; and

(d)     be entitled to continue to utilize the central cash management system and, subject to the terms of the Term Sheet (as defined below), continue to use all credit cards currently in place, as described in the Monette Affidavit or replace it with another substantially similar central cash management system (the "**Cash Management System**") and that any present or future bank providing the Cash Management System shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Group of funds transferred, paid, collected or otherwise dealt with in the Cash Management System, shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Group, pursuant to the terms of the documentation applicable to the Cash Management System, and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under the Plan with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

6.     Neither the Group, nor any member thereof, will accept delivery of any crop from a producer (being any eligible holder of cash purchase tickets, elevator receipts or grain receipts issued pursuant to the *Canada Grain Act*, RSC 1985, c G-10) unless payment in full has been made in advance and in accordance with the Term Sheet.

7.     The Group is authorized to complete outstanding transactions and engage in new transactions and to continue, on or after the date hereof, to buy and sell goods and services including without limitation head office and shared services, and allocate, collect and pay costs, expenses and other amounts from and to the other members of the Group (collectively, together with the Cash Management System and all transactions, intercompany funding and other processes and services among the Group, the "**Intercompany Transactions**") in the ordinary course of business. All ordinary course Intercompany Transactions among the Group, including the provision of goods and services amongst the Group, shall continue on terms consistent with existing arrangements or past practice, subject to such changes thereto, or to such governing principles, policies or procedures as the Monitor may require, or subject to further Order of this Court. Other than as permitted elsewhere by this Order, the Group shall not enter into any Intercompany Transactions outside the ordinary course of business with any other member of the Group.

-4-

8.  To the extent permitted by law, the Group shall be entitled but not required to make the following advances or payments of the following expenses, incurred prior to or after this Order:

(a)  all outstanding and future wages, salaries, employee and pension benefits, vacation pay and expenses payable on or after the date of this Order, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

(b)  obligations and expenses owing for goods and services supplied to the Group prior to the date of this Order by vendors and suppliers, deemed by the Group to be critical to the extent required to ensure ongoing supply of critical goods and services necessary for the continued operation or preservation of the Business or Property, subject to: (i) the Term Sheet, or (ii) the prior approval by the Monitor, the Syndicate's Financial Advisor, and the DIP Agent (as defined below), up to a maximum amount of $100,000 in any one transaction and $3,000,000 in the aggregate;

(c)  all outstanding and future amounts owing to or in respect of individuals working as independent contractors solely with the Business, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements; and

(d)  the reasonable fees and disbursements of any Assistants retained or employed by the Group in respect of these proceedings, at their standard rates and charges, including for periods prior to the date of this Order.

9.  Except as otherwise provided to the contrary herein, the Group shall be entitled but not required to pay all reasonable expenses incurred by the Group in carrying on the Business in the ordinary course after this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)  all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers insurance), maintenance and security services; and

(b)  payment for goods or services actually supplied to the Group following the date of this Order.

10.  The Group shall remit, in accordance with legal requirements, or pay:

(a)  any statutory deemed trust amounts in favour of the Crown in Right of Canada or of any Province thereof or any other taxation authority that are required to be deducted from employees' wages, including, without limitation, amounts in respect of:

(i)  employment insurance;

(ii)  Canada Pension Plan; and

-5-

(iii)    income taxes,

but only where such statutory deemed trust amounts arise after the date of this Order, or are not required to be remitted until after the date of this Order, unless otherwise ordered by the Court;

(b)    all goods and services or other applicable sales taxes (collectively, "**Sales Taxes**") required to be remitted by the Group in connection with the sale of goods and services by the Group, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or collected prior to the date of this Order but not required to be remitted until on or after the date of this Order; and

(c)    any amount payable to the Crown in Right of Canada or of any Province thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors and that are attributable to or in respect of the carrying on of the Business by the Group.

11.    Until such time as a real property lease is disclaimed or resiliated in accordance with the CCAA, the Group may pay all amounts constituting rent or payable as rent under real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable as rent to the landlord under the lease) based on the terms of existing lease arrangements or as otherwise may be negotiated by the Group from time to time for the period commencing from and including the date of this Order ("**Rent**"), but shall not pay any rent in arrears.

12.    Except as specifically permitted in this Order or the Term Sheet, the Group is hereby directed, until further order of this Court:

(a)    to make no payments of principal, interest thereon or otherwise on account of amounts owing by the Group to any of their creditors as of the date of this Order;

(b)    to grant no security interests, trust, liens, charges or encumbrances upon or in respect of any of their Property; and

(c)    not to grant credit or incur liabilities except in the ordinary course of the Business.

**RESTRUCTURING**

13.    The Group shall, subject to such requirements as are imposed by the CCAA and such covenants as may be contained in the Term Sheet and the Definitive Documents (as hereinafter defined at paragraphs 35 and 36 respectively), have the right to:

(a)    other than in respect of all breeding and feeder cattle owned or controlled by the Group (the "**Cattle**"), permanently or temporarily cease, downsize or shut down any portion of their business or operations and to dispose of redundant or non-material assets not

-6-

exceeding $1,000,000 in any one transaction or $10,000,000 in the aggregate, provided that any sale that is either (i) in excess of the above thresholds, or (ii) in favour of a person related to the Applicants (within the meaning of section 36(5) of the CCAA), shall require authorization by this Court in accordance with section 36 of the CCAA;

(b)    in accordance with the Term Sheet, dispose of the Cattle without further order of this Court;

(c)    terminate the employment of such of its employees or temporarily lay off such of its employees as it deems appropriate on such terms as may be agreed upon between the Group and such employee, or failing such agreement, to deal with the consequences thereof in the Plan;

(d)    disclaim or resiliate, in whole or in part, with the prior consent of the Monitor (as defined below) or further Order of the Court, their arrangements or agreements of any nature whatsoever with whomsoever, whether oral or written, as the Group deems appropriate, in accordance with section 32 of the CCAA; and

(e)    pursue all avenues of refinancing of their Business or Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing,

all of the foregoing to permit the Group to proceed with an orderly restructuring of the Business (the "**Restructuring**").

14.    The Group shall provide each of the relevant landlords with notice of the Group' intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal. The relevant landlord shall be entitled to have a representative present in the leased premises to observe such removal. If the landlord disputes any of the Group's entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors, such landlord and the Group, or by further order of this Court upon application by the Group on at least two (2) days' notice to such landlord and any such secured creditors. If any Applicant disclaims or resiliates the lease governing such leased premises in accordance with section 32 of the CCAA, they shall not be required to pay Rent under such lease pending resolution of any such dispute other than Rent payable for the notice period provided for in section 32(5) of the CCAA, and the disclaimer or resiliation of the lease shall be without prejudice to the Group's claim to the fixtures in dispute.

15.    If a notice of disclaimer or resiliation is delivered pursuant to section 32 of the CCAA, then:

(a)    during the notice period prior to the effective time of the disclaimer or resiliation, the landlord may show the affected leased premises to prospective tenants during normal business hours, on giving the Group and the Monitor twenty-four (24) hours' prior written notice; and

(b)    at the effective time of the disclaimer or resiliation, the relevant landlord shall be entitled to take possession of any such leased premises without waiver of or prejudice to any

-7-

claims or rights such landlord may have against the Group in respect of such lease or leased premises and such landlord shall be entitled to notify the Group of the basis on which it is taking possession and to gain possession of and re-lease such leased premises to any third party or parties on such terms as such landlord considers advisable, provided that nothing herein shall relieve such landlord of its obligation to mitigate any damages claimed in connection therewith.

**NO PROCEEDINGS AGAINST THE GROUP OR THE PROPERTY**

16. Until and including May 1, 2026, or such later date as this Court may order (the "**Stay Period**"), no proceeding or enforcement process in any court (each, a "**Proceeding**") shall be commenced or continued against or in respect of the Group or the Monitor, or affecting the Business or the Property, except with leave of this Court, and any and all Proceedings currently under way against or in respect of the Group or affecting the Business or the Property are hereby stayed and suspended pending further order of this Court.

**NO EXERCISE OF RIGHTS OR REMEDIES**

17. During the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "**Persons**" and each being a "**Person**"), whether judicial or extra-judicial, statutory or non-statutory against or in respect of the Group or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended and shall not be commenced, proceeded with or continued except with leave of this Court, provided that nothing in this Order shall:

   (a) empower the Group to carry on any business that the Group is not lawfully entitled to carry on;

   (b) affect such investigations, actions, suits or proceedings by a regulatory body as are permitted by section 11.1 of the CCAA;

   (c) prevent the filing of any registration to preserve or perfect a security interest;

   (d) prevent the registration of a claim for lien; or

   (e) exempt the Group from compliance with statutory or regulatory provisions relating to health, safety or the environment.

18. Nothing in this Order shall prevent any party from taking an action against the Group where such an action must be taken in order to comply with statutory time limitations in order to preserve their rights at law, provided that no further steps shall be taken by such party except in accordance with the other provisions of this Order, and notice in writing of such action be given to the Monitor at the first available opportunity.

-8-

**NO INTERFERENCE WITH RIGHTS**

19.     During the Stay Period, no Person shall accelerate, suspend, discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Group, except with the written consent of the Group and the Monitor, or leave of this Court.

**CONTINUATION OF SERVICES**

20.     During the Stay Period, all Persons having:

 (a) statutory or regulatory mandates for the supply of goods and/or services; or

 (b) oral or written agreements or arrangements with the Group, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, insurance (including crop insurance), transportation, services, utilities, raw materials, fertilizer, chemicals, equipment, customs clearing, warehouse services, outside processors or other services to the Business or the Group,

are hereby restrained until further order of this Court from discontinuing, altering, interfering with, suspending or terminating the supply of such goods or services as may be required by the Group exercising any other remedy provided under such agreements or arrangements. The Group shall be entitled to the continued use of their current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the usual prices or charges for all such goods or services received after the date of this Order are paid by the Group in accordance with the payment practices of the Group, or such other practices as may be agreed upon by the supplier or service provider and each of the Group and the Monitor, or as may be ordered by this Court.

**NON-DEROGATION OF RIGHTS**

21.     Nothing in this Order has the effect of prohibiting a person from requiring immediate payment for goods, services, use of leased or licensed property or other valuable consideration provided on or after the date of this Order, nor shall any person, be under any obligation on or after the date of this Order to advance or re-advance any monies or otherwise extend any credit to the Group.

**PROCEEDINGS AGAINST DIRECTORS AND OFFICERS**

22.     During the Stay Period, and except as permitted by subsection 11.03(2) of the CCAA and paragraph 18 of this Order, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the Applicants with respect to any claim against the directors or officers that arose before the date of this Order and that relates to any obligations of the Applicants whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Applicants, if one is filed, is sanctioned by this Court or is refused by the creditors of the Applicants or this Court.

-9-

## DIRECTORS' AND OFFICERS' INDEMNIFICATION AND CHARGE

23.     The Applicants shall indemnify their directors and officers against obligations and liabilities that they may incur as directors and or officers of the Applicants after the commencement of the within proceedings except to the extent that, with respect to any officer or director, the obligation was incurred as a result of the director's or officer's gross negligence or wilful misconduct.

24.     The directors and officers of the Applicants shall be entitled to the benefit of and are hereby granted a charge (the "**Directors' Charge**") on the Property, which charge shall not exceed an aggregate amount of $1,500,000, as security for the indemnity provided in paragraph 23 of this Order. The Directors' Charge shall have the priority set out in paragraphs 40 and 42 herein.

25.     Notwithstanding any language in any applicable insurance policy to the contrary:

(a)     no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge; and

(b)     the Applicants' directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 23 of this Order.

## APPOINTMENT OF MONITOR

26.     FTI is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the Property, Business, and financial affairs of the Group with the powers and obligations set out in the CCAA or set forth herein and that the Group and their shareholders, officers, directors, and Assistants shall advise the Monitor of all material steps taken by the Group pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations and provide the Monitor with the assistance that is necessary to enable the Monitor to adequately carry out the Monitor's functions.

27.     The Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

(a)     monitor the Group's receipts and disbursements, Business and dealings with the Property;

(b)     report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein and immediately report to the Court if in the opinion of the Monitor there is a material adverse change in the financial circumstances of the Group;

(c)     assist the Group, to the extent required by the Group, in its dissemination to the DIP Lenders and their counsel periodically of financial and other information as agreed to

-10-

between the Group and the DIP Lenders which may be used in these proceedings, including reporting on a basis as reasonably required by the DIP Lenders;

(d) advise the Group in the preparation of the Group's cash flow statements and reporting required by the DIP Lenders, which information shall be reviewed by the Monitor and delivered to the DIP Lenders and its counsel in accordance with the Term Sheet, or as otherwise agreed to by the DIP Lenders;

(e) advise the Group in its development of the Plan and any amendments to the Plan;

(f) assist the Group, to the extent required by the Group, with the holding and administering of creditors' or shareholders' meetings for voting on the Plan;

(g) have full and complete access to the Property, including the premises, books, records, data, including data in electronic form and other financial documents of the Group to the extent that is necessary to adequately assess the Property, Business, and financial affairs of the Group or to perform its duties arising under this Order;

(h) be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order;

(i) hold funds in trust or in escrow, to the extent required, to facilitate settlements between the Group and any other Person; and

(j) perform such other duties as are required by this Order or by this Court from time to time.

28. The Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, or by inadvertence in relation to the due exercise of powers or performance of duties under this Order, be deemed to have taken or maintain possession or control of the Business or Property, or any part thereof. Nothing in this Order shall require the Monitor to occupy or to take control, care, charge, possession or management of any of the Property that might be environmentally contaminated, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal or waste or other contamination, provided however that this Order does not exempt the Monitor from any duty to report or make disclosure imposed by applicable environmental legislation or regulation. The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order be deemed to be in possession of any of the Property within the meaning of any federal or provincial environmental legislation.

29. The Monitor shall provide any creditor of the Group with information provided by the Group in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information

-11-

disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Group is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Group may agree.

30. In addition to the rights and protections afforded the Monitor under the CCAA or as an Officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the protections afforded to the Monitor by the CCAA or any applicable legislation.

31. The Monitor, counsel to the Monitor, counsel to the Group, and the financial advisor to the Syndicate (as defined in the Monette Affidavit), PricewaterhouseCoopers Inc. (the "**Syndicate's Financial Advisor**"), shall be paid their reasonable fees and disbursements (including any pre-filing fees and disbursements related to these CCAA proceedings), in each case at their standard rates and charges, by the Group as part of the costs of these proceedings. The Group is hereby authorized and directed to pay the accounts of the Monitor, counsel for the Monitor, counsel for the Group, and the Syndicate's Financial Advisor in accordance with the Term Sheet.

32. The Monitor and its legal counsel shall pass their accounts from time to time.

33. The Monitor, counsel to the Monitor, the Group's counsel, and the Syndicate's Financial Advisor shall, as security for the professional fees and disbursements incurred both before and after the granting of this Order, be entitled to the benefits of and are hereby granted a charge (the "**Administration Charge**") on the Property, which charge shall not exceed an aggregate amount of $1,500,000, as security for their professional fees and disbursements incurred at the normal rates and charges of the Monitor, counsel to the Monitor, the Group's counsel, and the Syndicate's Financial Advisor, both before and after the making of this Order in respect of these proceedings. The Administration Charge shall have the priority set out in paragraphs 40 and 42 herein.

**INTERIM FINANCING**

34. The Group is hereby authorized and empowered to obtain and borrow under a credit facility from the DIP Lenders (as defined in the Term Sheet (the "**DIP Lenders**")) in order to finance the Group's working capital requirements and other general corporate purposes and capital expenditures, provided that the initial advance under such facility shall not exceed $40,000,000 unless permitted by further order of this Court.

35. Such credit facility shall be on the terms and subject to the conditions set forth in the Senior Secured Debtor-In-Possession Interim Financing Term Sheet Agreement, between Monette Farms Ltd., and Monette Farms USA, Inc., as Borrowers, the Group, as Guarantors, The Bank of Nova Scotia, as DIP Agent (the "**DIP Agent**"), and the DIP Lenders, as lenders, each as defined therein, dated as of April 17, 2026 (the "**Term Sheet**").

36.   The Group is hereby authorized and empowered to execute and deliver such credit agreements, commitment letters, mortgages, charges, hypothecs, account control agreements and security documents, guarantees, and other definitive documents (collectively, the "**Definitive Documents**"), as are contemplated by the Term Sheet or as may be reasonably required by the DIP Lenders pursuant to the terms thereof, and the Group is hereby authorized and directed to pay and perform all of their indebtedness, interest, fees, liabilities, and obligations to the DIP Lenders under and pursuant to the Term Sheet and the Definitive Documents as and when the same become due and are to be performed, notwithstanding any other provision of this Order.

37.   The DIP Lenders shall be entitled to the benefits of and are hereby granted a charge (the "**DIP Lenders' Charge**") on the Property to secure all obligations under the Term Sheet and the Definitive Documents. The DIP Lenders' Charge shall not secure any obligation existing before the date this Order is made, except as provided for in the Term Sheet or the Definitive Documents, as applicable. The DIP Lenders' Charge shall have the priority set out in paragraphs 40 and 42 hereof.

38.   Notwithstanding any other provision of this Order:

(a)   the DIP Lenders may take such steps from time to time as they may deem necessary or appropriate to file, register, record or perfect the DIP Lenders' Charge, the Term Sheet, or any of the Definitive Documents;

(b)   upon the occurrence of an event of default under the Term Sheet, the Definitive Documents or the DIP Lenders' Charge, the DIP Lenders shall be entitled to immediately cease making advances to the Group and, upon 2 days' prior notice to the Group and the Monitor, may exercise any and all of its rights and remedies against the Group or the Property under or pursuant to the Term Sheet, the Definitive Documents, and the DIP Lenders' Charge, including without limitation, to set off and/or consolidate any amounts owing by the DIP Lenders to the Group against the obligations of the Group to the DIP Lenders under the Term Sheet, the Definitive Documents or the DIP Lenders' Charge, to make demand, accelerate payment, and give other notices, or to apply to this Court for the appointment of a receiver, receiver and manager or interim receiver, or for a bankruptcy order against the Group and for the appointment of a trustee in bankruptcy of the Group; and

(c)   the foregoing rights and remedies of the DIP Lenders shall be enforceable against any trustee in bankruptcy, interim receiver, receiver or receiver and manager of the Group or the Property.

39.   The DIP Lenders shall be treated as unaffected in any plan of arrangement or compromise filed by the Group under the CCAA, or any proposal filed by the Group under the *Bankruptcy and Insolvency Act* of Canada (the "**BIA**"), with respect to any advances made under the Definitive Documents.

-13-

**VALIDITY AND PRIORITY OF CHARGES**

40. The priorities of the Directors' Charge, the Administration Charge, and the DIP Lenders' Charge, as among them, shall be as follows:

> First – Administration Charge (to the maximum amount of $1,500,000);
>
> Second – DIP Lenders' Charge (to the maximum of $95,000,000); and
>
> Third - Directors' Charge (to the maximum amount of $1,500,000).

41. The filing, registration or perfection of the Directors' Charge, the Administration Charge, and the DIP Lenders' Charge (collectively, the "**Charges**") shall not be required, and the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect.

42. Each of the Directors' Charge, the Administration Charge, and the DIP Lenders' Charge (all as constituted and defined herein) shall constitute a charge on the Property and, subject always to section 34(11) of the CCAA, such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, and claims of secured creditors, statutory or otherwise (collectively, "**Encumbrances**") in favour of any Person, provided that:

> (a) the DIP Lenders' Charge and the Directors' Charge shall rank junior in priority to any valid, enforceable, perfected, first ranking security interests (the "**FCC Security**") granted by the Group in favour of Farm Credit Canada ("**FCC**") pursuant to a Loan and Security Agreement (Livestock) dated December 4, 2024 (as amended, the "**FCC Loan Agreement**"), in respect of certain personal Property (as defined therein) (the "**FCC Priority Collateral**"). For greater certainty, nothing in this Order recognizes or grants to FCC a priority in the FCC Priority Collateral, other than in respect of the Charges, that the FCC Security does not otherwise have under applicable law or contract; and
>
> (b) amounts held as cash collateral in accordance with the Term Sheet to secure the continued use of credit cards by the Group shall not be subject to the Charges or any other Encumbrances.

43. Except as otherwise expressly provided for herein, or as may be approved by this Court, the Group shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the Directors' Charge, the Administration Charge, or the DIP Lenders' Charge unless the Group also obtain the prior written consent of the Monitor and the beneficiaries of the Directors' Charge, the Administration Charge, the DIP Lenders' Charge, or further order of this Court.

44. The Directors' Charge, the Administration Charge, the Term Sheet, the Definitive Documents, and the DIP Lenders' Charge shall not be rendered invalid or unenforceable and the rights and

-14-

remedies of the chargees entitled to the benefit of the Charges (collectively, the "**Chargees**") thereunder shall not otherwise be limited or impaired in any way by:

(a)     the pendency of these proceedings and the declarations of insolvency made in this Order;

(b)     any application(s) for bankruptcy order(s) issued pursuant to BIA, or any bankruptcy order made pursuant to such applications;

(c)     the filing of any assignments for the general benefit of creditors made pursuant to the BIA;

(d)     the provisions of any federal or provincial statutes; or

(e)     any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an "**Agreement**") that binds the Group and, notwithstanding any provision to the contrary in any Agreement:

(i)     neither the creation of the Charges nor the execution, delivery, perfection, registration or performance of any documents in respect thereof shall create or be deemed to constitute a new breach by the Group of any Agreement to which it is a party;

(ii)     none of the Chargees shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from the creation of the Charges, or the execution, delivery or performance of the Definitive Documents; and

(iii)     the payments made by the Group pursuant to this Order, and the granting of the Charges, do not and will not constitute preferences, fraudulent conveyances, transfers at undervalue, oppressive conduct or other challengeable or voidable transactions under any applicable law.

**ALLOCATION**

45.     Any interested Person may apply to this Court on notice to any other party likely to be affected for an order to allocate the Directors' Charge, the Administration Charge, or the DIP Lenders' Charge amongst the various assets comprising the Property.

**FOREIGN REPRESENTATIVE**

46.     The Monitor is hereby authorized and empowered to act as the foreign representative (in such capacity the "**Foreign Representative**") in respect of these proceedings for the purpose of having these proceedings recognized under chapter 15 of Title 11 of the United States Bankruptcy Code. The Foreign Representative is hereby authorized to apply for foreign recognition and approval of these proceedings, as necessary, in the United States of America.

-15-

**"STATUS QUO" OF GROUP'S LICENCES**

47.     The *status quo* in respect of the Group's licences, (excluding the Group's Canadian Grain Commission licences) but including the British Columbia Ministry of Forests, Lands, Natural Resource Operations and Rural Development grazing licences (collectively, the "**Licences**") shall be preserved and maintained during the pendency of the Stay Period any such Licences expiring during the Stay Period are deemed extended by a period equal to the Stay Period.

**INTERIM DISTRIBUTIONS**

48.     Subject to the Monitor being satisfied (following a review of the security and proprietary rights of stakeholders) that the Syndicate has valid and senior ranking security in respect of any of the Property of the Group, the Group is hereby authorized, without further order of this Court and in accordance with the Term Sheet, to make distributions from time to time first to any parties holding claims senior to the Syndicate in respect of such property, then in accordance with the distribution waterfall specified in the Term Sheet (the "**Distributions**").

49.     Should the Group sell any FCC Priority Collateral, the Group is authorized and directed, subject to the Monitor being satisfied (following a review of the security and proprietary rights of stakeholders) that FCC has valid and senior ranking security in respect of the FCC Priority Collateral, to distribute such proceeds of sale to FCC through such payment arrangements as otherwise directed by FCC (the "**FCC Distributions**").  The Group is hereby authorized and directed, without further order of this Court, to make the FCC Distributions from time to time through such payment arrangements as otherwise directed by FCC. Any proceeds realized from the sale of the FCC Priority Collateral which remain after the payment in full of amounts owing to FCC in respect of or relating to the FCC Loan Agreement, FCC Security, and/or FCC Priority Collateral, may be distributed in accordance with the Term Sheet and paragraph 48 above.

50.     The Group is hereby authorized to take all necessary steps and actions to effect the Distributions in accordance with the terms of this Order and the Term Sheet, and shall not incur any liability as a result of making the Distributions.

51.     Notwithstanding:

(a)     the pendency of these proceedings;

(b)     any application for a bankruptcy or receivership order now or hereafter issued pursuant to the BIA or other applicable legislation in respect of the Group or any of them, and any bankruptcy or receivership order issued pursuant to any such applications;

(c)     any assignment in bankruptcy made in respect of the Group or any of them;

(d)     any provision of any federal or provincial legislation,

-16-

the Distributions shall be made free and clear of all Encumbrances (including the Charges) and shall be binding on any trustee in bankruptcy or receiver that may be appointed in respect of the Group and shall not be void or voidable nor deemed to be a preference, assignment, fraudulent conveyance, transfer at undervalue, or other reviewable transaction under the BIA or any other applicable federal or provincial legislation, nor shall they constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

**SERVICE AND NOTICE**

52. The Monitor shall (i) without delay, publish in the Globe and Mail, Calgary Herald, and Regina Leader Post a notice containing the information prescribed under the CCAA; (ii) within five (5) days after the date of this Order: (A) make this Order publicly available in the manner prescribed under the CCAA, (B) send, in the prescribed manner, a notice to every known creditor who has a claim against the Group of more than $1,000, and (C) prepare a list showing the names and addresses of those creditors and the estimated amounts of those claims, and make it publicly available in the prescribed manner, all in accordance with section 23(1)(a) of the CCAA and the regulations made thereunder.

53. This Court further orders that a Case Website shall be established in accordance with the Guide with the following URL http://cfcanada.fticonsulting.com/MonetteFarms.

54. The Group or the Monitor, as applicable, are at liberty to serve this Order, any other materials and orders in these proceedings, or any notice or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, recorded mail, courier, personal delivery or electronic transmission to the Group's creditors or other interested parties at their respective addresses as last shown on the records of the Group, or as otherwise updated on the Service List (as defined below), and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on that business day, or if sent by ordinary mail or recorded mail, on the third business day after mailing.

55. Any Person that wishes to be served with any application and other materials in these proceedings must deliver to the Monitor by way of ordinary mail, courier, or electronic transmission, a request to be added to the service list (the "**Service List**") to be maintained by the Monitor. Subject to Rules 11.25 and 11.26 of the Alberta Rules of Court (the "**Rules**"), this Order shall constitute an order for substituted service pursuant to Rule 11.28 of the Rules.

56. Any party to these proceedings may serve any court materials in these proceedings by emailing a PDF or other electronic copy of such materials to the email addresses as recorded on the Service List from time to time, and the Monitor shall post a copy of all prescribed materials on the Monitor's website.

-17-

**GENERAL**

57.   The Group or the Monitor may from time to time apply to this Court for advice and directions in the discharge of its powers and duties hereunder.

58.   Notwithstanding Rule 6.11 of the Rules, unless otherwise ordered by this Court, the Monitor will report to the Court from time to time, which reporting is not required to be in affidavit form and shall be considered by this Court as evidence. The Monitor's reports shall be filed by the Court Clerk notwithstanding that they do not include an original signature.

59.   Nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager or a trustee in bankruptcy of the Group, the Business or the Property.

60.   This Court hereby requests the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in any foreign jurisdiction, to give effect to this Order and to assist the Group, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Group and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Group and the Monitor and their respective agents in carrying out the terms of this Order.

61.   Any interested party (including the Applicants and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days' notice to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

62.   This Order and all of its provisions are effective as of 12:01 a.m. Mountain Time on the date of this Order.

_____
Justice of the Court of King's Bench of Alberta